# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| SHIELDS OF STRENGTH,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE; LLOYD J. AUSTIN III, in his official capacity as Secretary of Defense; ARMY TRADEMARK LICENSING PROGRAM OFFICE; PAUL JENSEN, individually and in his official capacity as Director of the Army Trademark Licensing Program; U.S. MARINE CORPS TRADEMARK & LICENSING PROGRAM OFFICE; JESSICA O'HAVER, individually and in her official capacity as Director of the Marine Corps Trademark Licensing Office; NAVY TRADEMARK LICENSING OFFICE (OFFICE OF NAVAL RESEARCH); NADINE SANTIAGO, individually and in her official capacity as Director of the Navy's Trademark Licensing Program; AIR & SPACE FORCES INTELLECTUAL PROPERTY MANAGEMENT OFFICE; and APRIL ROWDEN, individually and in her official capacity as Director of the Air & Space Forces Trademark and Licensing Program,<br><br>        Defendants. | **Case No.**  6:21-cv-484 |

## ORIGINAL COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF AND DAMAGES

1.      Plaintiff Shields of Strength ("SoS") files this Original Complaint for declaratory and injunctive relief and damages against Defendants and alleges as follows:

## PRELIMINARY STATEMENT

2.      Plaintiff Shields of Strength is a private, faith-based business with a registered place of business in Beaumont, Texas.  Founded over two decades ago by Mr. John Kennedy Vaughan in 1998, SoS creates and sells military-themed items such as replica "dog tags" and jewelry.  Many SoS products include Bible verses, while other products draw upon the Bible as inspiration for encouraging words and phrases. The following graphics depict typical SoS dog tags:



Graphic 1. Shields of Strength dog tag with a USMC emblem and "Marine Sister" on one side, and Bible verse "1 Corinthians 13:7-8 [l]ove bears all things, believes all things, hopes all things, endures all things, love never fails" and source designation "Shields of Strength" on the other side.

ORIGINAL COMPLAINT                                                                                          2



Graphic 2. Shields of Strength dog tag with "Army Mom" on one side, Bible verse "1 Corinthians 13:7-8 [l]ove bears all things, believes all things, hopes all things, endures all things, love never fails" and source designation "Shields of Strength" on the other side.

3.      For 23 years, SoS has continuously supported members of the military and their loved ones by providing emblems that help them connect with their faith and express their support for their country, military, and loved ones.  SoS replica dog tags, in particular, are popular due to the messages they carry and encouragement they provide.  In fact, SoS replica dog tags are estimated to be the item "most often carried by members of the military in Afghanistan and Iraq [aside from the official insignias they wear.]"[1] So far, SoS has sold or donated over four million Shields of Strength dog tags.

4.      One notable example is that of Army Captain Russell Rippetoe who was tragically killed in action on April 3, 2003, while serving in support of Operation Iraqi Freedom.  He was wearing a SoS Joshua 1:9[2] dog tag.  Captain Rippetoe was the first combat casualty from Operation Iraqi Freedom to be buried at Arlington National Cemetery.  The following month, during the 2003

---

[1] STEPHEN MANSFIELD, THE FAITH OF THE AMERICAN SOLDIER, Chapter 2 "Shields of Strength," (Jeremy Tarcher, 1st ed. 2006).
[2] The dog tag worn by Captain Rippetoe bears an excerpt of Joshua 1:9: "I will be strong and courageous, I will not be afraid."

ORIGINAL COMPLAINT                                                                                    3

Memorial Day Ceremony at Arlington National Cemetery, President George W. Bush spoke of Captain Rippetoe's faith, and mentioned the SoS dog tag Captain Rippetoe wore as a source of great encouragement.[3]

5.      Historically, SoS enjoyed a well-established relationship with Defendant Department of Defense (the "DoD").  In December 2003, the DoD invited Mr. Vaughan to speak at the Pentagon, and SoS eventually sold its products in Army and Air Force Exchange Service ("AAFES") outlets.

6.      SoS's original replica dog tags had only an American flag on one side and a Scripture verse on the other.  In around 2001, an Army chaplain contacted SoS and commissioned the production of a replica dog tag with Army insignia.  Since then, many of SoS's military themed products have originated from specific requests by members of the DoD.

7.      For more than a decade before 2011, the DoD did not require SoS to obtain licenses in order to produce and sell military-themed products.  But after 2011, DoD officials from the Army, Navy, Air Force, and Marines informed SoS that it would need to obtain trademark licenses before continuing to sell military-themed products.  Despite the significant, newly-created financial and administrative burdens this imposed, SoS complied with the DoD directive and obtained trademark licenses from the U.S. Department of the Army ("Army"), U.S. Marine Corps ("Marine Corps"), and U.S. Department of the Air Force ("Air Force").  SoS was not able to obtain a license from the U.S. Department of the Navy ("Navy") because the Navy would not approve products that contained Bible verses and references.

---

[3] David Dodd/Fox News, *Shields of Strength Fox News*, YOUTUBE (2003), https://www.youtube.com/watch?v=0XvAXHqW-Ec

ORIGINAL COMPLAINT                                                                                        4

8.      In July 2019, over two decades after SoS began selling its military-themed products, a non-governmental organization, the Military Religious Freedom Foundation ("MRFF"), submitted complaints to various DoD Trademark Licensing Offices demanding that the DoD and individual service branches prohibit SoS from producing and selling DoD-licensed items that contain religious content.  Despite years of licensed sales of such items by SoS, the DoD and the service branches promptly complied with the MRFF's demands and sent SoS cease-and-desist notices prohibiting SoS from producing or selling licensed items with religious content.

9.      SoS files this action in order to freely exercise its religious liberties and continue making, selling, and donating its products free from impermissible and improper interference from the DoD and Service Branches.

## PARTIES

10.      Plaintiff Shields of Strength is a private, patriotic, faith-based business with a registered place of business in Beaumont, Texas. Its mission is "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ."

11.      Defendant United States Department of Defense is an executive branch department that coordinates and supervises all agencies and functions of the government related to the United States Armed Forces, including licensing and monitoring the use of military trademarks.[4]

12.      Defendant Lloyd J. Austin III is the Secretary of Defense. The Secretary is sued in his official capacity. The Secretary is responsible for the licensure of DoD Trademarks, service

---

[4] SoS does not concede that DoD and Service Branches own enforceable trademarks.  Nothing in this Complaint shall be interpreted as an admission regarding or acknowledgement of Defendants' alleged trademark rights.  SoS reserves all rights to object to or challenge any trademark rights or filings allegedly owned or owned by the DoD and Service Branches.

ORIGINAL COMPLAINT                                                                                      5

marks, certification marks, and collective marks to private companies he deems qualified to use such marks. *See* 10 U.S.C. § 2260. The Secretary authorized the promulgation and enforcement of DoD Instruction Number 5535.12.

13.     Defendant Army Trademark Licensing Program Office (the "Army TMLPO") is an executive branch department under the Department of the Army that licenses and monitors the use of Army trademarks.

14.     Defendant Paul Jensen is the Director of the Army Trademark Licensing Program. Defendant Jensen is sued in his official and individual capacities. Defendant Jensen is responsible for the licensure of Army trademarks, service marks, certification marks, and collective marks to private companies. Defendant Jensen's predecessor in office, Michael J. Sullivan, denied Shields of Strength a license for use of the Army logo alongside Bible verses.

15.     Defendant United States Marine Corps Trademark & Licensing Program Office (the "Marine Corps TMLPO") is an executive branch department under the United States Marine Corps that licenses and monitors the use of trademarks belonged to the Marine Corps.

16.     Defendant Jessica O'Haver is the Director of the Marine Corps TMLPO. Defendant O'Haver is sued in her official and individual capacities. Defendant O'Haver is responsible for the licensure of Marine Corps trademarks, service marks, certification marks, and collective marks to private companies. Defendant O'Haver denied Shields of Strength a license for use of the Marine Corps logo alongside Bible verses she deemed too "controversial."

17.     Defendant Navy Trademark Licensing Office (Office of Naval Research) (the "Navy TMLO") is an executive branch department under the United States Department of the Navy that licenses and monitors the use of trademarks belonged to the Navy.

18.     Defendant Nadine Santiago is Director of the Navy TMLO. Defendant Santiago is sued in her official and individual capacities. Defendant Santiago is responsible for determining what types of products can carry the Navy's trademark. Defendant Santiago denied Shields of Strength a license to use the Navy logo with Bible verses.

19.     Defendant Air & Space Forces Intellectual Property Management Office (the "Air & Space Forces IPMO") is an executive branch department under the United States Department of the Air Force that licenses and monitors the use of Air Force trademarks.

20.     April Rowden is the Director of the Air & Space Forces IPMO. Defendant Rowden is sued in her official and individual capacities. Defendant Rowden is responsible for the licensure of Air & Space trademarks, service marks, certification marks, and collective marks to private companies.

