UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:21-cv-00484

———

**Shields of Strength,**
*Plaintiff,*

v.

**U.S. Department of Defense et al.,**
*Defendants.*

———

**REVISED OPINION AND ORDER**

Defendants move to dismiss this action for lack of jurisdiction and failure to state viable claims. Plaintiff, in turn, moves for a preliminary injunction. For the reasons given below, (1) the individual-capacity defendants' motion to dismiss is granted, (2) the official-capacity defendants' motion to dismiss is granted in part and denied in part, and (3) plaintiff's motion for a preliminary injunction is denied.

**Table of Contents**

Background ........................................................................ 2

Analysis ........................................................................... 9

I.   Defendants' motions to dismiss ......................................... 9

  A. Subject-matter jurisdiction ........................................... 9

    1. Concreteness of the non-infringement claims ......... 10

    2. Sovereign immunity from damages claims .............. 10

    3. Action committed to agency discretion by law ........11

    4. Six-year statute of limitations ................................. 14

    5. Standing to assert the rights of others .................... 14

  B. Personal jurisdiction over individual defendants .......... 15

  C. Pleading of claims on which relief can be granted ........ 15

    1. Licensing challenges (Counts 1–3, 8–10) ............... 16

      a. Abridgement of the freedom of speech ............. 17

      b. Burden on religious exercise ............................. 24

       c.  Establishment of religion ................................... 27

    2.  Licensee-estoppel defense (Count 7) ...................... 28

    3.  Viability of individual-capacity relief ...................... 31

  D.  Summary ..................................................... 35

II.  Shields' motion for a preliminary injunction ...................... 35

Conclusion .............................................................. 37

## Background

**1.**  Trademark rights arise from common law and serve two, complementary goals: they foster competition by "secur[ing] to the owner of the mark the goodwill of his business," and they "protect the ability of consumers to distinguish among competing producers."[1] Although Congress did not create trademark rights, it has helped protect them since at least the 1946 Lanham Act. The Lanham Act allows a trademark owner to register its marks with the Patent and Trademark Office, which confers certain enforcement advantages, and allows access to federal court for claims of trademark infringement.[2]

Section 45 of the Lanham Act defines a "person" who can register and protect trademarks to include the United States and any agency thereof.[3] That includes military departments. And the service branches of the Department of Defense have registered numerous trademarks related to the military.[4] Those trademark-registration efforts picked up in the past two decades as pride in military service saw more businesses using military branding.[5] At one point, Disney even tried to trademark the name *SEAL Team Six*.[6]

---

[1] *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

[2] *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142–45 (2015).

[3] 15 U.S.C. § 1127.

[4] Helene Cooper, *As Wars End, Military Gives Its Trademarks New Vigilance*, N.Y. Times, May 25, 2014, at A14.

[5] *Id.*

[6] *Id.*

The service branches now have hundreds of registered trademarks, ranging the spectrum of popular familiarity.[7] For instance, the Department of the Army has registered a trademark in the name *Explosive Ordnance Disposal Technology Directorate Picatinny Arsenal*.[8] The department has also registered the name *West Point*[9] and the West Point crest[10] for use with shirts, hats, and other articles of clothing. And the department has registered the word *Army*[11] and applied to register the Army logo[12] as trademarks for use with articles of clothing.

**2.** Shields of Strength is a private company based in east Texas. Since 1998, Shields has made and sold goods that feature Christian symbols, quote Bible verses, or draw on the Bible as inspiration for encouraging words and phrases.[13] Among those goods are pendants replicating the shape of soldiers' "dog tags."[14] Two examples of Shields' dog tags are shown below:[15]

---

[7] *See, e.g.*, Gerben Perrott PLLC, *United States Army Trademarks*, www.gerbenlaw.com/trademarks/government-agencies/united-states-army/; Gerbert Perrott PLLC, United States Navy Trademarks, www.gerbenlaw.com/trademarks/government-agencies/united-states-navy/.

Trademark registrations and applications may be viewed using the Patent and Trademark Office system at https://tsdr.uspto.gov/. Some military insignia, such as the Marine Corps' emblem, are also statutorily protected. 10 U.S.C. § 8921. But the complaint and pending motions do not address statutory insignia protection, so neither does this order.

[8] EXPLOSIVE ORDNANCE DISPOSAL TECHNOLOGY DIRECTORATE PICATINNY ARSENAL, U.S. Reg. No. 3,831,877.

[9] WEST POINT, U.S. Reg. No. 3,942,977.

[10] DUTY HONOR COUNTRY WEST POINT MDCCCII U.S.M.A., U.S. Reg. No. 5,425,907.

[11] ARMY, U.S. Reg. No. 3,152,724.

[12] U.S. ARMY, U.S. Serial No. 97,593,125 (application pending).

[13] Doc. 34 at 2. Pinpoint citations are to the pagination added by ECF at the top of each page, not to the parties' assigned pagination. Factual recitations from the operative complaint and the motion briefing are described in this section as background for the motion to dismiss, not as findings of fact.

[14] *Id.* at 2 ¶ 2.

[15] *Id.* at 1–2.



Fig. 1 from First Am. Complaint (obverse: Marine Corps' emblem, "Marine Sister," and American flag; reverse: Bible verse, Shields' logo, and Marine Corps' emblem)



Fig. 2 from First Am. Complaint (obverse: "Army Mom," cross, and American flag; reverse: Bible verse and Shields' logo)

Shields has distributed millions of dog tags with words or symbols meant to show military pride or connection.[16] The dog tags have even received presidential attention. In 2003, President George W. Bush's remarks at Arlington National Cemetery noted that Captain Russell Rippetoe, the first serviceman killed in action during Operation Iraqi Freedom, wore a dog tag with a Bible verse from Joshua 1:9.[17]

Before 2011, at least some Department of Defense officials appear to have acquiesced in Shields' production of dog tags displaying military words and insignia alongside Bible verses. For instance, in 2003, after Shields' founder gave invited remarks at the Pentagon, Department of Defense employees requested that Shields place its products in Army and Air Force Exchange Service outlets.[18]

In 2011, the military's approach shifted. At that time, the military had finished creating and staffing Trademark Licensing Program Offices ("trademark offices") to implement trademark-licensing authority that Congress granted to the Secretary of Defense in 2004.[19] Those trademark offices license the military's registered marks for use on commercial products such as shirts,

---

[16] *Id.* at 11 ¶ 40.

[17] *Id.* at 3–4 ¶ 4.

[18] *Id.* at 17 ¶ 56.

[19] Doc. 22 at 11–12; *see* 10 U.S.C. § 2260(a).

hats, and mugs,[20] creating licensing fees used to pay for the trademark program and for morale, welfare, and recreation activities in the military.[21]

In licensing those trademarks, the offices are governed by Department of Defense Instruction 5535.12, issued in 2013. Its second enclosure provides in pertinent part, with emphasis added:

2. <u>TRADEMARK LICENSING PROGRAM REQUIREMENTS AND PROCESS</u>

a. Each OSD and DoD Component shall provide oversight and management of all marks owned or controlled by the Component. This includes but is not limited to establishing policies for the creation of marks for official use; monitoring marks for, and protecting them against, unauthorized use; and, as appropriate, licensing marks for authorized use by non-DoD entities, and registering marks with the USPTO.

. . . .

d. In accordance with subpart 2635.702 of Title 5, Code of Federal Regulations (Reference (h)), DoD marks may not be licensed for use in a manner that creates a perception of DoD endorsement of any non-federal entity or its products and services. *DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change.* Marks may not be fraudulently or wrongfully affixed pursuant to sections 506 and 1017 of Title 18, U.S.C. (Reference (i)).

---

[20] *See* U.S. Dep't of Def., *Help Center: DOD Branding & Trademark Licensing*, https://www.defense.gov/Contact/Help-Center/#dod-branding. *See also* U.S. Dep't of Def., *Branding and Trademarks*, https://www.defense.gov/Resources/Branding-and-Trademarks/ (describing the trademark offices of the Army, Marine Corps, Navy, Air and Space Force, and Coast Guard).