## JURISDICTION AND VENUE

21.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

22.     The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

23.     The Court also has jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

24.     The Court also has jurisdiction to review Defendants' unlawful actions and inactions and enter appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§701–706.

25.     The Court also has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–92 (1949).

ORIGINAL COMPLAINT                                                                                  7

26.     Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff resides in this judicial district, and events that give rise to the claims in this action occurred in this district.

27.     None of the DoD, the Army Trademark Licensing Program Office, the United States Marine Corps Trademark & Licensing Program Office, the Navy Trademark Licensing Office (Office of Naval Research), or the Air & Space Forces Intellectual Property Management Office (jointly the "DoD and Service Branches") enjoy sovereign immunity and may be subject to judicial review when, as here, they act outside the scope of their statutory authority.

## FACTS

### A.  SoS's Founding and Purpose

28.     Since childhood Kenny Vaughan chased a dream of winning a national championship in water-ski jumping.  But Mr. Vaughan feared failing and the dangers associated with the high-speed, high-risk sport.  To help calm his nerves before a tournament in 1996, his girlfriend, Tammie (now his wife), used a Sharpie to write Bible Scripture on the handle of his water-ski rope. Mr. Vaughan meditated on and prayed about that Scripture, and God's Comfort through His Word weaved a path from the ski rope handle to his head and ultimately to his heart. With peace in his heart, he overcame his fears and after 15 years of failure, Kenny finally realized his dream: He won the 1996 national ski jumping tournament.

29.     To remind himself of the lessons he learned, Mr. Vaughan engraved a dog tag with the Scripture from his ski rope handle.  This was the first "Shields of Strength" product he produced. He wore it under his shirt, but it did not take long for someone to notice and ask about it.  Mr. Vaughan shared his story and gave the dog tag away.  He made another one, and again gave it away to someone in need of hope. Mr. Vaughan eventually realized other people needed and wanted God's Word as much as he did, and it was at that moment "Shields of Strength" was born.

30.     In December 1998, the first SoS dog tags were placed in a store.  By 2001, stores across the country carried them and on one fateful day, they caught the eye of Colonel David Dodd. Colonel Dodd commanded the 86th Signal Battalion of the U.S. Army, and he and his troops were headed to Afghanistan for the start of Operation Enduring Freedom.  When he contacted the Vaughans about buying some SoS dog tags in bulk, the Vaughans donated five hundred of them at zero cost to Colonel Dodd for his combat-ready troops.

31.     This began a longstanding friendship and relationship between SoS and the United States military.  The most popular "tag" for soldiers was decorated with the U.S. Flag and engraved with the Bible verse Joshua 1:9.  It is this dog tag that made its way to a young Army Captain named Russell Rippetoe, a name that still brings tears to the eyes of those in the SoS family.

32.     In 2003, while serving in Iraq, Captain Rippetoe was killed in action while wearing a SoS dog tag.  He was the first American casualty of Operation Iraqi Freedom laid to rest at Arlington National Cemetery.

33.     The following month, during the 2003 Memorial Day Ceremony at Arlington National Cemetery, President Bush referenced the dog tag Captain Rippetoe was wearing and read the Bible verse engraved on it.  Following that, SoS received calls from various national media outlets and was overwhelmed with the number of people submitting new orders for its dog tags.

34.     One call came from Captain Rippetoe's father, Joe who was also a veteran of war. Joe was so moved by the SoS dog tags his son had worn that he wanted to make sure that each of the other soldiers from Captain Rippetoe's unit had one.

35.     The mission of Shields of Strength remains the same today as it was in the beginning: To share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ.

ORIGINAL COMPLAINT                                                                                               9

### B.  SoS's Customers and Creation of Its Products

36.    Since its founding, SoS has made over four million dog tags and has given hundreds of thousands of them to the U.S. military and other organizations.  In fact, bestselling author Stephen Mansfield wrote in his book, *The Faith of the American Soldier*, "aside from the official insignias they wear, [the SoS dog tag] is the emblem most often carried by members of the military in Afghanistan and Iraq."

37.    Over the years, the popularity of SoS's dog tags grew exponentially and crossed all demographics.  Churches use them as outreach tools, hospitals for encouragement, athletes for courage, military family members to show support for their loved ones and country, military members to self-identify and show support for their country and as a constant reminder of their faith, and thousands of others for the hope they instill while experiencing personal trials.

38.    As SoS's popularity grew, so did the variety of its dog tags.  From athletics to various vocations and hobbies, there is an SoS dog tag for almost every ministry or person.  Those who order and/or wear a SoS dog tag include police officers, fire fighters, NASA Astronauts, and EMS professionals. Many professional athletes from a wide range of sportswear SoS dog tags as well, including Reggie Wayne, Ryan Tannehill, Eddie Lacey, Tim Tebow, Ronnie Coleman, Richard Sherman, Earl Thomas, Ray Lewis, Christian Michael, and Robert Griffin III.

39.    By far the largest group of SoS customers is current and former military members and their families and friends.  One of the reasons that SoS's dog tags are so popular with this group is that the the DoD and Service Branches do not offer or provide such dog tags or similar products.  As a result, military members and their families and friends turn to SoS.

40.    The majority of SoS's sales have been (i) online through SoS's website and the Army & Air Force Exchange Service ("AAFES") platform, and (ii) to Military chaplains and

commanders who approached SoS to request custom dog tags.  In addition to the U.S. military, numerous members of divisions of foreign militaries, including the Canadian Armed Forces, Israel Defense Forces, and British Royal Army, have contacted SoS to purchase and/or customize dog tags.  SoS also makes dog tags for law enforcement departments, rescue organizations, and church groups.

41.     Prior to 2011, SoS created and sold or donated approximately three million different dog tags that displayed U.S. military-related words and/or insignia.  The dog tags were available in military exchanges worldwide for years.  At one point, SoS was sending five hundred to one thousand dog tags per month to the Pentagon Chaplain's office for Pentagon leadership and military guests.  SoS also supported the next generation of the military.  For example, SoS donated twenty thousand dog tags per year to Marines who graduated from boot camp.  Every Marine at Camp Pendleton was given an SoS Marine Corps-themed dog tag along with their Eagle Globe and Anchor when they became a Marine upon graduating boot camp. The entire graduating classes from West Point each received a Shields of Strength dog tag upon graduation.  At one point, SoS made as many as fifteen thousand dog tags for several entire Divisions of the U.S. military at the request of their Chaplains and Commanding Generals.

42.     It is a tradition in many U.S. military units, for example, the Army's Red Bull unit, 10th Mountain Division, 82nd Airborne, multiple Ranger Battalions, and the Marine Corps' Camp Pendleton, to order custom-designed dog tags from SoS.  Many of these units have ordered as many as five to ten thousand pieces each year for over a decade.  Typically, SoS fulfills each of these custom-design orders by developing a new design based on feedback regarding past designs for these units and elements preferred by these units.  In fact, then General Lloyd Austin (now Secretary of Defense Lloyd Austin) requested thousands of SoS dog tags for the 3rd Infantry

ORIGINAL COMPLAINT                                                                                                11

Division and the 10th Mountain Division of the Army between 2003 and 2005.  Secretary Austin

actually began a tradition with the 10th Mountain Division that lasted until the Army Trademark

Licensing Program informed SoS that it could no longer make the dog tags.  An example of an

SoS dog tag created for the 3rd Infantry Division with the unit logo and the Scripture verse Joshua

1:9 is below. More examples of such tags are provided in Exhibit A.



43.    The impact that SoS's dog tags have had on U.S. soldiers, as a source of comfort

and inspiration, has been documented in several books written by independent authors.  In *The

Faith of the American Soldier*, Stephen Mansfield describes one touching example of the

inspiration that SoS dog tags provided for our military:

> [A] black Marine known for his sonorous voice leads a responsive
> declaration of Joshua 1:9.  While the men say the words in unison,
> some will kiss the little Shield of Strong from which the words come.
>
> I will be strong and courageous.
> I will not be terrified, or discouraged;

ORIGINAL COMPLAINT                                                                                  12

> For the Lord my God is with me
> Wherever I go.
>
> When the black Marine says "Amen," all the others … say "Amen"
> after him, and this is the sign to disband and move out.[5]

Chaplain (Captain) Don Williamson shares a story about how he used his SoS dog tag to encourage

a wounded soldier on a medical evacuation helicopter:

> As they bundled him up, I got down and put my mouth close to his
> ear.  I whispered to him Joshua 1:9 and told him to stay strong and
> courageous.  He nodded and closed his eyes.  I wanted to give him
> something to hang on to.  Then I remembered the Shield of Strength
> that I had on my dogtag chain.  I quickly took it off and slipped it
> into the palm of his hand.[6]

These stories illustrate how U.S. military members have relied on the SoS dog tags as an expression

of their religious faith and source of strength while on the battlefield.