[21] 10 U.S.C. § 2260(d).

e. DoD marks may not be licensed for use in a manner that would reflect negatively on the DoD; degrade the name, reputation, or public goodwill of the DoD Components; or be contrary to community relations objectives established in DoDD 5410.18 (Reference (j)).[22]

Starting in 2011, the military's trademark offices informed Shields that it needed a license to sell products with marks registered by the military.[23] Three of the military's trademark offices (those of the Army, Marines, and Air Force) eventually issued licenses to Shields, and their license agreements or later review of Shields' products limited Shields' usage or citation of Bible verses near licensed marks.[24] The Navy denied Shields' request for a license altogether.[25]

In 2019, some of the trademark offices received a letter from the Military Religious Freedom Foundation, an organization that advocates the "separation of Church and state" in the military.[26] The letters threatened litigation unless the military acted on what the Foundation viewed as Shields' distribution of products using the military's trademarks outside the scope of Shields' license.[27] In response, various military officials sent Shields a cease-and-desist letter prohibiting it from producing or selling items with specified religious content alongside the military's registered marks.[28]

---

[22] U.S. Dep't of Def. Instruction (DoDI) 5535.12, *DoD Branding & Trademark Licensing Program Implementation* at 6, Encl. 2, ¶ 2(d) (Sept. 13, 2013), www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/553512p.pdf.

[23] Doc. 34 at 20–21 ¶ 68.

[24] *Id.* at 21 ¶¶ 70–71 (Army's 2012 license allowed only three inspirational phrases, without attribution to the Bible); *id.* at 24 ¶¶ 86–87 (Marine Corps' 2018 license allowed Biblical references in the form of inspirational words but not "controversial" passages or Biblical citation); *id.* at 27 ¶ 99 (describing Air Force's communications after review of Shields' products); Doc. 40-7 at 8 (Air Force license that required Shields to submit proposed designs for Air Force review and approval).

[25] Doc. 34 at 26 ¶¶ 93–95.

[26] *Id.* at 27 ¶ 102.

[27] *Id.*

[28] *Id.* at 5 ¶ 8.

Shields' trademark licenses expired in 2020 and 2021, and its requests for license renewal were denied.[29]

**3.**  Shields now sues, challenging the military's policy and decisions regarding trademark licensing (Counts 1–3 and 8–11) and the military's assertion that Shields' unlicensed dog tags infringe trademark rights (Counts 4–7).[30] Shields seeks the relief listed below.

(1) As to the denial or limitation of trademark licenses (Counts 1–3 and 8–11), Shields seeks:

(a) nominal and compensatory damages for past violation of Shields' rights under the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment and under RFRA, the Religious Freedom Restoration Act of 1993 (relief on Counts 1–3 and 8);

(b) a declaration that the future denial or limitation of a trademark license for Shields' dog tags based on Instruction 5535.12 would violate the First Amendment and RFRA, and an injunction against such future conduct (relief on Counts 1–3 and 8–10);

(c) an order vacating the past denials and limitations of a trademark license for Shields' dog tags and vacating the pertinent provision of Instruction 5535.12, as violating the First Amendment and RFRA (relief on Counts 9–10); and

---

[29] *Id.* at 22–23 ¶¶ 74–78, 25 ¶ 89, 27 ¶ 101.

[30] Count 4 largely presents the claim that Shields' unlicensed distribution of dog tags would not create trademark-infringement liability, but it also contains an allegation that defendants "discriminated against Shields and retaliated because of religion." *Id.* at 37 ¶ 162. That allegation, which appears to underlie Count 4's damages request, refers to the military's denial or limitation of trademark licenses. Because that allegation in ¶ 162 of Count 4 repeats the allegation in ¶ 156 of Count 3—that defendants "discriminated against Shields and retaliated because of religion"—that aspect of Count 4 is treated as part of Count 3 for simplicity of analysis. The rest of Count 4 concerns, not the military's licensing decisions, but whether a license is needed at all.

(d) an order vacating the past denials and limitations of a trademark license for Shields' dog tags, and vacating the pertinent provision of Instruction 5535.12, as arbitrary and capricious and an abuse of discretion within the meaning of the Administrative Procedure Act (relief on Count 11).

(2) As to the assertion of trademark rights against Shields' unlicensed dog tags (Counts 4–7), Shields seeks:

(a) a declaration that Shields' unlicensed distribution of its dog tags would not create trademark liability because the dog tags meet the expressive-works test for noninfringement[31] or create a defense of an as-applied Free Speech Clause violation (relief on Counts 4 and 6);

(b) a declaration that Shields' unlicensed distribution of its dog tags would not be trademark infringement because there is no likelihood of consumer confusion regarding origin (relief on Count 5);

(c) a declaration that Shields' unlicensed distribution of its dog tags would not be trademark infringement pursuant to the defense of fair use (relief on Count 5);

(d) a declaration that Shields' unlicensed distribution of its dog tags would not create liability for infringing certain trademarks because they are unprotectable as generic, and an order cancelling the registration of those marks (relief on Count 7); and

(e) if needed, an injunction enforcing those declarations.

Shields now moves for a preliminary form of the injunctive relief listed at (1)(b) above—an injunction against the denial or limitation of a trademark license for Shields' dog tags because it would

---

[31] *Id.* at 35–37 (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989); *VIP Prods. LLC v. Jack Daniel's Properties, Inc.*, 953 F.3d 1170 (9th Cir. 2020), *cert. granted after remand*, 143 S. Ct. 476 (No. 22-148)).

violate the First Amendment and RFRA.[32] Defendants oppose a preliminary injunction and move to dismiss on several grounds.[33]

## Analysis

The court first rules on the motions to dismiss (*infra* Part I) and then on the motion for a preliminary injunction (*infra* Part II).

### I.  Defendants' motions to dismiss

The official-capacity defendants are the Department of Defense; the Secretary of Defense in his official capacity; the trademark-licensing offices of the Air Force, the Army, the Marine Corps, and the Navy; and those four trademark offices' directors in their official capacities.[34] The four trademark-office directors, but not the Secretary of Defense, are also sued in their individual capacities for damages.[35]

The official-capacity defendants first move to dismiss all claims pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction. *See infra* Part I.A. Three of the trademark-office directors then move to dismiss the claims against them in their individual capacities pursuant to Rule 12(b)(2) for lack of personal jurisdiction. *See infra* Part I.B. Finally, all defendants move to dismiss certain counts pursuant to Rule 12(b)(6) as failing to state a viable claim for relief. *See infra* Part I.C.

### A.  Subject-matter jurisdiction

The court grants the motion to dismiss for lack of subject-matter jurisdiction as to the damages claims against the official-capacity defendants (*infra* Part I.A.2) and as to a limited aspect of Count 11 (*infra* Part I.A.3). As to the other claims, the motion to dismiss for lack of subject-matter jurisdiction is denied.

---

[32] Doc. 27.

[33] Docs. 22, 37, 40. Plaintiff filed an amended complaint on May 5, 2022. That new pleading mooted any pending motions to dismiss. So the individual-capacity defendants' first motion to dismiss is denied as moot.

[34] Doc. 34 at 1.

[35] *Id.* at 1; *see id.* at 59 ¶ k.

### 1.   Concreteness of the non-infringement claims

Defendants first seek dismissal of Counts 4–7 as seeking a declaration of nonliability for trademark infringement without presenting for review a definite product design and thus without presenting a concrete dispute creating standing.[36] That contention is meritless. Shields' complaint alleges that it had been making military themed dog tags for years and shows specific product designs.[37] The complaint further specifies eight Biblical phrases and citations that Shields wishes to substitute for the ones on the depicted examples.[38]

That is enough to plausibly allege an immediate intention and ability for Shields to make and sell specific, substantially fixed designs. Defendants rely only on a distinguishable case holding a dispute non-justiciable when the products at issue were merely at the design stage and the declaratory plaintiff failed to show any ability or intent to actually make products.[39] Those facts are a far cry from the allegations here—that Shields had already been making specific designs, which the military reviewed.