      44.    Despite having never advertised to foreign militaries or solicited business from them,

the popularity of SoS's products spread worldwide. Over the years, foreign military members also

became acquainted with SoS and began requesting their own SoS dog tags.  SoS made dog tags

displaying Bible verses for soldiers of many of America's allies from the Canadian Armed Forces,

Israeli Defense Forces, and British Royal Army.  And in each case, a member of these militaries

reached out directly to SoS.  For instance, in 2009, SoS received an email request from a member

of the British Royal Army to make unique SoS dog tags for Royal Army soldiers.  At their request,

SoS even customized the dog tags to spell the words so that they are consistent with "a British

point of view … E.g. [changing] 'Savior' into 'Saviour'."  The Royal Army has ordered as many

---

[5] STEPHEN MANSFIELD, THE FAITH OF THE AMERICAN SOLDIER, pp. 174-175, (Jeremy Tarcher, 1st ed. 2006).
[6] Chaplain (Captain) Don Williamson, Bringing Courage to the Courageous, p. 59, (Xulon Press, Sept. 2010).

ORIGINAL COMPLAINT                                           13

as eight thousand SoS dog tags at a time for their troops, all of which were donated free of charge by SoS.

### C. SoS Design Process

45.    Each SoS dog tag is created for the sole purpose of encouraging and strengthening the hearts of its recipient.  SoS's goal is to give a military member something to hang on to that is meaningful to them and will encourage their hearts in the midst of fear.  Military members worldwide are grateful to represent their service, to defend their flag, and show they trust God to go with them on their mission.  Our own military members are particularly grateful to proudly represent their branch as they serve to defend America and the American flag, with a deep trust that God will accompany them on their mission.

46.    With this in mind, SoS designs each dog tag by thoughtfully placing and arranging the American or relevant national flag, the name or insignia of the military branch or unit to which the recipient belongs, a cross, and/or a Scripture verse, and most often Joshua 1:9 or Psalm 91,[7] because military members have told SoS that these Scripture verses encourage them the most. Each of SoS's dog tags contains less than two square inches of surface area, thus requiring careful consideration of the placement and arrangement of the foregoing elements to ensure that the dog tag effectively conveys the intended message.

47.    Many military members ask for dog tags for their family members—such as spouses, mothers, and fathers—because the family members share the burden with the military members and want their own SoS dog tags for encouragement.  In response to such requests, SoS has designed dog tags for military family members, such as, the Army Wife dog tag, by thoughtfully

---

[7] "He who dwells in the shelter of the Most High will rest in the shadow of the Almighty. I will say of the Lord, 'He is my refuge and my fortress, my God in whom I trust.'" Psalm 91 : 1-2

ORIGINAL COMPLAINT                                                                                                    14

using the flag, a cross, a personal identity (e.g., Army Wife) and a Scripture verse.  Because a military wife's battle is different from a soldier's, SoS chooses a Scripture tailored to encourage them.  SoS also asks military family members which Scriptures are the most meaningful to them. Similarly, SoS asks their preferences on and personal connections to each potential design element.

48.     SoS typically invests an average of two to four months and two thousand to five thousand dollars in each dog tag design before producing it on a larger scale.

49.     There are two main categories of military-related dog tags sold by SoS.  The first are developed and designed independently by SoS for sale in military exchanges.  The second are designed for specific military units based on custom design orders.

50.     The design process for both categories is very similar.  With thoughtful attention to detail, numerous staff at SoS participate in the initial discussion regarding new designs.  After the initial discussion, SoS continues to extensively research which design elements are likely to be more meaningful for the target audience of the particular dog tag.  For custom orders, SoS's team asks the military unit their preferences of design elements and Scriptures.

51.     After the information is gathered, graphic designers create rough sketches. For the SoS-designed dog tags, the sketches are then shown to focus groups comprised of individuals affiliated with the military for input.  Sketches of custom ordered dog tags are shown to the military unit(s) that placed the order(s) to obtain their feedback regarding the design.

**D.  SoS's Use of Military Words & Insignia**

52.     SoS's dog tags created for and sold or distributed to military members and their families and friends are a form of artistic expression.  Each dog tag is thoughtfully designed with the intention of: (i) identifying or describing the recipient's role in or relationship to the military,

(ii) conveying their support for the military and pride in their country, and (iii) expressing their religious faith.

53.     As a result, SoS's military-themed dog tags typically display the name or insignia of the military branch or unit to which the recipient or their family member or friend belongs.  For example, SoS dog tags designed for members of the Army or Air Force have displayed "U.S. Army" or "U.S. Air Force" and Army or Air Force insignia on one side, with a Bible verse on the other side.  SoS dog tags intended for parents of members of the Navy have displayed "Navy Mom" or "Navy Dad" along with an American flag and cross on one side, and a Bible verse on the other side.  An example of SoS's military-themed dog tags is shown below:



54.     SoS's use of military-related words and insignia is artistically relevant to the purpose of its dog tags, namely, to identify the individuals wearing them and convey their support of the military or patriotism, while also connecting them with and expressing their religion.  Indeed, and at a minimum, the use of the generic and/or descriptive words such as "Army," "Navy, "Marine(s)," and "Air Force" is necessary to accomplish that purpose.

55.     Nothing on SoS's website, advertising and promotional materials, packaging, or the products themselves have ever contained any indication that SoS or its products are affiliated with

the DoD and Service Branches.  To the contrary, unless expressly prohibited by an agreement with a Service Branch, SoS's website, advertising and promotional materials, packaging, and the products themselves have always prominently displayed SoS's SHIELDS OF STRENGTH name and logo.

56.     For almost two decades, SoS had a well-established and friendly mutual relationship with the DoD and Service Branches.  In fact, for over a decade prior to 2011, the DoD and Service Branches acquiesced to—and often affirmatively consented to or encouraged—SoS's sale or distribution of products displaying (i) military words and insignia and (ii) Bible verses without a trademark license.

### E.  SoS's Well-Established Relationship with the DoD

57.     For almost two decades, SoS had a well-established relationship with the DoD and Service Branches.  In December 2003, the DoD invited Mr. Vaughan to speak at an event held at the Pentagon.  Following the speech, several DoD employees approached Mr. Vaughan and requested that SoS place its products in Army and Air Force Exchange Service ("AAFES") outlets.  At that time, the DoD and Service Branches did not require SoS to obtain a license to sell its products displaying military words or insignia and Scripture verses.  In fact, for over a decade before 2011, the DoD and Service Branches allowed SoS to sell products displaying (i) trademarks of the DoD and Service Branches and (ii) Bible verses without a license.

### F.  The DoD's Trademark Policy

58.     The DoD and Service Branches claim rights in and own U.S. trademark registrations for numerous word marks and insignia.[8]

---

[8] Plaintiff does not concede that the DoD and Service Branches own enforceable U.S. trademarks or other relevant rights.

59.     18 U.S.C. §506 provides that Department of Defense and Military Seals ("Seals") (i.e., the official seals of each of the service branches) are limited to official use by DoD personnel. However, 18 U.S.C. §506 does *not* restrict the use of other trademarks of the DoD and Service Branches (the "DoD Trademarks").  Instead, the DoD cites the 10 U.S.C. § 2260, 32 C.F.R. § 507.10, and the Lanham Act as the legal bases for enforcing DoD Trademarks.

60.     The DoD Trademarks include, *inter alia¸* terms comprised of ARMY, NAVY, MARINES, or AIR FORCE, as well as designs and other insignia.

61.     Within the DoD, each of the service branches has its own office for licensing its trademarks.  Entities that seek to license DoD Trademarks must apply and negotiate for licenses from each of the offices for the respective service branches.  Under 10 U.S.C. § 2260, the Secretary of Defense may "license trademarks, service marks, certification marks, and collective marks owned or controlled by the Secretary . . . to any qualifying company upon receipt of a request from the company."  Furthermore, "a qualifying company is any United States company that . . . is determined by the Secretary concerned to be qualified in accordance with such criteria as determined appropriate by the Secretary of Defense."

62.     However, internal instructions within the DoD provide unconstitutional limits that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."[9]

63.     Upon information and belief, the Army Trademark Licensing Program Office, the United States Marine Corps Trademark & Licensing Program Office, the Navy Trademark

---

[9] Trademark Licensing Program Requirement and Process, Para. D., Department of Defense Instruction Number 5535. 12.

ORIGINAL COMPLAINT                                                                                          18

Licensing Office (Office of Naval Research), and the Air & Space Forces Intellectual Property Management Office actively license DoD Trademarks to third parties for commercial use.