To be sure, the court would lack jurisdiction to grant a non-infringement declaration about mere abstract product characteristics, without a substantially fixed product design. But Shields' complaint shows specific, fixed designs that are in dispute and thus adequately pleads a concrete case or controversy. The motion to dismiss Counts 4–7 on this basis is denied.

### 2.   Sovereign immunity from damages claims

Sovereign immunity renders the United States and its departments and agents in their official capacities immune from suit.[40] The federal government can waive sovereign immunity, but the waiver "must be unequivocally expressed in the statutory text."[41]

---

[36] Doc. 37 at 10–13.
[37] Doc. 34 at 1 ¶ 2.
[38] *Id.* at 22 ¶ 74.
[39] *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 749 (5th Cir. 2009).
[40] *Williamson v. USDA*, 815 F.2d 368, 373 (5th Cir. 1987).
[41] *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Because sovereign immunity is jurisdictional in nature,[42] a damages claim against the government that is not within an unambiguous waiver of sovereign immunity must be dismissed as outside the court's subject-matter jurisdiction.[43]

RFRA's allowance of "appropriate relief against a government"[44] is not a clear and unequivocal reference to or waiver of sovereign immunity. Several circuit courts have so held.[45] Similarly, the Supreme Court has held that an analogous provision in the Religious Land Use and Institutionalized Persons Act of 2000 does not waive state sovereign immunity from damages claims.[46] Because the damages claims against the defendants sued in their official capacities here do not fall within an unambiguous waiver of sovereign immunity, those claims are dismissed.

### 3. Action committed to agency discretion by law

The Administrative Procedure Act generally waives sovereign immunity from suits seeking non-monetary relief from agency action.[47] But § 701(a)(2) of the APA excludes from that waiver any agency action "committed to agency discretion by law."[48] That exception to judicial review is "very narrow."[49] It applies only "if

---

[42] *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

[43] *Lane*, 518 U.S. at 192.

[44] 42 U.S.C. § 2000bb-1(c).

[45] *E.g.*, *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 841 (9th Cir. 2012); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015).

[46] *Sossamon v. Texas*, 563 U.S. 277 (2011); *see* 42 U.S.C. § 2000cc-2(a). Although RFRA's allowance of "appropriate relief against a government" does not unambiguously waive the sovereign's immunity from damages claims, it can support a damages award against a government official sued in his or her individual capacity. *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020). In distinguishing *Tanzin* from *Sossamon*, the Court explained that "[t]he obvious difference is that [*Tanzin*] features a suit against individuals, who do not enjoy sovereign immunity," whereas *Sossamon* featured a suit "against a State, which does enjoy sovereign immunity." *Id.* at 493.

[47] 5 U.S.C. § 702.

[48] *Id.* § 701(a)(2); *see Lundeen v. Mineta*, 291 F.3d 300, 304–05 (5th Cir. 2002) (holding that this provision is an exception from the waiver of sovereign immunity and is thus jurisdictional in nature).

[49] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971).

no judicially manageable standards are available for judging how and when an agency should exercise its discretion."[50]

Because the Constitution itself provides judicially manageable standards, a claim that agency action violates the Constitution is reviewable unless Congress's intent to preclude review is clear.[51] Defendants do not argue that § 701(a)(2) clearly precludes review of Shields' claims that defendants' licensing policy violates the First Amendment.[52]

Shields also claims that the APA's waiver of sovereign immunity applies to the non-constitutional licensing claims—that defendants' licensing policy violates RFRA, violates trademark law, and is arbitrary, capricious, and an abuse of discretion.[53] Defendants respond that those claims fall within § 701(a)(2)'s preclusion of judicial review because they challenge agency action committed to agency discretion by law, namely, by 10 U.S.C. § 2260.[54] That statute provides:

> (a) Authority.—Under regulations prescribed by the Secretary of Defense . . . , the Secretary concerned *may* license trademarks . . . owned or controlled by the Secretary concerned and may retain and expend fees received from such licensing in accordance with this section.[55]

The term "may" in that statute connotes discretion.[56] But "[t]he mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under

---

[50] *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 410).

[51] *Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998) (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)).

[52] Doc. 37 at 25 n.8.

[53] Doc. 34 at 56–58.

[54] Doc. 37 at 24–26.

[55] 10 U.S.C. § 2260(a) (emphasis added). Shields' complaint also cites subsection (c) of § 2260, which allows the Secretary to license trademarks "relating to military designations and likenesses of military weapons systems to any qualifying company upon receipt of a request from the company." Doc. 34 at 18 ¶ 60. But subsection (c) is not applicable because Shields' complaint has no pleading about marks related to weapons systems.

[56] *See Jama v. ICE*, 543 U.S. 335, 346 (2005).

the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised."[57]

Counts 9 and 10 claim that defendants' licensing policy violates RFRA and trademark law. Those sources of law provide judicially manageable standards for review of the challenged agency action. So defendants' motion to dismiss Count 9 and 10 on reviewability grounds is denied.

Count 11 alleges that Instruction 5535.12 is arbitrary, capricious, and an abuse of the Secretary's discretion to regulate the licensing of military trademarks. Shields, however, has not identified any aspect of the statutory scheme conferring that discretion, or any other relevant materials, that provide the Secretary guidance on how his discretion is to be exercised so long as it complies with the Constitution, RFRA, and trademark law. Shields does point to constitutional limits,[58] but the constitutional claims have already been held reviewable. Because the statutory scheme authorizing Instruction 5535.12 does not supply "standards for the court to apply" in assessing whether that regulation is an abuse of discretion (as opposed to whether it violates the Constitution or other law), the motion to dismiss the aspect of Count 11 challenging Instruction 5535.12 is granted.[59]

Count 11, however, also challenges as an abuse of discretion the *implementation* of Instruction 5535.12 by the trademark offices in reviewing Shields' products and licensing requests.[60] And Instruction 5535.12 itself provides a standard against which to judge whether the decisions of the trademark offices were arbitrary, capricious, or an abuse of discretion. As the Fifth Circuit explains: "Even if the substance of an agency's decision is beyond review

---

[57] *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam)).

[58] Doc. 45 at 30–31.

[59] *See Perales*, 903 F.2d at 1047–51; *Ellison*, 153 F.3d at 254.

[60] Doc. 34 at 57–58 ¶¶ 251–254.

as discretionary, an agency's failure to follow its own regulations may be challenged under the APA."[61] So defendants' motion to dismiss that aspect of Count 11 on reviewability grounds is denied.

### 4.  Six-year statute of limitations

Defendants argue that the jurisdictional statute of limitations in 28 U.S.C. § 2401(a) bars Shields' claims "to the extent" they accrued before December 14, 2015.[62] But defendants do not identify any such extent, nor does the court see any. The allegations about pre-2015 events appear to simply present context and background.[63] The motion to dismiss on this basis is denied.

### 5.  Standing to assert the rights of others

A federal court has an obligation to independently ensure its own subject-matter jurisdiction,[64] which includes a plaintiff's standing to assert the rights of others. Count 8 alleges that Instruction 5535.12 violates RFRA by substantially burdening "Shields['], its owners', its employees', and its customers' (including our frontline U.S. military troops') exercise of religion."[65]

Shields has constitutional standing to assert its own rights. And given the pleading about Shields' ownership,[66] the court reads the allegation about the rights of Shields' owners as emphasizing the allegations about the rights of Shields itself. But the complaint does not identify any characteristic of Shields' employees or customers that would trigger an exception to the "traditional rule against third-party standing"[67] and allow Shields to assert those third parties' rights. So Count 8 is dismissed for lack of

---

[61] *Ellison*, 153 F.3d at 252 (citing *Webster*, 486 U.S. at 601 n.7); *accord Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) ("[J]udicially manageable standards may be found in formal and informal policy statements and regulations.") (internal quotation marks omitted); *Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

[62] Doc. 37 at 25–26.

[63] *Id.*

[64] *See, e.g., Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

[65] Doc. 34 at 48 ¶ 204.

[66] *See* Doc. 34 at 2 ¶ 2.