### a.  SoS's U.S. Army License

64.   For over a decade before 2011, SoS sold U.S. and foreign military-themed products without a license.  Included in the military-themed products that SoS sold before 2011 are those identified in Exhibit A.  During this period, the Army did not enforce any of its alleged trademarks against SoS, nor did it communicate to SoS that a license was required.  Indeed, the Army encouraged SoS's creation and distribution of Army-themed products.  For example, Mr. Paul Jensen, in his official capacity as the Director of the Army Trademark Licensing Program, told Mr. Vaughan that "One of our Licensees, K&S Unique, had some of your [dog tags] there. We talked about you and the [dog tags]. I got to witness a little bit on the job . . . Amazing how God works."

65.   Furthermore, the Army did not apply for a trademark for the word "ARMY" or "U.S. ARMY" until September 2001 despite claiming a date of first use of July 1923.  The Army received its first trademark registration for "ARMY," U.S. Trademark Registration No. 27034279 on September 17, 2002 for "Posters, decals, stickers, brochures and catalogs about sports and sporting activities, printed matter namely, schedules of sporting events, note pads, note cards, postcards, bumper stickers, ink pens and pencils" in Class 16 and "entertainment services, namely, arranging and conducting athletic competitions; Educational services, namely, providing training and instruction in sport and sporting activities" in Class 41.

66.   In 2011, the Army Trademark Licensing Program Office (the "Army TMLPO") first notified SoS that it would need to obtain a license to continue selling Army-themed products. Rather than disagree, and in an attempt to maintain their longstanding relationship, SoS began the process of obtaining a license from the Army to display trademarks registered by the Army on SoS

products.  In an April 18, 2011, email exchange, Mr. Vaughan asked the Army TMLPO Director, Mr. Paul Jensen, whether SoS "will be able to use the Army logo or seal on a [dog] tag?"  Mr. Jensen responded, "Yes, absolutely.  You would be able to use the Army logo, which I have attached."  Nevertheless, SoS was not able to immediately obtain a license.

67.    On May 7, 2012, Mr. Vaughan emailed the Army asking why the Army might decline to issue a license and whether there is "something written in the Army license guidelines that excludes this type of item."  Despite Mr. Jensen's previous assurance that SoS would "absolutely" be able to use the Army logo, he responded:

> If it's not approved, it would most likely be due to the biblical scripture.  There is a big concern in the Army right now, as some religious groups have been challenging the Army on different issues.

68.    At some point thereafter in 2012, the Army granted a license to SoS to display Army trademarks on its products.

69.    SoS's license from the Army authorized SoS to use only three specific Biblical phrases on licensed items:

  a) I will be strong and courageous. I will not be terrified or discouraged.
  b) I can do all things.
  c) Mount up with wings like eagles, run and not get [tired], [walk] and not become weary.

70.    Although the Army license authorized SoS to use three Biblical phrases, the Army did not permit SoS to identify the source of those phrases as Bible verses.  This restriction substantially burdened SoS's ability to exercise its sincerely held religious beliefs.

71.    Under the terms of its license from the Army, SoS was not permitted to display any other religious words or symbols on its Army-themed products.  This restriction substantially burdened SoS's ability to exercise its sincerely held religious beliefs.

ORIGINAL COMPLAINT                                                                 20

72.     On October 26, 2020, the Army offered to renew SoS's license.  On December 8, 2020, while in the license renewal negotiation period, Mr. Vaughan requested the following change to SoS's Army license:

"The licensed articles may contain the following phrases and citations:
1)  'I will be strong and courageous. I will not be terrified, or discouraged; for the Lord my God is with me wherever I go.' Joshua 1:9
2)  'I can do all things through Christ who strengthens me.' Philippians 4:13
3)  'But those who hope on the Lord will renew their strength. They will soar on wings as eagles; they will run and not grow weary; they will walk and not be faint.' Isaiah 40:31
4)  'He who dwells in the shelter of the Most High will rest in the shadow of the Almighty. I will say of the Lord, "He is my refuge and my fortress, my God, in whom I trust."' Psalm 91:1-2
5)  'Greater love has no one than this: to lay down one's life for one's friends.' John 15:13
6)  'May the Lord watch between you and me while we are apart.' Genesis 31:49
7)  'Yea though I walk through the valley of the shadow of death I will fear no evil, for Thou art with me, Thy rod and Thy staff, they comfort me.' Psalm 23:4
8)  'Then I heard the voice of the Lord saying, "Whom shall I send? And who will go for us?" And I said, "Here am I, send me!"' Isaiah 6:8"

73.     In his request to make the aforementioned change to the license agreement, Mr. Vaughan also offered to include on all SoS product packaging and advertising a disclaimer that the Army does not endorse SoS or its licensed products.

74.     On March 25, 2021, Mr. Michael J. Sullivan, then the Director of the Army Trademark Licensing Program, rejected Mr. Vaughan's request stating

"DoD policy prohibits us from licensing marks for any purpose intended to promote religious beliefs (including non-belief).  *See* Department of Defense Instruction 5535.12, Branding and Trademark Licensing Program Implementation. Accordingly, we cannot accept the changes you requested to the terms of your agreement as the citations violate DoD policy."

75.     In September 2021, when SoS's license from the Army expired, SoS waited for the Army's approval to extend the sell-off period provided by its license.

ORIGINAL COMPLAINT                                                                                          21

76.     While the Army has since conceded that SoS may sell products using the word "army," such as "Army Mom" without a license, it will no longer license SoS's products for use with the Army logo. Eventually, the Army declined to renew SoS's license.

### b.  SoS's U.S. Marine Corps License

77.     For over a decade prior to 2011, the Marine Corps did not require SoS to obtain a license to sell Marine Corps-themed products.  In 2011, the Marine Corps TMLPO representative, Mr. Phillip Greene, first notified SoS it would either need to obtain a license to continue selling Marine Corps-themed products, or alternatively, SoS could sell products so long as it did not promote those products as being licensed by the Marine Corps.  Accordingly, SoS began the process of obtaining a license from the Marine Corps to use Marine Corps trademarks on SoS products.

78.     On July 20, 2011, Mr. Greene sent Mr. Vaughan an email stating "we do not feel comfortable licensing religious materials."

79.     Between 2011 and 2017, SoS sold its products without a license and refrained from stating that the products were licensed by the Marine Corps.

80.     In 2017, AAFES, the distributer for the dog tags, contacted Mr. Vaughan by email stating that it wanted a copy of SoS's license to sell Marine Corps dog tags. Mr. Vaughan explained to AAFES that he was told that he did not need a license to sell his dog tags as long as the products did not say they were licensed by the Marine Corps. AAFES asked if Mr. Vaughan could get that guidance confirmed in writing from the Marine Corps license department.

81.     On May 15, 2017, Ms. Jessica O'Haver of the Marine Corps TMLPO said although that was the guidance in 2012, she previously sent Mr. Vaughan the "new" DOD policy issued in 2013 prohibiting DOD licenses "for any purpose intended to promote . . . religious beliefs

(including non-belief) . . . " Mr. Vaughan asked for the emails or any communications updating SoS on the new policy because he did not receive it, but Ms. O'Haver never responded to that request.

82.     At this point, Mr. Vaughan decided that since the Marine Corps would not confirm that he could continue selling SoS's dog tags without a license, he needed to obtain a license to continue selling the products. Mr. Vaughan began consistently contacting the Marine Corps by phone and email asking about how he could obtain a license for the SoS dog tags.

83.     On June 26, 2017, Ms. O'Haver stated by email that although SoS *could* display trademarks owned by the Marine Corps on products also displaying Biblical passages, SoS "would need to keep the chapter and verse reference out of the product designs," and the Marine Corps "couldn't allow for Marine Corps branded products with more controversial passages that may offend some (hell, brimstone, lake of fire, eternal damnation, etc.)."   Ms. O'Haver did not define what might constitute "controversial."

84.     Finally, on August 16, 2018, after a lengthy and difficult negotiation process, the Marine Corps issued a license to SoS.  SoS then began producing Marine Corps-themed items in accordance with the written terms of its license, and Mr. Vaughan's email and verbal agreement with Ms. O'Haver that permitted SoS to use Biblical references in the form of inspirational words as long as it avoided using "controversial" passages or Scripture verses on licensed products.

85.     Unlike the Army license, the Marine Corps license did not limit SoS's ability to display religious references on licensed items.  Accordingly, some of SoS's Marine Corps-themed products included the aforementioned religious references,[10] yet SoS at all times complied with the June 26, 2017 request to avoid "controversial" passages.  However, cease and desist letters

---

[10] See ¶62, supra.

ORIGINAL COMPLAINT                                                                                    23

from the Marine Corps TMLPO have significantly lowered the number of licensed items sold by SoS.

86.    In October 2021, the USMC Trademark office provided the following reasons to deny SoS's request to renew its license:

1) SoS did not submit a royalty report in 2020 as required by the license and only paid its annual minimum guarantee when invoiced
2) That the license costs the USMC Trademark Program more in program costs than it generates in royalty-revenue.