[67] *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2143 (2020) (Thomas, J., dissenting) (describing that rule).

subject-matter jurisdiction to the extent that it invokes the rights of Shields' employees and customers.

### B.  Personal jurisdiction over individual defendants

Having first resolved the Rule 12(b)(1) motion as required,[68] two other arguments for dismissal remain: dismissal under Rule 12(b)(2) for lack of personal jurisdiction over three defendants sued in their individual capacities, and dismissal under Rule 12(b)(6) for failure to state a legally viable claim. Ordinarily, a court must address any challenge to personal jurisdiction over a defendant before addressing that defendant's challenge to the merits of a claim.[69]

But in cases with (1) multiple defendants, (2) indisputable personal jurisdiction over at least one defendant, and (3) a collective challenge by all defendants to the legal merits of a claim, a court may address the legal merits first and, if it dismisses the claim, decline to address personal jurisdiction.[70] The court proceeds in that manner here. Although three of the four individual-capacity defendants contest personal jurisdiction over them, the fourth defendant (Rowden) does not. The court thus addresses the individual-capacity defendants' common challenge to the merits of the damages claims against them based on that undisputed personal jurisdiction, not hypothetical jurisdiction. *See infra* Part I.C.3.

### C.  Pleading of claims on which relief can be granted

Defendants move to dismiss several counts pursuant to Rule 12(b)(6) for failure to plead a claim on which relief can be granted:

- The official-capacity defendants seek dismissal of the licensing-based claims (Counts 1–3 and 8–10) as alleging

---

[68] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

[69] *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (Friendly, J.).

[70] *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012).

facts that do not constitute a violation of the First Amendment or RFRA. *See infra* Part I.C.1.

- The official-capacity defendants seek dismissal of the claim for cancellation of certain word marks (Count 7) as barred by the defense of licensee estoppel. *See infra* Part I.C.2.

- Lastly, the trademark-office directors seek dismissal of the damages claims against them in their individual capacities as beyond the scope of a *Bivens* action, beyond the scope of relief authorized by RFRA, and barred by qualified immunity. *See infra* Part I.C.3.

Those contentions are addressed in turn.

### 1. Licensing challenges (Counts 1–3, 8–10)

Shields alleges that defendants' licensing policy violates the Free Speech Clause, the Free Exercise Clause, the Establishment Clause, and RFRA. One point common to those claims bears emphasis: They challenge the military's *licensing* policy, not its *registration* of any particular trademark. To be sure, a separate claim (Count 7) seeks to cancel the registration of certain marks. Yet other claims (Counts 4–6) seek a declaration that certain Shields' products using a registered trademark do not create infringement liability based on doctrines such as fair use or a Free Speech Clause challenge to the existence of particular trademarks.

But, in analyzing the licensing challenges, the court treats the military's trademark on the word *Army* with the same validity as its trademark on *Explosive Ordnance Disposal Technology Directorate Picatinny Arsenal*.[71] Any concerns with the breadth of speech foreclosed by a particular trademark, such as *Army*, will be resolved in the noninfringement claims based on the particular mark and products at issue.

The court first addresses the free-speech claim and then addresses the religious-exercise and religious-establishment claims.

---

[71] EXPLOSIVE ORDNANCE DISPOSAL TECHNOLOGY DIRECTORATE PICATINNY ARSENAL, U.S. Reg. No. 3,831,877.

### a. Abridgement of the freedom of speech

Shields alleges that the denial of a license to use the military's registered marks on Shields' goods based on Instruction 5535.12 was a viewpoint-based denial of access to a limited public forum for private speech.[72] The military responds that its issuance of trademark licenses does not open a forum for private speech because it is government speech.[73] Of course, "speech" is used in this discussion not in its literal sense of audible expression but in the First Amendment sense that includes expressive conduct.

The threshold question is whether the government's trademark-licensing program opens a forum for private speech or, instead, conveys only the government's own speech.[74] A "forum" in First Amendment analysis can be real property, such as a public park[75] or a flagpole at a city hall,[76] or it can have a transitory nature, as with advertising space on city buses[77] or government literature soliciting charitable donations.[78] A forum can also exist "more in a metaphysical than in a spatial or geographic sense," such as in a government program "expend[ing] funds to encourage a diversity of views from private speakers."[79]

But not every governmental choice about the use of its resources in a way connected to expression opens a forum for private speech. The government must have the ability to choose and convey its own messages. Sometimes that means not speaking at

---

[72] Doc. 34 at 31–32 ¶¶ 121–136.

[73] Doc. 37 at 17–23 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)).

[74] *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1587 (2022) (explaining the threshold need to draw the "line between a forum for private expression and the government's own speech"); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (explaining that, when a forum is found, it must then be classified as one of three types of forums: "the traditional public forum, the public forum created by governmental designation, and the nonpublic forum").

[75] *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

[76] *Shurtleff*, 142 S. Ct. at 1583.

[77] *Lehman v. City of Shaker Heights*, 418 U.S. 298, 300 (1974).

[78] *Cornelius*, 473 U.S. at 806.

[79] *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830, 834 (1995).

all on a topic, just as private organizations can decide not to express a view. Not all institutions need to take positions on every matter.[80]

Because the government must be able to express its own positions, it may devote resources to that expression. When "the government appropriates public funds to promote a particular policy *of its own* it is entitled to say what it wishes."[81] That is true even if private parties propose speech for the government to adopt.[82] Because the government's speech is not restricted by the Free Speech Clause, "forum analysis is inapposite" as to it.[83]

Three forum-opening factors bear on whether a government program involving expression opens a forum for private speech:

(i)   "the history of the expression at issue,"[84] such as the historical purpose of the government program;[85]

(ii)  "the public's likely perception as to who (the government or a private person) is speaking;"[86] and

(iii) "the extent to which the government has actively shaped or controlled the expression,"[87] turning on facts such as the government's selectivity among messages.[88]

---

[80] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to Our Institutions Can Revive the American Dream* 41 (2020) (lamenting that some "now think of institutions less as formative and more as performative, less as molds of our character and behavior, and more as platforms for us to stand on and be seen").

[81] *Rosenberger*, 515 U.S. at 833 (emphasis added).

[82] *Walker*, 576 U.S. at 217; *Pleasant Grove City v. Summum*, 555 U.S. 460, 470–72 (2009).

[83] *Walker*, 576 U.S. at 217. Although Supreme Court precedent directs this binary choice "between the government-as-speaker and the government-as-the-creator-of-public-fora," some academics argue for reorienting doctrine in this area around a "government speech–forum continuum." Wayne Batchis, *The Government Speech–Forum Continuum: A New First Amendment Paradigm and Its Application to Academic Freedom*, 75 N.Y.U. Ann. Surv. Am. L. 33, 35 (2020).

[84] *Shurtleff*, 142 S. Ct. at 1589 (citing *Walker*, 576 U.S. at 209–14).

[85] *Summum*, 555 U.S. at 470–72.

[86] *Shurtleff*, 142 S. Ct. at 1589 (citing *Walker*, 576 U.S. at 209–14).

[87] *Id*. at 1590 (citing *Walker*, 576 U.S. at 209–14).

[88] *Summum*, 555 U.S. at 471–73.

As explained below, the nature of a trademark-licensing program makes the forum-opening factors reduce to one inquiry here: whether the military has surrendered any institutional voice in its trademark-licensing decisions.

Similarly, the Supreme Court in *Shurtleff* held that "the most salient feature" of that case was "the extent to which Boston actively controlled" the use of its City Hall flagpole.[89] There, Boston had told the public that it sought to accommodate all applicants "at Boston's 'public forums,' including on City Hall Plaza."[90] Boston admitted to having put essentially no time into thinking about its flag-raising practices. The city had no written policies about what flags groups could fly, and the city had never asked to see an applicant's flag or asked for changes in a flag.[91]

Construing the complaint liberally in Shields' favor, Count 1 survives a motion to dismiss. But Shields faces a higher bar in proving that the military has surrendered any institutional voice in trademark licensing.