87.    SoS did send the four quarterly royalty reports. The minimum revenue is determined after the USMC receives annual royalty reports.  The Marine Corps' can only determine that the SoS program cost more than it generates in revenue after it receives the royalty report.  Further, SoS paid the annual minimum guarantee of $600, therefore the USMC does not lose revenue.

88.    On one hand, the USMC substantially burdened SoS's ability to exercise its sincerely held religious beliefs and suppressed SoS's exercise of its freedom of speech by restricting the products SoS could make or sell.  On the other, the USMC cited to SoS's low revenue—which was a direct result of USMC's severely limiting the products SoS was allowed to sell—as a reason to deny SoS's license renewal request.

89.    SoS's most recent license from the Marine Corps expired on August 26, 2021. Citing economic reasons, the USMC Trademark Office denied SoS's request to renew its license. SoS is currently in negotiations with the USMC to extend the sell-off period of its current inventory.

### c.  SoS's U.S. Navy License

90.    In 2019, Mr. Vaughan applied for a trademark license from the Navy Trademark Licensing Office (the "Navy TMLO").  The Navy TMLO made it clear that they would not grant a license to SoS due to the fact that their products display Scriptural verses.

91.     During the process, Mr. Vaughan spoke with Ms. Santiago from the Navy TMLO regarding SoS's application for a Navy trademark license.   The representative informed Mr. Vaughan that SoS's application had been received, but that DoD policy prohibited the use of Bible verses on products displaying trademarks registered by the Navy.   The representative further suggested that the Navy would approve a license with terms similar to those approved by the Army—for example, the inclusion of Bible verses would be permitted so long as SoS did not identify the source of those verses as the Bible.

92.     The Navy ultimately did not approve a trademark license with SoS.

### d.  SoS's U.S. Air Force License

93.     SoS attempted to negotiate a license from the Air Force as early as 2014. In 2014, one of SoS's attempts to negotiate a license from the Air Force was denied because the Air Force Branding & Trademark Licensing Program (the "Air Force BTLP") found that the phrase "I will be strong and courageous, I will not be afraid" to be a "religious" phrase, even without identification of the source of the verse as the Bible.

94.     On October 18, 2017, the Air Force granted SoS a license to continue selling its Air Force-themed products.

95.     SoS's Air Force license agreement does not limit SoS's ability to include Bible verses on licensed items.

96.     In 2017, however, Air Force BTLP responded that "we're still unable to license faith based products.  In accordance with DODI 5535.12, dated 13 September 2013, DoD marks may not be licensed for use in a manner that promotes religious beliefs (including non-belief)."  In 2019, Ms. April Rowden asked SoS to submit "all other merchandise" for approval, and reminded SoS

that "the language on Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work – including in the product description."

97.     The Air Force's restriction substantially burdened SoS's ability to exercise its sincerely held religious beliefs.

98.     The Air Force license was termed for 36 months from October 1, 2017 to September 30, 2020.

### G.  The DOD and the Military Branches Expand Their Constitutional Violations at the Urging of the Military Religious Freedom Foundation

99.     On July 8, 2019, the Military Religious Freedom Foundation ("MRFF"), a private organization that advocates for a so-called "separation of Church and state" in military affairs, sent the Army TMLPO, Marine Corps TMLPO, and Navy TMLO [11] each a letter threatening "administrative and litigation complaints" to "compel compliance" unless they prohibited SoS from selling Marine Corps-licensed items that include religious references.

#### a.  The Army's Response to the MRFF Letter

100.    On August 12, 2019, after seven years without incident or complaint involving SoS, but only one month after receiving the MRFF letter, the Army TMLPO sent an email to SoS.  The subject of the email was "Negative Press."  In the body of the email, the Army TMLPO issued the following directive to SoS:

> "You are not authorized to put biblical verses on your Army products. For example Joshua 1:9. Please remove ALL biblical references from all of your Army products."

---

[11] SoS does not hold a trademark license with the U.S. Navy and thus does not produce or sell Navy-themed items.

101.   The Army TMLPO then included a URL to an article on the "Friendly Atheist" website that discussed a purported "Cease and Desist" letter from the MRFF to the U.S. Navy and the U.S. Marine Corps.  The MRFF letter threatened "administrative and litigation complaints" to "compel compliance" unless SoS stopped including religious references on its DoD-licensed products.

### b.  Marine Corps' Response to the MRFF Letter

102.   On July 11, 2019, just three days after MRFF threatened "administrative and litigation complaints" against the Marine Corps, Mr. Phillip Greene, Marine Corps Trademark Counsel, immediately complied with the MRFF's demands and sent a cease-and-desist notice to SoS on behalf of the Marine Corps.

103.   On information and belief, Mr. Greene sent the letter to SoS at the request of Defendant O'Haver.

104.   The cease-and-desist notice—which was addressed from Mr. Phillip Greene, trademark counsel for the Marine Corps— referenced multiple conversations between the Marine Corps TMLPO and Mr. Vaughan in which the Marine Corps TMLPO allegedly issued guidance prohibiting the inclusion of religious expression on Marine Corps-licensed products.

105.   The cease-and-desist notice does not reference his June 26, 2017 email expressly authorizing SoS to use religious expression on Marine Corps-themed items.

106.   The cease-and-desist notice further stated that SoS's "conduct in the coming weeks will have a bearing on whether or not the USMC in fact terminates your company's license, as we are strongly considering doing so."

107.   SoS's license from the Marine Corps is dated August 16, 2018, and it does not contain any restriction or limitation on the use of religious passages or symbols.

ORIGINAL COMPLAINT                                                                                       27

108.   Between (i) August 16, 2018, the date on which the Marine Corps granted a trademark license to SoS, and (ii) July 11, 2019, the date on which Mr. Greene chose to comply with the MRFF's demands and sent a cease-and-desist notice to SoS, the Marine Corps TMLPO expressed no concern or issues with SoS' products that displayed religious passages or symbols.

109.   On December 18, 2019, Mr. Greene sent Mr. Vaughan another email stating:

"Frankly, I'm at a loss as to what you're not understanding here.  In July, I went to great lengths to explain to you that we could not tolerate merchandise that had a) Marine Corps trademarks and b) a religious theme."

110.   SoS has since sought to restore its trademark license with the Marine Corps, but to no avail.

111.   The Marine Corps' severe restrictions on SoS's Marine Corps license agreement and SoS's use of Marine Corps trademarks—in violation of the terms of the license agreement and Mr. Vaughan's agreements with Ms. O'Haver—substantially burden SoS's ability to exercise its sincerely held religious beliefs.

### c.  The Air Force's Response to the MRFF Letter

112.   On July 9, 2019—just one day after the MRFF letter of complaint and despite the absence of any limitation in its license agreement—Ms. April Rowden of the Air Force Intellectual Property Management Office, Branding, Band Support, & Trademark Licensing, sent Mr. Vaughan an email asking that he "review all your USAF-branded merchandise and verify they are using inspiration quotes instead of quoted scripture."

113.   On July 25, 2019, Ms. Rowden sent Mr. Vaughan an email stating "the language on the Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work – including in the product description."

114.   Due to the DoD's arbitrary and capricious denial of trademark license applications, SoS, a business established upon the support for and from members of the military community, was unable to manufacture any products bearing DoD Trademarks, including any military terms or insignia.

115.   SoS's mission, which is rooted in its sincerely held religious beliefs, compel it to share God's Word with others by including religious passages and symbols on its products, including its military-themed dog tags.  Accordingly, SoS cannot remove or obscure the religious expression because to do so would be to violate its mission and sincerely held religious beliefs.

## FIRST CAUSE OF ACTION: FIRST AMENDMENT

### Free Exercise Clause

116.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

117.   The First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral and non-generally applicable laws or policies unless they are narrowly tailored to a compelling government interest.

118.   DODI No.5525.12 is not a neutral and generally applicable government policy. DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change." The exclusion of "religious belief" in DODI No.5525.12 renders it non-neutral and non-generally applicable. As such, it is subject to strict scrutiny.

119.   The DoD cannot justify its ban on "religious belief" by any narrowly tailored compelling government interest.  First, the DoD does not have a compelling interest in eliminating

religious belief from its licensure of trademarks because it allows SoS to print the actual verses on the dog tags, just not the particular Scripture reference.  Second, DODI No.5525.12 is not narrowly tailored because the DoD could, inter alia, simply require SoS to print a small disclaimer on all packaging indicating that SoS dog tags with DoD trademarked logos do not represent the views of the DoD.

120.   SoS is aggrieved by DODI No.5525.12 and the DoD's actions because it cannot follow its religious calling to manufacture, sell, and donate dog tags and other products that contain both the DoD logos and specific references to Bible verses.  As a result, SoS cannot share the love and hope of Jesus Christ with military service members, their families, and the public.

121.   SoS has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages under RFRA, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION: FIRST AMENDMENT

### Establishment Clause

122.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

123.   The First Amendment's Establishment Clause does not only forbid the government from formally establishing religion, it also prohibits the government from officially favoring or *disfavoring* particular religious viewpoints or expression.[12]  The DoD's directive that SoS remove all Biblical references from its products demonstrates precisely the type of government hostility towards religion that the Establishment Clause forbids.