**i.**   The first forum-opening factor—the historical purpose of the government program at issue—requires reviewing the purpose of trademark law. Trademark law allows the person who first uses a distinctive mark in commerce to exclude others from using the mark in a way likely to confuse consumers about the origin of goods.[92] By excluding others from using certain words, trademark rights inherently suppress speech. But trademark law blunts that effect through various doctrines, such as fair use and the denial of protection to generic and functional marks.[93]

This case specifically concerns the licensing of trademarks. A license is a grant of permission that negates an element of a trademark-infringement claim, freeing the licensee to sell goods using

---

[89] 142 S. Ct. at 1592.
[90] *Id.*
[91] *Id.*
[92] *See B&B Hardware*, 575 U.S. at 142.
[93] *See, e.g., Sugar Busters LLC v. Brennan*, 177 F.3d 258, 270–71 (5th Cir. 1999); *VIP Prods.*, 953 F.3d at 1174.

the mark.[94] A bare license does not make the licensee an agent of the trademark owner. But a trademark owner typically imposes licensing terms and conditions to uphold the reputation that the owner wants to foster or avoid with its trademark.[95] That is because "trademark owners have a duty to control the quality of their trademarks,"[96] which are "a symbol of goodwill."[97]

Selectively granting permission to use a trademark is expressive conduct, conveying that the licensed product comports with the reputation that the trademark owner wants to cultivate. Hence the tort of trademark dilution occurs by an unapproved use that "harms the reputation of the famous mark."[98] And expression can occur in both granting and denying affiliation, as shown by *Summum*'s consideration of the governmental message expressed by selectively accepting monuments for display.[99] One speaker might prefer to avoid placing its mark on products that it views as "incredibly divisive" such as a "Choose Life" placard,[100] whereas another speaker might view such usage as desirable.[101] Or consider the "Satan's Shoes" made by inserting blood into shoes with

---

[94] 15 U.S.C. § 1114(1) (creating liability for use of a registered trademark "without the consent of the registrant").

[95] *See Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48 (9th Cir. 1971) (discussing licensing rationales).

[96] *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010); *accord Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992) (noting that, without proper control, "a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.").

[97] *Sugar Busters*, 177 F.3d at 265; *see* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (5th ed.) § 3:2 (summarizing the functions of trademarks, including source designation and visually representing the "good will and reputation" that a business has built up).

[98] 15 U.S.C. § 1125(c)(2)(C).

[99] *Summum*, 555 U.S. at 473 ("The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park").

[100] *E.g.*, *Child. First Found., Inc. v. Fiala*, 790 F.3d 328, 352 (2d Cir.), *opinion withdrawn and superseded on reh'g in part*, 611 F. App'x 741 (2d Cir. 2015), quoted in *Walker*, 576 U.S. at 235 (Alito, J., dissenting) (noting New York's rationale for rejecting "Choose Life" state license plates).

[101] *E.g.*, *Walker*, 576 U.S. at 235 (Alito, J., dissenting) (noting Texas's approval of "Choose Life" state license plates).

Nike's trademark; the proprietor willingly attached its name to the product, whereas Nike sued based on unauthorized affiliation.[102] In short, marketing viewpoints can be as "complex and multifaceted" as are other viewpoints in modern life.[103]

If trademarks registered by private entities "are private . . . speech" for First Amendment purposes, as the Supreme Court held in *Matal v. Tam*,[104] then trademarks registered by governmental entities are government speech for First Amendment purposes. And if a private owner's trademark-licensing choices are presumed to be expressive conduct, then a government owner's trademark-licensing choices are also presumed to be expressive conduct. That, in turns, sets up a presumption that the first forum-opening factor favors the government in this case.[105]

To illustrate the point with a government example outside the military context, take the Smokey Bear trademark owned by the U.S. Forest Service.[106] Over 100 companies have a license to use the character on products ranging from aprons to koozies.[107] But the licensing program states its focus on the government's vision of Smokey Bear as a "trusted and embraced" character promoting "wildfire prevention."[108] As long as the Forest Service has not licensed Smokey Bear to appear on goods promoting pyromania, it

---

[102] Bryan Pietsch, *Nike Sues over Unauthorized 'Satan Shoes,'* N.Y. Times (Mar. 28, 2021) https://www.nytimes.com/2021/03/28/style/nike-satan-shoes-lil-Nas-x.html.

[103] *Rosenberger*, 515 U.S. at 831.

[104] 582 U.S. 218, 239 (2017).

[105] Instruction 5535.12 explicitly recites its purpose to advance the government's own vision of public goodwill: "DoD marks may not be licensed for use in a manner that would reflect negatively on the DoD; degrade the name, reputation, or public goodwill of the DoD Components; or be contrary to community relations objectives." *See supra* note 22.

[106] The character's name and likeness are protected by PTO registration and statutory trademark. *See* SMOKEY BEAR, U.S. Trademark Serial No. 89,001,660; 16 U.S.C. § 580p-1.

[107] U.S. Forest Service, Official Smokey Bear Licensees and Products, https://www.fs.usda.gov/working-with-us/contracts-commercial-permits/smokeybearlicensing.

[108] U.S. Forest Service, Licensing of Smokey Bear, https://www.fs.usda.gov/working-with-us/contracts-commercial-permits/licensing-of-smokey-bear.

seems difficult to see that licensing program as opening a limited public forum for using the Smokey Bear trademark.

Although the first forum-opening factor presumptively favors an agency in operating a trademark-licensing program, that presumption may be rebutted by the history of a specific program. Here, the complaint pleads that the military has "opened its trademarks for the public to use on a wide variety of products."[109] But that alone is not enough. *Walker* shows that government speech is not incompatible with promoting or associating with even directly competing products or services, such as the many competitor universities showcased by Texas's government speech in that case.[110]

The complaint here also pleads, however, that "the DoD has not used the particular medium at issue, licensing trademarks to speak to the public."[111] At the motion to dismiss stage, the complaint is liberally construed in favor of the plaintiff. So the court reads this as an allegation that the military has exercised no licensing voice at all, similar to Boston's approach to flying private flags at its city hall in *Shurtleff*.

It is feasible that a trademark owner's licensing practices may be so unrestricted that the owner takes no position at all on how licensed products or services relate to public perception of owner. The trademark defense of "naked licensing" reflects that possibility.[112] And the Eighth Circuit reached a similar conclusion on the record before it in *Gerlich v. Leath*.[113] The facts there were close to those in *Rosenberger*: a university offered its property (a trademark in *Gerlich*, money in *Rosenberger*) for use by any student organization while disclaiming any substantive standards for the organizations' usage.

---

[109] Doc. 34 at 31 ¶ 123.
[110] 576 U.S. at 236 (appendix to opinion of Alito, J., dissenting).
[111] Doc. 34 at 31 ¶ 124.
[112] *See FreecycleSunnyvale*, 626 F.3d at 515 (explaining the "naked licensing" defense in trademark law).
[113] 861 F.3d 697 (8th Cir. 2017).

Here, if the strongest reading of Shields' allegation is born out by the evidence, it would rebut the presumption that trademark licensing has a selective purpose. Accordingly, the first forum-opening factor is treated as favoring Shields for purposes of defendants' motion to dismiss.

**ii.**   The second forum-opening factor is the public's likely perception of who is speaking. Shields' complaint alleges that "Members of the public associate Shields dog tags, such as those bearing phrases such as 'Army Mom' and 'Marine Sister,' to be expression of the person wearing the item."[114] Of course, consumers often display or use a trademark-bearing product to achieve a self-expressive purpose beyond identifying the source of the goods. But the self-expressive aspects of a consumer's choice tied to a trademark are often possible only because the trademark identifies a particular source of the product. So this point does not undermine the public's perception that a trademark owner has affiliated with a product when licensing its trademark.

The complaint does, however, call this second factor into sufficient question by alleging that the military does not exercise any expressive control over how its trademarks are licensed. That is the same pleading that suffices to call the first forum-opening factor into enough dispute to survive a motion to dismiss. It suffices on this factor too.