---

[12] *See Good News Club v. Milford Central Sch.*, 533 U.S. 98, 115 (2001).

124.    Additionally, the DoD's internal policy provide that "DoD marks may not be licensed for any purpose intended to promote … religious beliefs …."  These policies fall under the type of government hostility towards religion that the Establishment Clause forbids.[13]

125.    The DoD has reiterated in various occasions that SoS's designs with verses that have Biblical origins are acceptable, if such verses are used *without* Biblical citations or references. Clearly, the DoD and its various branches' reluctance with licensing their Trademarks to SoS did not stem from the language or underlying message of the Scripture; instead, their hostility are based on their blatantly anti-religious positions.  This is, once again, precisely the type of government hostility towards religion that the Establish Clause forbids.

126.    SoS has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages under RFRA, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION: FIRST AMENDMENT

### Expressive Works

127.    SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

128.    SoS thoughtfully and creatively selects and arranges the content on the dog tags so that they convey unique, succinct, compelling, and profound messages to their owners while also depicting creativity and artistry.  The dog tags are two- or three-dimensional artworks.  They are embodiments of SOS's artistic expression and are entitled to First Amendment protection.

---

[13] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.

129.   Numerous courts have held that the Lanham Act only applies to expressive works if the plaintiff establishes one of the two requirements: either the use of the mark is not artistically relevant to the underlying work, or that it explicitly misleads consumers as to the source or content of the work.   The public policy reason is that protection of expressive works under the First Amendment trumps trademark infringement claims under the Lanham Act.[14]  A work need not be the "expressive equal of Anna Karenina or Citizen Kane" to show artistic relevance to the underlying work, and is not rendered non-expressive simply because it was sold commercially.[15] The use by SoS of DoD Trademarks is both artistically relevant to SOS's dog tags, and does not explicitly mislead consumers.   SoS's products creatively convey different combinations of a customer's identity as a member of the military, a customer's support of the military, a customer's religious beliefs, and/or simply patriotism.   SoS's use of DoD Trademarks in SoS's products is not gratuitous or irrelevant.   The dog tags have a particular meaning to the wearer, and serve to memorialize, celebrate, remember, inspire, praise, and respect.   The likelihood of confusion is nonexistent at least because most of SoS's customers are members of the military (or their families), and they understand the distinction between SoS's products and other products bearing DoD Trademarks even better than the general public.   Therefore, SoS's Freedom of Speech rights outweigh the DoD's trademark rights.[16]

---

[14] *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d. Cir. 1989); *VIP Prods. LLC v. Jack Daniel's Properties, Inc.*, 953 F.3d 1170 (9th Cir. 2020) (cert. denied)
[15] *VIP Prods. LLC v. Jack Daniel's Properties, Inc.*, 953 F.3d at 1174.
[16] SoS does not concede that DoD    has enforceable trademark rights, or that it has infringed the DoD Trademarks in any manner.

ORIGINAL COMPLAINT                                                                                          32

130.    Although SoS benefits economically from its speech, SoS's speech is principally based on religious convictions and should be categorized as noncommercial.[17] Thus, SoS's expressive use of DoD Trademarks is a type of protected speech under the First Amendment.

## FOURTH CAUSE OF ACTION: FIRST AMENDMENT

### Freedom of Speech

131.    SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

132.    The Free Speech clause of the First Amendment restricts government regulation of private speech, but not government speech.

133.    The DoD Instruction Number 5535.12 ("DODI No.5535.12"), Trademark Licensing Program Requirement and Process, provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."[18]

134.    By making its trademarks available for private citizens to license, the DoD has created a limited public forum for such private citizens.[19] Therefore, the administration of DoD Trademark licensing regime is not government speech, and the DoD may not discriminate against speech based on viewpoint.

135.    Additionally, the DoD's trademark licensing regime does not amount to government speech.  Historically, the DoD has not used the particular medium at issue—licensing trademarks to merchants who wish to show their support of the military.  In fact, the DoD did not start policing

---

[17] *See Smith v. Wal-Mart Stores, Inc*., 537 F. Supp. 2d 1302, 1309 (N.D. Ga. 2008).
[18] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.
[19] *See Gergich v. Leath*, 861 F.3d 697 (8th Cir. 2017).

ORIGINAL COMPLAINT                                                                                          33

the use of DoD Trademarks until 2011.  Further, there is no indication that members of the public associate merchants' use of such trademarks with the U.S. government or as endorsed by the U.S. government.

136.   As noted, the DoD's restrictive trademark licensing policy is discriminative censorship toward SoS's speech based on religious viewpoint.  It is also a wrongful restriction of protected political speech.  By denying SoS's ability to use DoD Trademarks, the DoD denied SoS access to a limited public forum in violation of the Free Speech Clause of the First Amendment.

137.   The DoD's restriction on "controversial speech" is overbroad and vague.

138.   SoS has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages under RFRA, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT OF NO TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, OR UNFAIR COMPETITION (FAIR USE)**

139.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

140.   A justiciable and actual controversy exists before this Court with respect to whether SoS's use of DoD Trademarks on SoS's products infringes upon or otherwise violates any rights claimed by Defendants under federal, state, or common law for trademark infringement, false designation of origin, or unfair competition.  Following the cease-and-desist notices from the DoD and Service Branches, SoS is faced with the choice of ceasing all production and sales or distribution of products displaying various word marks that are considered DoD Trademarks

ORIGINAL COMPLAINT                                                                                            34

("DoD Word Marks"),[20] or risking liability for damages. SoS has been using military-related words (e.g., "Army," "Navy," "Marines," "Air Force," etc.) and phrases on its products for over 20 years. In fact, SoS's use of military-related words and phrases predates the filing and registration dates of many DoD Trademarks at the United States Patent and Trademark Office.

141. SoS uses DoD Word Marks on its products fairly and in good faith and does not use DoD Word Marks in a manner that is likely to confuse consumers as to the source or affiliation of its products.

142. Customers purchase SoS's products that bear such military words because they get to voice their support of the military and/or affiliation with the military or military members while simultaneously connecting with their faith.

143. SoS's use of DoD Word Marks is necessary to communicate customers' support of the military and/or affiliation with the military or military members.

144. SoS's use of DoD Word Marks constitutes nominative fair use because it is intended to truthfully identify the Service Branches. In particular, these terms are used to refer to the Service Branches or their members as organizations or individuals that SoS's customers support or are affiliated with.

145. SoS's use of DoD Word Marks also constitutes "descriptive" or "classic" fair use because it is intended to describe SoS's customers. In particular, these terms are used to identify customers' support of or affiliation with the military or military members. For example, dog tags bearing the terms "Marine Sister" or "Army Mom" are descriptive of the individuals purchasing

---

[20] Plaintiffs do not concede that the DoD and Service Branches own enforceable U.S. trademarks or other relevant rights.

and/or wearing those tags.  Similarly, a dog tag bearing the word "Marine" is descriptive of the individual as a member of the U.S. Marine Corps.

146.   SoS has never advertised or marketed its products in a manner that suggests affiliation with the DoD and Service Branches, and, to the extent not expressly prohibited by any of the Service Branches, SoS's advertising and promotional materials, packaging, and products themselves have always prominently displayed SoS's SHIELDS OF STRENGTH name and mark to identify the source of the products.

147.   Most of SoS's customers are former or current military members, or family or friends of military members.  Such products are not offered or provided by the DoD and Service Branches, which is why military members, families, and friends obtain them from a third party such as SoS.  Thus, SoS's customers are very much aware of the fact that SoS's products do not emanate from and are not affiliated with the DoD and Service Branches.  As a result, consumer confusion is unlikely.

148.     Indeed, since it first started using DoD Trademarks on its products over 20 years ago, SoS has never been made aware of a single instance of consumer confusion.

149.   SoS's popularity shows that there was no confusion regarding the origin of its products.  Consumer's know where to get those products, and it is not from the DoD.

150.   Instead, it is the DoD or individual military branches that have asked SoS to remove its own branding.  By asking SoS to remove SoS's branding from their own products, the DoD has wrongfully interfered with SoS's ability to identify the source of its products.  In other words, the only opportunities for possible confusion are those directly created by DoD's instructions, not SoS.

151.   SoS's use of military-related words and phrases—licensed or not—therefore does not amount to trademark infringement but is fair use.

ORIGINAL COMPLAINT                                                                                                 36

152.   Accordingly, SoS seeks a declaration that SoS's use of DoD Trademarks on SoS's products—licensed or not—constitutes fair use and does not infringe Defendants' claimed rights in DoD Trademarks or constitute a false designation of origin or unfair competition.