**iii.** The third forum-opening factor is the extent to which the government has actively shaped or controlled the expression at issue. Again, the focus here is on the military's control over how its trademarks are licensed. The same pleading that suffices as to the first and second forum-opening factors also suffices here.

\* \* \*

If the military does not have meaningful conditions and controls on the licensing of its trademarks, the military may be deemed to have opened a limited public forum for private expression using those marks. That is sufficiently pleaded in Shields'

---

[114] Doc. 34 at 34 ¶ 125.

complaint, liberally construed. If a public forum were opened, dis-allowing views that promote religious beliefs would seem a prima facie case of unconstitutional viewpoint discrimination. So de-fendants' motion to dismiss the viewpoint-discrimination claims in Counts 1, 9, and 10 is denied. As in *Shurtleff*, the "parties [may] engage[] in discovery" on the forum-opening factors.[115]

### b. Burden on religious exercise

Defendants next seek dismissal of Shields' claims that the mil-itary's trademark-licensing policy violates the Free Exercise Clause (Count 2) and RFRA (Count 8) and that those violations justify relief under the APA (Counts 9 and 10).[116]

The Free Exercise Clause "protects religious observers against unequal treatment."[117] So the government "cannot in a se-lective manner impose burdens only on conduct motivated by re-ligious belief."[118] If a law burdening religious practice is not of general and neutral applicability, the law must be narrowly tai-lored to a compelling governmental interest.[119]

As a constitutional matter, strict scrutiny does not apply to laws of general and neutral applicability that burden religious practice. But it does apply to them by statute. Under RFRA, the government may "not substantially burden a person's exercise of religion even if the burden results from a rule of general

---

[115] *Shurtleff*, 142 S. Ct. at 1589.

[116] Counts 2 and 9–11 refer to the military's Instruction "5525.12," not 5535.12. The court assumes that the latter citation was intended.

[117] *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993).

[118] *Id*. at 542–43.

[119] *Id*. at 531–32. Trademark law itself "is neutral and generally applicable" within the meaning of Free Exercise Clause precedent. *Gen. Conf. Corp. of Sev-enth-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (addressing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990)); *cf. Van Stry v. McCrea*, No. 2:19-cv-00104, 2020 WL 1812586, at *6–7 (E.D. Tex. Apr. 9, 2020) (Bryson, J.) (holding that "the Copyright Act is a neutral, generally ap-plicable law" for purposes of a Free Exercise Clause defense to copyright in-fringement). So in a private infringement dispute, there is no Free Exercise defense based on a defendant's religious reason to use a trademark. That is so even if the mark itself is religious, as in *McGill*. 617 F.3d at 405–06, 409.

applicability" unless the burden is the least restrictive way to advance a compelling governmental interest.[120]

The asserted burden on religious exercise here is "preventing Shields from producing its products" that use the military's registered trademarks.[121] That burden arises from the prospect of trademark liability. And that liability requires the concurrence of four things: (1) the absence of a license to use a given trademark, (2) Shields' using the trademark in a prohibited way, as by creating likely consumer confusion, (3) the mark being protectable, not invalid, and (4) no applicable defense to the trademark's use, such as fair use.

If a particular product is shielded from liability by any of items (2)–(4), then the absence of a trademark license would not matter to liability. And whereas the issuance of a trademark license is within a trademark owner's control, items (2)–(4) are legal determinations about the scope of intellectual-property rights, which this case will determine as to certain of Shields' products. Although one might argue that the need to litigate those issues is itself a substantial burden on the exercise of religion—a questionable view in light of the Supreme Court's decision in *Hernandez v. Commissioner*—that burden would survive strict scrutiny based on the compelling public interest in resolving disputes over the scope of property rights in a uniform system of litigation, free of myriad exceptions, similar to the interest behind the tax provisions upheld in *Hernandez*.[122]

---

[120] 42 U.S.C. § 2000bb-1(a), (b).

[121] Doc. 34 at 49 ¶ 206; *accord id.* at 30 ¶ 117, 34 ¶ 149.

[122] *Hernandez v. Commissioner*, 490 U.S. 680 (1989), expressed doubt as to the substantiality of the burden on religious exercise alleged to arise from a tax provision when "[n]either the payment nor the receipt of taxes is forbidden by the Scientology faith generally, and Scientology does not proscribe the payment of taxes in connection with auditing or training sessions specifically." *Id.* at 699. The same doubt may be expressed as to the payment of the costs of litigation to determine the scope of intellectual-property rights, even when those property rights are relevant to religious practice. Although the Court in *Hernandez* expressed doubt on the burden issue, it ultimately held that any burden passed muster under strict scrutiny. *Id.* at 699–700.

For that reason, analysis of Shields' challenge to the licensing practices listed as item (1) must assume that requirements (2)–(4) for trademark liability are met as to Shields' products that are sold without a license (or outside the terms of a license). Only then could item (1)—defendants' challenged licensing practices—potentially impose a substantial burden on religious exercise. For purposes of the religious-exercise claims, therefore, the court assumes that any marks not licensed for use on Shields' dog tags are valid trademarks, used in a way likely to confuse consumers, without a defense to liability (other than religious-exercise rights). The question under Counts 2 and 8 is whether the military's failure to license that usage violates the Free Exercise Clause or RFRA.

The answer turns on the same categorization called for by the free-speech challenge to Instruction 5535.12. If the military's grants of trademark licenses are government speech, then any burden from the military's licensing choice is justified by the compelling governmental interest that animates trademark law generally and, specifically, a trademark owner's liberty to decide and control its own vision of a mark's reputation. That conclusion is driven by the Supreme Court's holding that even a trademark regime without some traditional features of trademark law survives First Amendment strict scrutiny as being no "greater than necessary to further a substantial governmental interest."[123] And because a trademark owner's expressive freedom in controlling the use of its mark is the compelling public interest, a court has no role in opining on whether a particular vision of brand reputation is compelling or not.

On the other hand, if the military's program here is so unrestrictive that the military has surrendered any licensing voice—making its licensing program a limited public forum for private speech using the marks—that deficiency also negates the compelling public interest for denying Shields' ability to use the marks. Shields' complaint, liberally construed, sufficiently pleads the

---

[123] *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 531–32, 537 (1987).

absence of governmental speech. *See supra* Part I.C.1.a. And denying the ability to participate in a limited public forum for speech using military trademarks has been sufficiently pleaded as substantially burdening Shields' religious practice of ministering to others.[124] For those reasons, the motion to dismiss Counts 2 and 8–10 for failing to state a claim is denied.

### c.  Establishment of religion

The Establishment Clause prohibits the making of any law respecting an establishment of religion. Count 3 of the complaint alleges that Instruction 5535.12 and its implementation violate the Establishment Clause insofar as they prohibit licensing the military's trademarks for a purpose of promoting religious beliefs.[125]

The doctrinal basis of that allegation is unclear. A typical Establishment Clause claimant argues "that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so."[126] Count 3 contains no such pleading. And Count 3 cites only *Good News Club v. Milford Central School District*, which in pertinent part noted that neutrality toward religion is an important part of upholding against Establishment Clause scrutiny a government program that *aids* religion.[127] But Shields' contention is that the military's licensing policy disfavors religion, not that it aids religion.

Shields' response to the motion to dismiss lumps together its Free Exercise Clause and Establishment Clause claims.[128] Shields' joint argument on those claims cites the Establishment Clause only for the proposition that a *Free Exercise Clause*

---

[124] Doc. 34 at 48 ¶ 204; *see Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (addressing RLUIPA test: "the effect of a government action or regulation is significant when it . . . forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs").

[125] Doc. 34 at 34–35 ¶¶ 153–54.

[126] *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quotation and alteration marks omitted).

[127] 533 U.S. 98, 114 (2001).

[128] Doc. 45 at 18–25.

challenge to a benefit program's exclusion of religious recipients cannot be justified by an interest in separating church and state more fiercely than required by the Establishment Clause.[129] Again, that does not explain how the Establishment Clause is violated here.