**SIXTH CAUSE OF ACTION: DECLARATORY JUDGMENT OF NO TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, OR UNFAIR COMPETITION (EXPRESSIVE WORKS)**

153.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

154.   A justiciable and actual controversy exists before this Court with respect to whether SoS's use of DoD Trademarks on SoS's products infringes upon or otherwise violates any rights claimed by the Defendants under federal, state, or common law for trademark infringement, false designation of origin, or unfair competition.  Following the cease-and-desist notices from the DoD and Service Branches, SoS is faced with the choice of ceasing all production and sales or distribution of products displaying DoD Trademarks, or risking liability for damages.  SoS has been using military-related words (e.g., "Army," "Navy," "Marines," "Air Force," etc.), phrases, emblems, and insignia on its products for over 20 years.  In fact, SoS's use of military-related words, phrases, emblems, and insignia predates the filing and registration dates of many DoD Trademarks at the United States Patent and Trademark Office.

155.   SoS's military-themed products are expressive works due to their embodiment of SOS's creative expression.  Furthermore, SoS's use of military-related words, phrases, emblems, and insignia does not confuse consumer as to the source or affiliation of its products.

156.   SoS's use of DoD Trademarks on its products is artistically relevant to the purpose of those products: (i) to identify or describe the customer's role in or relationship to the military, (ii) to convey their support for the military or pride in their country, and (iii) to express their

religious faith in connection with (i) and (ii).  For example, the display of "U.S. Navy," "U.S. Air Force," "Marine Sister," and "Army Mom" on SoS's dog tags is intended to identify the individual purchasing or wearing them as a member of the Navy, a member of the Army, a sister of a Marine Corps member, or the mother of an Army member, respectively.

157.   SoS uses DoD Trademarks on its products fairly and in good faith and does not use DoD Trademarks in a manner that is likely to mislead consumers as to the source or affiliation of its products.  SoS has never advertised or marketed its products in a manner that suggests affiliation with the DoD and Service Branches, and, to the extent not expressly prohibited by any of the Service Branches, SoS's advertising and promotional materials, packaging, and products themselves have always prominently displayed SoS's SHIELDS OF STRENGTH name and mark to identify the source of the products.

158.   Most of SoS's customers are former or current military members, or family or friends of military members.  They purchase or wear SoS's products displaying DoD Trademarks to identify their affiliation with the military or military members and express their support of the military or patriotism, while simultaneously connecting with their faith.  Such products are not offered or provided by the DoD and Service Branches, which is why military members, families, and friends obtain them from a third party such as SoS.  Thus, SoS's customers are very much aware of the fact that SoS's products do not emanate from and are not affiliated with the DoD and Service Branches.  As a result, consumer confusion is unlikely.

159.   Furthermore, SoS's expressive use of DoD Trademarks is artistically relevant to the underlying SoS products, and such use is not explicitly misleading.  SoS's customers purchase goods bearing DoD Trademarks to express their support of the military or to self-identify, and they are not misled by SoS's expressive use in any manner.  In fact, most of SoS's customers are

ORIGINAL COMPLAINT                                                                                                38

veterans, otherwise affiliated with the military, or related to military members, and they are aware of the fact that SoS's products are not produced by and do not emanate from the military.  In other words, SoS's expressive use of DoD Trademarks does not cause confusion, mistake, or deception as to the origin of the goods.  As a result, the Lanham Act does not apply to SoS's expressive use of DoD Trademarks.  Such use does not constitute trademark infringement; instead, it falls squarely under First Amendment protection.

160.   SoS's products are a form of artistic expression protected by the First Amendment.

161.   Accordingly, SoS seeks a declaration that SoS's use of DoD Trademarks on SoS's products—licensed or not—constitutes expressive works and does not infringe Defendants' claimed rights in DoD Trademarks or constitute a false designation of origin or unfair competition.

**SEVENTH CAUSE OF ACTION: RELIGIOUS FREEDOM RESTORATION ACT**

162.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

163.   The Religious Freedom Restoration Act of 1993 (RFRA) states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."[21]  Unless the government satisfies the compelling interest test by "demonstrat[ing] that [the] application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest,"[22] the governmental act will be found to be a substantial burden and rejected.

---

[21] 42 U.S.C.A. 2000bb-1.
[22] 42 U.S.C.A. 2000bb-1(b).

164.   RFRA imposes strict scrutiny over all actions of the federal government that "substantially burden a person's exercise of religion."[23]  The act broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[24]  In *Burwell v. Hobby Lobby Stores*, the Supreme Court stated that the exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reason."[25]  Further, the Court has repeatedly articulated that courts have no business addressing whether sincerely held religious beliefs are reasonable.[26]

165.   Under 10 U.S.C. § 2260, the Secretary of Defense may "license trademarks, service marks, certification marks, and collective marks owned or controlled by the Secretary . . . to any qualifying company upon receipt of a request from the company."[27]  Furthermore, "a qualifying company is any United States company that . . . is determined by the Secretary concerned to be qualified in accordance with such criteria as determined appropriate by the Secretary of Defense."[28]  However, there is no statute that defines or grants the government's ability to monitor and license trademarks as a compelling government interest.

166.   The DoD Instruction Number 5535.12 ("DODI No.5535.12"), Trademark Licensing Program Requirement and Process, provides that "DoD marks may not be licensed for **any**

_____

[23] *Id.*
[24] *Id.*; *See* 42 U.S.C.A. 2000bb-2(4).
[25] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (citing *Smith*, 494 U.S. at 877).
[26] *See id.* at 724.
[27] 10 U.S.C. §§ 2260 (a), (c)(1) (2004).
[28] Id. at § 2260 (c)(2)(B).

**purpose** intended to promote ideological movements, sociopolitical change, **religious beliefs (including non-belief)**, specific interpretations of morality, or legislative/statutory change."[29]

167.   As an organization, SoS has a mission "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ."  In expressing the sincerely held belief of SoS and its owners and employees, SoS produces goods bearing both Biblical Scripture and military related words and insignia.  The production of such goods is not only SoS's foundation and livelihood, but also how SoS as an entity, as well as its owners, its employees, and its customers exercise their sincerely held religious beliefs.  DODI No.5535.12, therefore, does much more damage than substantially burdening SoS, its owners', its employees', and its customers' (including our frontline U.S. military troops') exercise of religion.

168.   The purpose of RFRA is clear and written into the statute itself.  The Act was created to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."[30]  A compelling interest is defined as, "only those interests of the highest order."[31]  "[O]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation."[32]  Additionally, the government must show it took the least restrictive means in furthering its interest.  Least restrictive means has its plain meaning,[33] and as the Supreme Court has continually noted, "[t]he least-restrictive-means standard is exceptionally

---

[29] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.
[30] 42 U.S.C.A. 2000bb(b)(1).
[31] *Yoder*, 406 U.S. at 215.
[32] *Sherbert*, 374 U.S. at 406.
[33] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009).

demanding."[34]   And most importantly, it is the government that bears the *heavy* burden of demonstrating its actions were the least restrictive means.[35]

169.   The DoD failed to meet its burden when it adopted DODI No.5535.12.  The DoD does not have a compelling state interest in preventing SoS from producing its products.  The DoD's restriction prevents SoS and its customers, including frontline U.S. military troops, from promoting their support of the military, therefore it hurts the government's interest instead.  The blanket restriction that prohibits licensing for "any purpose intended to promote . . . religious beliefs (including non-belief)" is undeniably overbroad, thus not narrowly tailored.  The inclusion of "non-belief" in the list of restrictions does not change the fact that the policy unlawfully limits one's freedom to exercise their religious belief(s).

170.   SoS has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages under RFRA, and attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT**

**Agency Action that Is Not in Accordance with Law**

171.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

172.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12 complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained of herein are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

---

[34] *Hobby Lobby*, 573 U.S. at 728.
[35] *See id.* at 727 (emphasis added).

173.    The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). DODI No.5525.12 is not in accordance with law for several reasons.

174.    DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

175.    DODI No.5525.12 violates the APA because it is not a neutral and generally applicable government policy, nor is it justified by a narrowly tailored compelling government interest, which violates the Free Exercise Clause of the First Amendment.

176.    DODI No.5525.12 violates the APA because it disfavors religion over nonreligion and demonstrates hostility toward religion in violation of the Establishment Clause of the First Amendment.

177.    DODI No.5525.12 further violates the APA because it discriminates against religious viewpoints in violation of the Free Speech Clause of the First Amendment. By excluding the promotion of "religious beliefs" from the trademark licensing program, and, particularly, by prohibiting SoS from including Scripture citations alongside Bible verses, the DoD discriminates on the basis of viewpoint in a limited public forum.