The Establishment Clause itself singles out religion as an impermissible subject of some government action, so it cannot be unconstitutional simply to treat religion distinctly as a subject.[130] And the Establishment Clause does not affirmatively require that government speech support religion or particular religious practices. For example, the Fourth Circuit has held that a city council's decision to open its legislative meetings with only nonsectarian prayers, as opposed to denominational prayers, did not violate the Establishment Clause.[131] Of course, the Free Exercise Clause or RFRA may require governmental support if its denial improperly burdens or discriminates against religious exercise. But Shields has not pleaded facts showing a violation of the Establishment Clause itself, so Count 3 is dismissed for failing to state a claim on which relief can be granted.

### 2. Licensee-estoppel defense (Count 7)

Count 7 seeks an order pursuant to § 37 of the Lanham Act[132] cancelling the registration of certain trademarks as generic and incapable of protection as trademarks.[133] The complaint identifies only five trademark registrations specifically:

- ARMY, U.S. Reg. No. 2[,620,9]79.[134]

---

[129] *Id.* at 21 (citing *Carson ex rel. O. C. v. Makin*, 142 S. Ct. 1987, 1997 (2022)).

[130] *See Locke v. Davey*, 540 U.S. 712, 721 (2004).

[131] *Turner v. City Council of the City of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008).

[132] 15 U.S.C. § 1119.

[133] Doc. 34 at 46 ¶ 198.

[134] The complaint cites a nonexistent "trademark registration for 'ARMY,' U.S. Trademark Registration No. 27034279 on September 17, 2002 for 'Posters, . . .' in Class 16 and 'entertainment services . . .' in Class 41." Doc. 34 at 20 ¶ 67. The court takes judicial notice that no such trademark registration

- ARMY, U.S. Reg. No. 3,152,724.[135]
- MARINE, U.S. Reg. No. 6,280,533.[136]
- MARINES, U.S. Reg. No. 4,707,971.[137]
- NAVY, U.S. Reg. No. 6,169,397.[138]

The complaint also alleges that the military has registered other trademarks in the words *Army*, *Marine*, *Marines*, and *Navy* and in marks related to the name *Air Force* but not in that name itself.[139]

The complaint notes that Shields licensed Air Force, Army, and Marine Corps trademarks.[140] Defendants now move to dismiss Count 7—except as to Navy trademarks, which Shields never licensed[141]—based on "the doctrine of licensee estoppel."[142] Although the motion notes that each of Shields' license agreements included a commitment not to contest the validity of the licensed marks, those agreements have now expired.[143] Defendants thus rely on licensee estoppel, noting that it does "not require[]" a contractual no-contest clause.[144]

Estoppel is an affirmative defense listed in Federal Rule of Civil Procedure 8(c)(1). An affirmative defense does not negate the elements of a claim; it presents outside matters to allow the defendant to win even if the plaintiff proves its claim.[145] Courts "should usually refrain from granting Rule 12(b)(6) motions on

---

number exists in the PTO's Trademark Status & Document Retrieval system. The court also takes judicial notice of that system's record of a registration on that date, for those product types and classes, of a trademark in the word Army. *See* ARMY, U.S. Reg. No. 2,620,979. The court assumes that paragraph 67 of the complaint refers to that registered trademark.

[135] Doc. 34 at 43 n.21.

[136] *Id.* at 45 n.30.

[137] *Id.*

[138] *Id.* at 44 n.27.

[139] *Id.* at 43 ¶ 189, 44 ¶ 191, 44 ¶ 193, 45 ¶ 196.

[140] *Id.* at 21 ¶ 70, 24 ¶ 87, 27 ¶ 97.

[141] Doc. 37 at 16–17.

[142] *Id.* at 38–39.

[143] *Id.* at 38–39 & n.9.

[144] *Id.* at 39 n.9.

[145] *Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7*, 920 F.3d 269, 273 & n.14 (5th Cir. 2019).

affirmative defenses" because "these defenses typically turn on facts not before the court at that stage in the proceedings."[146]

Defendants have not shown any reason to depart from that principle here. The defense of licensee estoppel is "equitable in nature" and "not subject to rigid application."[147] So all of the relevant facts and circumstances should be developed before its applicability is determined. Indeed, the only Fifth Circuit case cited by the government on point ruled on this defense only after the district court issued "findings of facts," after which the Fifth Circuit emphasized "the facts and . . . circumstances here presented."[148]

In that case, a collaboration that "was never extremely amicable" ended in a "final estrangement" and termination of a license agreement.[149] The former licensee, when sued for continuing to use the trademark, raised the bold defense that the owner's failure to supervise the licensee's conduct during the term of the license agreement invalidated the trademark.[150] The facts and circumstances of that abandonment defense—arguing that the licensee's own conduct led to trademark invalidity—estopped the licensee from challenging the validity of the mark (and only then estopped a challenge based on conduct during the license term).[151]

In contrast, Shields is not relying on its own conduct in arguing that certain marks are unprotectable as generic. It is relying on all English speakers. Shields' claim also turns on the marks' usage before and after the term of Shields' license agreement. And, in

---

[146] *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *see also Cothron v. White Castle Sys., Inc.*, 467 F. Supp. 3d 604, 614 (N.D. Ill. 2020) ("waiver and estoppel are affirmative defenses").

[147] *Westco Group, Inc. v. K.B. & Assocs.*, 128 F. Supp. 2d 1082, 1090 (N.D. Ohio 2001); *accord* Restatement (Third) Unfair Competition § 33 cmt. d ("licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case").

[148] *Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 667, 672 (5th Cir. 1975).

[149] *Id*. at 666.

[150] *Id*. at 671 & n.1.

[151] *Id*.

contrast to the case cited by the Fifth Circuit for its ruling on which defendants rely, Claim 7 does not present a contest between plaintiff and defendant for ownership of a trademark.[152] The equities are entirely different when a former licensee seeks, not to take ownership of a mark for itself, but to cancel a mark's registration and thus free certain language for addition to the public domain. Those equities call to mind one court's inability to "think of any reason why such a licensee ought to be estopped; or why, a grant of a license should permanently immunize a trademark holder from legal attack."[153]

In short, nothing about the licensee-estoppel defense raised here suggests its suitability for resolution on a motion to dismiss. The motion to dismiss Count 7 on this basis is denied.

### 3.   Viability of individual-capacity relief

The four individual-capacity defendants move to dismiss the damages claims against them as unauthorized by *Bivens* or RFRA, and as barred by qualified immunity. Shields responds that it no longer wishes to pursue *Bivens* damages claims against those defendants.[154] That notice is treated as a Rule 15(a)(2) motion to amend the complaint. The court grants leave to do so, and the complaint is deemed amended to strike the *Bivens* damages claims for alleged constitutional violations.

Shields also seeks damages against the individual-capacity defendants for allegedly burdening religious exercise in violation of RFRA. The remedies provision of RFRA "permits litigants, when

---

[152] *Medd v. Boyd Wagner*, 132 F. Supp. 399, 405 (N.D. Ohio 1955) (applying licensee estoppel "as between parties claiming the right to a trade-mark," to defeat the former licensees' claim that ownership "became lodged in" them), *cited in PGA*, 514 F.2d at 671. Estoppel from claiming ownership of a licensed mark is the traditional application of licensee estoppel. Restatement (Third) Unfair Competition § 33 cmt. d ("A licensee who has used a designation under a license from another is ordinarily estopped from asserting *ownership* of the designation as against the licensor.") (emphasis added); *see, e.g.*, *Seven-Up Bottling Co. v. Seven-Up Co.*, 561 F.2d 1275, 1279 (8th Cir. 1977) (applying the "long settled principle of law that a licensee of a trademark or tradename may not set up any adverse *claim in it* as against its licensor.") (emphasis added).

[153] *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46–47 (1st Cir. 1991).

[154] Doc. 49 at 26.

appropriate, to obtain money damages against federal officials in their individual capacities."[155] As to whether damages are "appropriate," the directors assert entitlement to qualified immunity.