178.    DODI No.5525.12 further violates the APA because it substantially burdens SoS exercise of religion, is not justified by a compelling government interest, and is not the least restrictive means of achieving the government's purported interest, which violates the Religious Freedom Restoration Act. DODI No.5525.12 burdens SoS's exercise of religion because it prevents SoS from including Scriptural citations when it places a Bible verse next to a DoD logo on one of its dog tags. SoS believes it has a religious calling to place Scripture citations next to Bible verses on its dog tags "[t]o share the love, hope, forgiveness, and power of God's Word with

ORIGINAL COMPLAINT                                                                                    43

others and to see people victorious in life's battles and in a relationship with Jesus Christ." The DoD lacks a compelling interest in prohibiting the placement of Scripture references next to its logos, nor is the DoD's policy the least restrictive means of promoting religious neutrality because it bans all mention of religious belief.

179.    The decision by Defendants Army TMLPO and Jensen to allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

180.    The decision by Defendants Marine Corps TMLPO and O'Haver first to prohibit SoS from including "controversial" passages from the Bible alongside Marine Corps logos on SoS dog tags and then second to prohibit SoS from including any Scripture alongside the Marine Corps logos on SoS dog tags was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

181.    The decision by Defendant Navy TMLO to purportedly allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

182.    The decision by Defendants Air Force TMLO and Rowden to allow SoS to use Biblical verses alongside the Air Force logo, but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

183.    For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under the First Amendment.

184.   For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under the Religious Freedom Restoration Act.

185.   For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under trademark law.

186.   SoS has not adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

187.   SoS has no adequate remedy at law.

188.   Absent injunctive and declaratory relief against DODI No.5525.12, Sos will have been and continue to be harmed

189.   The Court should declare DODI No.5525.12 and each of the Defendants' decisions invalid and set them aside.

## EIGHTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT

### Agency Action that Exceeds Statutory Authority

190.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

191.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12 complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained of herein are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

192.   The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). DODI No.5525.12 exceeds statutory authority for several reasons.

ORIGINAL COMPLAINT                                                                                    45

193.   DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

194.   DODI No.5525.12 violates the APA because it disfavors religion over nonreligion and demonstrates hostility toward religion in violation of the Establishment Clause of the First Amendment.

195.   DODI No.5525.12 further violates the APA because it discriminates against religious viewpoints in violation of the Free Speech Clause of the First Amendment. By excluding the promotion of "religious beliefs" from the trademark licensing program, and, particularly, by prohibiting SoS from including Scripture citations alongside Bible verses, the DoD discriminates on the basis of viewpoint in a limited public forum.

196.   DODI No.5525.12 further violates the APA because it substantially burdens SoS exercise of religion, is not justified by a compelling government interest, and is not the least restrictive means of achieving the government's purported interest, which violates the Religious Freedom Restoration Act. DODI No.5525.12 burdens SoS's exercise of religion because it prevents SoS from including Scriptural citations when it places a Bible verse next to a DoD logo on one of its dog tags. SoS believes it has a religious calling to place Scripture citations next to Bible verses on its dog tags "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ." The DoD lacks a compelling interest in prohibiting the placement of Scripture references next to its logos, nor is the DoD's policy the least restrictive means of promoting religious neutrality because it bans all mention of religious belief.

197.   The decision by Defendants Army TMLPO and Jensen to allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

198.   The decision by Defendants Marine Corps TMLPO and O'Haver first to prohibit SoS from including "controversial" passages from the Bible alongside Marine Corps logos on SoS dog tags and then second to prohibit SoS from including any Scripture alongside the Marine Corps logos on SoS dog tags was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

199.   The decision by Defendant Navy TMLO to purportedly allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

200.   The decision by Defendants Air Force TMLO and Rowden to allow SoS to use Biblical verses alongside the Air Force logo, but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

201.   For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates SoS's rights under the First Amendment.

202.   For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates SoS's rights under the Religious Freedom Restoration Act.

203.   For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates SoS's rights under trademark law.

204.   SoS has not adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

205.   SoS has no adequate remedy at law.

206.   Absent injunctive and declaratory relief against DODI No.5525.12, Sos will have been and continue to be harmed

207.   The Court should declare DODI No.5525.12 and each of the Defendants' decisions invalid and set them aside.

## NINTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT

### Agency Action that Is Arbitrary, Capricious, and an Abuse of Discretion

208.   SoS incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

209.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12 complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained of herein are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

210.   The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). DODI No.5525.12 and Defendants' actions implementing DODI No.5525.12 are arbitrary, capricious, and an abuse of discretion for several reasons.

211.   DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

212.   DODI No.5525.12 prohibits the licensure of DoD Trademarks to "promote" "religious beliefs." The DoD lacks any basis in law for excluding the use of its trademarks alongside religious belief. It is arbitrary and capricious and an abuse of discretion for the DoD to conclude that "religious belief" may not be associated with its trademarks when soldiers buried at Arlington National Cemetery and military cemeteries around the world have headstones in the shape of Christian crosses and the Star of David, and include both religious and non-religious phrases on the headstones.

213.   It was also arbitrary and capricious and an abuse of discretion for Defendants Army TMLPO and Jensen to allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendants Army TMLPO and Jensen acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on SoS's dog tags.

214.   It was also arbitrary and capricious and an abuse of discretion for Defendants Marine Corps TMLPO and O'Haver first to prohibit SoS from including "controversial" passages from the Bible alongside Marine Corps logos on SoS dog tags and then second to prohibit SoS from including any Scripture alongside the Marine Corps logos on SoS dog tags. Defendants Marine Corps TMLPO and O'Haver never defined the terms "controversial" or "religious theme," and those terms are nowhere contained in any of the authorizing statutes or the Constitution.

Defendants Marine Corps TMLPO and O'Haver acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on SoS's dog tags.

215. It was also arbitrary and capricious and an abuse of discretion for Defendant Navy TMLO to purportedly allow SoS to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendant Navy TMLO acted arbitrarily and capriciously and abused its discretion by not approving a trademark license with SoS.

216. It was also arbitrary and capricious and an abuse of discretion for Defendants Air Force TMLO and Rowden to allow SoS to use Biblical verses alongside the Air Force logo, but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendants Air Force TMLO and Rowden acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on SoS's dog tags.

217. For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under the First Amendment.

218. For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under the Religious Freedom Restoration Act.

219. For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates SoS's rights under trademark law.

ORIGINAL COMPLAINT                                                                        50

220.   SoS has not adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

221.   SoS has no adequate remedy at law.

222.   Absent injunctive and declaratory relief against DODI No.5525.12, SoS will have been and continue to be harmed.

## JURY TRIAL DEMANED

223.   SoS requests a jury trial on all issues that may be tried to a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court enter an order:

a.   Declaring Defendants' policy and actions violate the Free Exercise Clause of the First Amendment;

b.   Declaring Defendants' policy and actions violate the Establishment Clause of the First Amendment;

c.   Declaring Defendants' policy and actions violate the Free Speech Clause of the First Amendment;

d.   Declaring Defendants' policy and actions violate the Religious Freedom Restoration Act;

e.   Declaring Plaintiff's use of DoD Trademarks on its products does not give rise to liability under 15 U.S.C. §§ 1114, 1125, or any other applicable law;.

f.   Permanently enjoining Defendants' from enforcing the policy and actions complained of herein;

g.   Vacate and set aside DODI No.5525.12 and the decisions of Defendants to deny Plaintiff a license;

h.      Requiring Defendants to withdraw or refrain from enforcing the unconstitutional aspects of 32 C.F.R. § 507.10;

i.      Awarding Plaintiff nominal and compensatory damages under RFRA;

j.      Awarding the Plaintiff costs and reasonable attorneys' fees and expenses; and

k.      Granting the Plaintiff all such other relief as the Court deems just and proper.

Dated: December 14, 2021                     **FISH & RICHARDSON P.C.**


By:   */s/ Carl E. Bruce* _____
      Carl E. Bruce
      Texas Bar No. 24036278
      bruce@fr.com
      Leonard E. Davis
      Texas Bar No. 05521600
      Terry Stalford
      Texas Bar No. 24011686
      stalford@fr.com
      Nan Lan
      Texas Bar No. 24121711
      lan@fr.com
      1717 Main Street, Suite 5000
      Dallas, TX  75201
      (214) 747-5070 – Telephone
      (214) 747-2091 – Facsimile

      Kenneth Hoover
      Texas Bar No. 24092537
      hoover@fr.com
      111 Congress Ave., Suite 810
      Austin. Texas 78701
      (512) 472-5070 – Telephone
      (512) 320-8935 – Facsimile

      Jeffrey C. Mateer
      Hiram S. Sasser, III
      David J. Hacker
      Michael D. Berry
      Keisha T. Russell
      First Liberty Institute
      2001 West Plano Parkway
      Suite 1600
      Plano, TX 75075
      (972) 941-4444
      mberry@firstliberty.org
      krussell@firstliberty.org

      **COUNSEL FOR PLAINTIFF
      SHIELDS OF STRENGTH**


ORIGINAL COMPLAINT                                          53