Shields briefly argues that qualified immunity is not an available defense in a RFRA action. Shields reasons that "[q]ualified immunity is a judicial intervention under 42 U.S.C. § 1983" whereas "RFRA does not even recognize qualified immunity."[156] But qualified immunity is not a statutory creation. It is a common-law immunity that need not be named in a statute to be available.[157] Hence, it can be a defense in *Bivens* actions against federal officials.[158] The existence of the immunity depends, not upon enactment, but rather upon "historical origins" and "public policy."[159]

Leading up to RFRA's enactment, federal officials could assert qualified immunity as a defense to a *Bivens* claim for damages from a Free Exercise Clause violation.[160] And since RFRA was "intended to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder*" for free-exercise violations,[161] the court sees no immediately apparent reason why the qualified-immunity inquiry into historical origins and public policy would differ as between Free Exercise Clause and RFRA challenges to the same federal action.

Nor has any other court. All five circuit courts to decide the issue have held that qualified immunity from damages may be asserted in a RFRA action against federal officials.[162] And even the

---

[155] *Tanzin*, 141 S. Ct. at 493.

[156] Doc. 49 at 12.

[157] *Filarsky v. Delia*, 566 U.S. 377, 384 (2012).

[158] *Butz v. Economou*, 438 U.S. 478, 507–08 (1978).

[159] *Richardson v. McKnight*, 521 U.S. 399, 404 (1997); *e.g.*, *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) (applying that two-part inquiry).

[160] *See, e.g.*, *Jihaad v. O'Brien*, 645 F.2d 556 (6th Cir. 1981).

[161] *Sossamon*, 563 U.S. at 281 (quotation marks and citations omitted).

[162] *Mack v. Yost*, 63 F.4th 211, 224 (3d Cir. 2023); *Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 813 (10th Cir. 2022); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015); *Padilla v. Yoo*, 678 F.3d 748, 756–57 (9th Cir. 2012); *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012).

parties in *Tanvir* agreed "that government officials are entitled to assert . . . qualified immunity."[163]

Given that reasoning and authority, one would expect to see Shields provide meaningful discussion of the common law and public policies that support its desired conclusion on the immunity's availability. But Shields has not provided any such discussion in its briefing.[164] That forfeits any argument under the governing legal test, although Shields has preserved its argument that RFRA does not itself mention qualified immunity. For that reason, the court proceeds to apply the two-part test for whether qualified immunity applies to a particular alleged violation.

Qualified immunity shields government officials from damages unless (1) they violated a federal statutory or constitutional right and (2) the unlawfulness of their conduct was clearly established at the time.[165] Courts may consider either inquiry first,[166] and Shields does not dispute that either inquiry may be decided in this procedural posture.

For a violation of law to be "clearly established" for purposes of qualified immunity, the law at the time of the official's conduct must have been "'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful."[167] The illegality of the official's conduct must be "beyond debate" and have a "sufficiently clear foundation in then-existing precedent," amounting to "settled law, which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"[168] Clearly established law is not defined at a "high level of generality" but must "clearly prohibit the officer's conduct in the particular circumstances before him."[169]

---

[163] 141 S. Ct. at 492 n.*.
[164] Doc. 49 at 18.
[165] *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018).
[166] *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021).
[167] *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).
[168] *Id.* (citations omitted).
[169] *Id.*

Under those principles, the individual-capacity defendants are entitled to qualified immunity on Shields' RFRA claim. No Supreme Court case law addresses whether and when the government's licensing of trademarks that it owns exceeds the government-speech doctrine or works a substantial religious-exercise burden not narrowly tailored to a compelling governmental interest. Nor is there any controlling authority or consensus of persuasive authority addressing whether a person's religious exercise is impermissibly burdened under RFRA or the Free Exercise Clause when government officials do not enter licensing contracts to allow companies to use government-owned trademarks alongside religious scripture. The motion to dismiss Count 8's damages claim against the individual-capacity defendants as foreclosed by qualified immunity is granted.

### D. Summary

To review, the court's rulings are as follows:

| Count | Description | Ruling |
|---|---|---|
| 1 | Free Speech Clause—licensing | Claim for damages dismissed but otherwise not dismissed |
| 2 | Free Exercise Clause—licensing | Claim for damages dismissed but otherwise not dismissed |
| 3 | Establishment Clause—licensing | Claim dismissed |
| 4 & 6 | Noninfringement—expressive work/free speech | Claim not dismissed |
| 5 | Noninfringement—no likely confusion/fair use | Claim not dismissed |
| 7 | Noninfringement—generic mark | Claim not dismissed |
| 8 | RFRA—licensing | Claim for damages dismissed; claim of third parties' rights dismissed; otherwise not dismissed |
| 9 | APA relief on First Amendment licensing claims | Claim not dismissed |
| 10 | APA relief on RFRA licensing claim | Claim not dismissed |
| 11 | APA relief for arbitrary and capricious licensing | Claim dismissed as to Instruction 5535.12 but not dismissed as to implementation of same |

Because the damages claims against the trademark-office directors have all been dismissed, counsel for defendants in their individual capacities need not continue to defend those claims here.

## II. Shields' motion for a preliminary injunction

Shields seeks a preliminary injunction against the denial or limitation of a trademark license for its dog tags pursuant to Instruction 5535.12, asserting a likelihood of success in proving a

violation of the First Amendment and RFRA.[170] A substantial likelihood of success on the merits is required to show entitlement to the extraordinary relief of a preliminary injunction.

Now that the Establishment Clause claim has been dismissed, Shields has no likely success on that claim. And the court has now analyzed (*supra* Part I.C.1) the Free Speech Clause, Free Exercise Clause, and RFRA claims underlying the motion for a preliminary injunction. Those claims' success depends, not on a showing that the military has exercised its own licensing voice by distancing its trademarks from acutely religious expression, but that the military has made those marks generally available to all, thus opening a forum for speech using the marks.

The exhibits before the court show that the military allows hundreds of vendors to apply its trademarks to many products, ranging from beer-tap handles to greeting cards to t-shirts.[171] But as explained above,[172] government expression in licensing is not incompatible with promoting or associating with a great many products, even competing products.

The exhibits before the court do not contain any unconditional trademark licenses. And Instruction 5535.12 itself directs the trademark offices to impose controls on brand management. The nature and variety of products licensed by the military do show a capacity for those products to be used by consumers to express themselves. But, as explained above, consumer self-expression does not mean that a trademark owner has surrendered its own voice in licensing.[173] A trademark owner need not adopt a vision of brand reputation limited to a niche market in a single message or a single viewpoint.

By way of contrast with the salient facts about the City of Boston in *Shurtleff*, the evidence here does not show that the military has given no thought to its licensing standards, has sought to

---

[170] Doc. 27 at 14–28.
[171] *E.g.*, Docs. 27-23, 27-43, 27-18 to 27-22.
[172] *See supra* notes 100–101 and accompanying text.
[173] *See supra* notes 106–108, 114 and accompanying text.

approve all applicants, lacks a written policy or guidance on licensing standards, has never requested to see a vendor's product, or has never requested a change to that product.[174] Nor, by way of contrast with the facts in *Gerlich*, does the evidence before the court show that the military has offered trademarks for use by all vendors so long as they apply via the right process and follow mere "design standards" in reproducing the trademarks.[175]

In sum, the court is unable to find evidence now before it that makes out a substantial likelihood of success on the Free Speech Clause, Free Exercise Clause, and RFRA challenges to the military's trademark-licensing program (Counts 1, 2, and 8). The court thus denies a preliminary injunction on those claims. But the evidence may be developed in discovery.

## Conclusion

For the reasons given above, the individual-capacity defendants' motion to dismiss is granted, the official-capacity defendants' motion to dismiss is granted in part and denied in part, and plaintiff's motion for a preliminary injunction is denied. This revised order and opinion supersedes and replaces the court's original order and opinion of March 31, 2023.

*So ordered by the court on May 5, 2023.*

J. CAMPBELL BARKER

United States District Judge

---

[174] *See supra* note 76.
[175] *See supra* note 113; *Gerlich*, 861 F.3d at 701.

- 37 -