**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

SHIELDS OF STRENGTH,

        Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
DEFENSE; LLOYD J. AUSTIN III, in his
official capacity as Secretary of Defense; ARMY
TRADEMARK LICENSING PROGRAM
OFFICE; PAUL JENSEN, individually and in
his official capacity as Director of the Army
Trademark Licensing Program; U.S. MARINE
CORPS TRADEMARK & LICENSING
PROGRAM OFFICE; JESSICA O'HAVER,
individually and in her official capacity as
Director of the Marine Corps Trademark
Licensing Office; NAVY TRADEMARK
LICENSING OFFICE (OFFICE OF NAVAL
RESEARCH); NADINE SANTIAGO,
individually and in her official capacity as
Director of the Navy's Trademark Licensing
Program; AIR & SPACE FORCES
INTELLECTUAL PROPERTY
MANAGEMENT OFFICE; and APRIL
ROWDEN, individually and in her official
capacity as Director of the Air & Space Forces
Trademark and Licensing Program,

        Defendants.

Case No. **6:21-cv-00484**

**SECOND AMENDED[1] COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND DAMAGES**

---

[1] To the extent the Court has already dismissed some parts of the complaint, Plaintiff does not attempt to re-raise those issues. The parts are retained in this Second Amended Complaint to for

1.      Plaintiff Shields of Strength ("SoS" or "Shields") files this First Amended Complaint for declaratory and injunctive relief and damages against Defendants and alleges as follows:

## PRELIMINARY STATEMENT

2.      Plaintiff Shields of Strength is a private, faith-based business with a registered place of business in Beaumont, Texas.  Founded over two decades ago by Mr. John Kennedy Vaughan in 1998, Shields creates and sells military-themed items such as replica "dog tags" and jewelry. Many Shields products include Bible verses, while other products draw upon the Bible as inspiration for encouraging words and phrases. The following graphics depict typical Shields dog tags:



Graphic 1. Shields of Strength dog tag with a USMC emblem and "Marine Sister" on one side, and Bible verse "1 Corinthians 13:7-8 [l]ove bears all things, believes all things, hopes all things, endures all things, love never fails" and source designation "Shields of Strength" on the other side.

---

completeness and to have one live complaint with all issues (resolved and not) for purposes of appeal.



Graphic 2. Shields of Strength dog tag with "Army Mom" on one side, Bible verse "1 Corinthians 13:7-8 [l]ove bears all things, believes all things, hopes all things, endures all things, love never fails" and source designation "Shields of Strength" on the other side.

3.      For 23 years, Shields has continuously supported members of the military and their loved ones by providing emblems that help them connect with their faith and express their support for their country, military, and loved ones.  Shields replica dog tags, in particular, are popular due to the messages they carry and encouragement they provide.  In fact, Shields replica dog tags are estimated to be the item "most often carried by members of the military in Afghanistan and Iraq [aside from the official insignias they wear.]"[2] So far, Shields has sold or donated over four million Shields of Strength dog tags.

4.      One notable example is that of Army Captain Russell Rippetoe who was tragically killed in action on April 3, 2003, while serving in support of Operation Iraqi Freedom.  He was wearing a Shields Joshua 1:9[3] dog tag.  Captain Rippetoe was the first combat casualty from Operation Iraqi Freedom to be buried at Arlington National Cemetery.  The following month, during the 2003 Memorial Day Ceremony at Arlington National Cemetery, President George W.

_____

[2] STEPHEN MANSFIELD, THE FAITH OF THE AMERICAN SOLDIER, Chapter 2 "Shields of Strength," (Jeremy Tarcher, 1st ed. 2006).
[3] The dog tag worn by Captain Rippetoe bears an excerpt of Joshua 1:9: "I will be strong and courageous, I will not be afraid."

SECOND AMENDED COMPLAINT                                                            3

Bush spoke of Captain Rippetoe's faith, and mentioned the Shields dog tag Captain Rippetoe wore as a source of great encouragement.[4]

5.     Historically, Shields enjoyed a well-established relationship with Defendant Department of Defense (the "DoD").  In December 2003, the DoD invited Mr. Vaughan to speak at the Pentagon, and Shields eventually sold its products in Army and Air Force Exchange Service ("AAFES") outlets.

6.     Shields' original replica dog tags had only an American flag on one side and a Scripture verse on the other.  Around 2001, an Army chaplain contacted Shields and commissioned the production of a replica dog tag with Army insignia.  Since then, many of Shields's military themed products have originated from specific requests by members of the DoD.

7.     For more than a decade before 2011, the DoD did not require Shields to obtain licenses in order to produce and sell military-themed products.  But after 2011, DoD officials from the Army, Navy, Air Force, and Marines informed Shields that it would need to obtain trademark licenses before continuing to sell military-themed products.  Despite the significant, newly-created financial and administrative burdens this imposed, Shields complied with the DoD directive and obtained trademark licenses from the U.S. Department of the Army ("Army"), U.S. Marine Corps ("Marine Corps"), and U.S. Department of the Air Force ("Air Force").  Shields was not able to obtain a license from the U.S. Department of the Navy ("Navy") because the Navy would not approve products that contained Bible verses and references.

8.     In July 2019, over two decades after Shields began selling its military-themed products, a non-governmental organization, the Military Religious Freedom Foundation

---

[4] David Dodd/Fox News, *Shields of Strength Fox News*, YOUTUBE (2003), https://www.youtube.com/watch?v=0XvAXHqW-Ec

SECOND AMENDED COMPLAINT                                                                 4

("MRFF"), submitted complaints to various DoD Trademark Licensing Offices demanding that the DoD and individual service branches prohibit Shields from producing and selling DoD-licensed items that contain religious content.  Despite years of licensed sales of such items by Shields, the DoD and the service branches promptly complied with the MRFF's demands and sent Shields cease-and-desist notices prohibiting Shields from producing or selling licensed items with religious content.

9.      Shields files this action in order to freely exercise its religious liberties and continue making, selling, and donating its products free from impermissible and improper interference from the DoD and Service Branches.

## PARTIES

10.      Plaintiff Shields of Strength is a private, patriotic, faith-based business with a registered place of business in Beaumont, Texas. Its mission is "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ."

11.      Defendant United States Department of Defense is an executive branch department that coordinates and supervises all agencies and functions of the government related to the United States Armed Forces, including licensing and monitoring the use of military trademarks.[5]

12.      Defendant Lloyd J. Austin III is the Secretary of Defense. The Secretary is sued in his official capacity. The Secretary is responsible for the licensure of DoD Trademarks, service marks, certification marks, and collective marks to private companies he deems qualified to use

---

[5] Shields does not concede that DoD and Service Branches own enforceable trademarks. Nothing in this Complaint shall be interpreted as an admission regarding or acknowledgement of Defendants' alleged trademark rights.  Shields reserves all rights to object to or challenge any trademark rights or filings allegedly owned or owned by the DoD and Service Branches.

SECOND AMENDED COMPLAINT                                                        5

such marks. *See* 10 U.S.C. § 2260. The Secretary authorized the promulgation and enforcement of DODI 5535.12.

13.     Defendant Army Trademark Licensing Program Office (the "Army TMLPO") is an executive branch department under the Department of the Army that licenses and monitors the use of Army trademarks.

14.     Defendant Paul Jensen is the Director of the Army Trademark Licensing Program. Defendant Jensen is sued in his official and individual capacities. Defendant Jensen is responsible for the licensure of Army trademarks, service marks, certification marks, and collective marks to private companies. Defendant Jensen's predecessor in office, Michael J. Sullivan, denied Shields of Strength a license for use of the Army logo alongside Bible verses.

15.     Defendant United States Marine Corps Trademark & Licensing Program Office (the "Marine Corps TMLPO") is an executive branch department under the United States Marine Corps that licenses and monitors the use of trademarks belonged to the Marine Corps.

16.     Defendant Jessica O'Haver is the Director of the Marine Corps TMLPO. Defendant O'Haver is sued in her official and individual capacities. Defendant O'Haver is responsible for the licensure of Marine Corps trademarks, service marks, certification marks, and collective marks to private companies. Defendant O'Haver denied Shields of Strength a license for use of the Marine Corps logo alongside Bible verses she deemed too "controversial."

17.     Defendant Navy Trademark Licensing Office (Office of Naval Research) (the "Navy TMLO") is an executive branch department under the United States Department of the Navy that licenses and monitors the use of trademarks belonged to the Navy.

18.     Defendant Nadine Santiago is Director of the Navy TMLO. Defendant Santiago is sued in her official and individual capacities. Defendant Santiago is responsible for determining

what types of products can carry the Navy's trademark. Defendant Santiago denied Shields of Strength a license to use the Navy logo with Bible verses.

19.    Defendant Air & Space Forces Intellectual Property Management Office (the "Air & Space Forces IPMO") is an executive branch department under the United States Department of the Air Force that licenses and monitors the use of Air Force trademarks.

20.    April Rowden is the Director of the Air & Space Forces IPMO. Defendant Rowden is sued in her official and individual capacities. Defendant Rowden is responsible for the licensure of Air & Space trademarks, service marks, certification marks, and collective marks to private companies.

## JURISDICTION AND VENUE

21.    This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

22.    The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

23.    The Court also has jurisdiction under 28 U.S.C. § 1361 to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

24.    The Court also has jurisdiction to review Defendants' unlawful actions and inactions and enter appropriate relief under the Administrative Procedure Act, 5 U.S.C. §§701–706.

25.    The Court also has jurisdiction to review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–92 (1949).

26.    Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff resides in this judicial district, and events that give rise to the claims in this action occurred in this district.

SECOND AMENDED COMPLAINT                                                                                      7

**FACTS**

A.     **Shields's Founding and Purpose**

27.     Since childhood Kenny Vaughan chased a dream of winning a national championship in water-ski jumping.  But Mr. Vaughan feared failing and the dangers associated with the high-speed, high-risk sport.  To help calm his nerves before a tournament in 1996, his girlfriend, Tammie (now his wife), used a Sharpie to write Bible Scripture on the handle of his water-ski rope. Mr. Vaughan meditated on and prayed about that Scripture, and God's Comfort through His Word weaved a path from the ski rope handle to his head and ultimately to his heart. With peace in his heart, he overcame his fears and after 15 years of failure, Kenny finally realized his dream: He won the 1996 national ski jumping tournament.

28.     To remind himself of the lessons he learned, Mr. Vaughan engraved a dog tag with the Scripture from his ski rope handle.  This was the first "Shields of Strength" product he produced. He wore it under his shirt, but it did not take long for someone to notice and ask about it.  Mr. Vaughan shared his story and gave the dog tag away.  He made another one, and again gave it away to someone in need of hope. Mr. Vaughan eventually realized other people needed and wanted God's Word as much as he did, and it was at that moment "Shields of Strength" was born.

29.     In December 1998, the first Shields dog tags were placed in a store.  By 2001, stores across the country carried them and on one fateful day, they caught the eye of Colonel David Dodd. Colonel Dodd commanded the 86th Signal Battalion of the U.S. Army, and he and his troops were headed to Afghanistan for the start of Operation Enduring Freedom. When he contacted the Vaughans about buying some Shields dog tags in bulk, the Vaughans donated five hundred of them at zero cost to Colonel Dodd for his combat-ready troops.

SECOND AMENDED COMPLAINT                                                                                  8

30.     This began a longstanding friendship and relationship between Shields and the United States military.  The most popular "tag" for soldiers was decorated with the U.S. Flag and engraved with the Bible verse Joshua 1:9. It is this dog tag that made its way to a young Army Captain named Russell Rippetoe, a name that still brings tears to the eyes of those in the Shields family.

31.     In 2003, while serving in Iraq, Captain Rippetoe was killed in action while wearing a Shields dog tag.  He was the first American casualty of Operation Iraqi Freedom laid to rest at Arlington National Cemetery.

32.     The following month, during the 2003 Memorial Day Ceremony at Arlington National Cemetery, President Bush referenced the dog tag Captain Rippetoe was wearing and read the Bible verse engraved on it.  Following that, Shields received calls from various national media outlets and was overwhelmed with the number of people submitting new orders for its dog tags.

33.     One call came from Captain Rippetoe's father, Joe who was also a veteran of war. Joe was so moved by the Shields dog tags his son had worn that he wanted to make sure that each of the other soldiers from Captain Rippetoe's unit had one.

34.     The mission of Shields of Strength remains the same today as it was in the beginning: To share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ.

**B.     Shields' Customers and Creation of Its Products**

35.     Since its founding, Shields has made over four million dog tags and has given hundreds of thousands of them to the U.S. military and other organizations.  In fact, bestselling author Stephen Mansfield wrote in his book, *The Faith of the American Soldier*, "aside from the

SECOND AMENDED COMPLAINT                                                                    9

official insignias they wear, [the Shields dog tag] is the emblem most often carried by members of the military in Afghanistan and Iraq."

36.     Over the years, the popularity of Shields's dog tags grew exponentially and crossed all demographics.  Churches use them as outreach tools, hospitals for encouragement, athletes for courage, military family members to show support for their loved ones and country, military members to self-identify and show support for their country and as a constant reminder of their faith, and thousands of others for the hope they instill while experiencing personal trials.

37.     As Shields' popularity grew, so did the variety of its dog tags.  From athletics to various vocations and hobbies, there is a Shields dog tag for almost every ministry or person. Those who order and/or wear a Shields dog tag include police officers, fire fighters, NASA Astronauts, and EMS professionals. Many professional athletes from a wide range of sportswear Shields dog tags as well, including Reggie Wayne, Ryan Tannehill, Eddie Lacey, Tim Tebow, Ronnie Coleman, Richard Sherman, Earl Thomas, Ray Lewis, Christian Michael, and Robert Griffin III.

38.     By far the largest group of Shields' customers is current and former military members and their families and friends.  One of the reasons that Shields' dog tags are so popular with this group is that the DoD and Service Branches do not offer or provide such dog tags or similar products.  As a result, military members and their families and friends turn to Shields.

39.     The majority of Shields sales have been (i) online through Shields' website and the Army & Air Force Exchange Service ("AAFES") platform, and (ii) to Military chaplains and commanders who approached Shields to request custom dog tags.  In addition to the U.S. military, numerous members of divisions of foreign militaries, including the Canadian Armed Forces, Israel Defense Forces, and British Royal Army, have contacted Shields to purchase and/or customize

SECOND AMENDED COMPLAINT                                                                    10

dog tags.  Shields also makes dog tags for law enforcement departments, rescue organizations, and church groups.

40.    Prior to 2011, Shields created and sold or donated approximately three million different dog tags that displayed U.S. military-related words and/or insignia.  The dog tags were available in military exchanges worldwide for years.  At one point, Shields was sending five hundred to one thousand dog tags per month to the Pentagon Chaplain's office for Pentagon leadership and military guests.  Shields also supported the next generation of the military.  For example, Shields donated twenty thousand dog tags per year to Marines who graduated from boot camp.  Every Marine at Camp Pendleton, a Marine Corps Base outside San Diego, California, was given a Shields Marine Corps-themed dog tag along with their Eagle Globe and Anchor when they became a Marine upon graduating boot camp. The entire graduating classes from West Point each received a Shields of Strength dog tag upon graduation.  At one point, Shields made as many as fifteen thousand dog tags for several entire Divisions of the U.S. military at the request of their Chaplains and Commanding Generals.

41.    It is a tradition in many U.S. military units, for example, the Army's Red Bull unit, 10th Mountain Division, 82nd Airborne, multiple Ranger Battalions, and the Marine Corps' Camp Pendleton, to order custom-designed dog tags from Shields.  Many of these units have ordered as many as five to ten thousand pieces each year for over a decade.  Typically, Shields fulfills each of these custom-design orders by developing a new design based on feedback regarding past designs for these units and elements preferred by these units.  In fact, then General Lloyd Austin (now Secretary of Defense Lloyd Austin) requested thousands of Shields dog tags for the 3rd Infantry Division and the 10th Mountain Division of the Army between 2003 and 2005.  Secretary Austin began a tradition with the 10th Mountain Division that lasted until the Army Trademark

Licensing Program informed Shields that it could no longer make the dog tags.  An example of a Shields' dog tag created for the 3rd Infantry Division with the unit logo and the Scripture verse Joshua 1:9 is below. More examples of such tags are provided in Exhibit A.



42.     The impact that Shields' dog tags have had on U.S. soldiers, as a source of comfort and inspiration, has been documented in several books written by independent authors.  In *The Faith of the American Soldier*, Stephen Mansfield describes one touching example of the inspiration that Shields dog tags provided for our military:

[A] black Marine known for his sonorous voice leads a responsive declaration of Joshua 1:9. While the men say the words in unison, some will kiss the little Shield of Strong from which the words come.

I will be strong and courageous.
I will not be terrified, or discouraged;
For the Lord my God is with me
Wherever I go.

When the black Marine says "Amen," all the others … say "Amen" after him, and this is the sign to disband and move out.[6]

Chaplain (Captain) Don Williamson shares a story about how he used his Shields dog tag to encourage a wounded soldier on a medical evacuation helicopter:

> As they bundled him up, I got down and put my mouth close to his ear.  I whispered to him Joshua 1:9 and told him to stay strong and courageous.  He nodded and closed his eyes.  I wanted to give him something to hang on to.  Then I remembered the Shield of Strength that I had on my dogtag chain.  I quickly took it off and slipped it into the palm of his hand.[7]

These stories illustrate how U.S. military members have relied on the Shields dog tags as an expression of their religious faith and source of strength while on the battlefield.

43.     Despite having never advertised to foreign militaries or solicited business from them, the popularity of Shields' products spread worldwide. Over the years, foreign military members also became acquainted with Shields and began requesting their own Shields dog tags.  Shields made dog tags displaying Bible verses for soldiers of many of America's allies from the Canadian Armed Forces, Israeli Defense Forces, and British Royal Army.  And in each case, a member of these militaries reached out directly to Shields.  For instance, in 2009, Shields received an email request from a member of the British Royal Army to make unique Shields dog tags for Royal Army soldiers.  At their request, Shields even customized the dog tags to spell the words so that they are consistent with "a British point of view … E.g. [changing] 'Savior' into 'Saviour'."  The Royal Army has ordered as many as eight thousand Shields dog tags at a time for their troops, all of which were donated free of charge by Shields.

---

[6] STEPHEN MANSFIELD, THE FAITH OF THE AMERICAN SOLDIER, pp. 174-175, (Jeremy Tarcher, 1st ed. 2006).

[7] Chaplain (Captain) Don Williamson, Bringing Courage to the Courageous, p. 59, (Xulon Press, Sept. 2010).

SECOND AMENDED COMPLAINT                                                          13

### C.      Shields' Design Process

44.     Each Shields dog tag is created for the sole purpose of encouraging and strengthening the hearts of its recipient.  Shields' goal is to give a military member something to hang on to that is meaningful to them and will encourage their hearts in the midst of fear.  Military members worldwide are grateful to represent their service, to defend their flag, and show they trust God to go with them on their mission. Our own military members are particularly grateful to proudly represent their branch as they serve to defend America and the American flag, with a deep trust that God will accompany them on their mission.

45.     With this in mind, Shields designs each dog tag by thoughtfully placing and arranging the American or relevant national flag, the name or insignia of the military branch or unit to which the recipient belongs, a cross, and/or a Scripture verse, and most often Joshua 1:9 or Psalm 91,[8] because military members have told Shields that these Scripture verses encourage them the most.  Each of Shields' dog tags contains less than two square inches of surface area, thus requiring careful consideration of the placement and arrangement of the foregoing elements to ensure that the dog tag effectively conveys the intended message.

46.     Many military members ask for dog tags for their family members—such as spouses, mothers, and fathers—because the family members share the burden with the military members and want their own Shields dog tags for encouragement.  In response to such requests, Shields has designed dog tags for military family members, such as, the Army Wife dog tag, by thoughtfully using the flag, a cross, a personal identity (e.g., Army Wife) and a Scripture verse.  Because a military wife's battle is different from a soldier's, Shields chooses a Scripture tailored to encourage

---

[8] "He who dwells in the shelter of the Most High will rest in the shadow of the Almighty. I will say of the Lord, 'He is my refuge and my fortress, my God in whom I trust.'" Psalm 91 : 1-2

SECOND AMENDED COMPLAINT                                                                                14

them.  Shields also asks military family members which Scriptures are the most meaningful to them.  Similarly, Shields asks their preferences on and personal connections to each potential design element.

47.     Shields typically invests an average of two to four months and two thousand to five thousand dollars in each dog tag design before producing it on a larger scale.

48.     There are two main categories of military-related dog tags sold by Shields.  The first are developed and designed independently by Shields for sale in military exchanges.  The second are designed for specific military units based on custom design orders.

49.     The design process for both categories is very similar.  With thoughtful attention to detail, numerous staff at Shields participate in the initial discussion regarding new designs.  After the initial discussion, Shields continues to extensively research which design elements are likely to be more meaningful for the target audience of the particular dog tag.  For custom orders, Shields' team asks the military unit their preferences of design elements and Scriptures.

50.     After the information is gathered, graphic designers create rough sketches. For the Shields-designed dog tags, the sketches are then shown to focus groups comprised of individuals affiliated with the military for input.  Sketches of custom ordered dog tags are shown to the military unit(s) that placed the order(s) to obtain their feedback regarding the design.

**D.     Shields' Use of Military Words & Insignia**

51.     Shields' dog tags created for and sold or distributed to military members and their families and friends are a form of artistic expression.  Each dog tag is thoughtfully designed with the intention of: (i) identifying or describing the recipient's role in or relationship to the military, (ii) conveying their support for the military and pride in their country, and (iii) expressing their religious faith.

SECOND AMENDED COMPLAINT                                                      15

52.     As a result, Shields' military-themed dog tags typically display the name or insignia of the military branch or unit to which the recipient or their family member or friend belongs.  For example, Shields dog tags designed for members of the Army or Air Force have displayed "U.S. Army" or "U.S. Air Force" and Army or Air Force insignia on one side, with a Bible verse on the other side.  Shields dog tags intended for parents of members of the Navy have displayed "Navy Mom" or "Navy Dad" along with an American flag and cross on one side, and a Bible verse on the other side.  An example of Shields's military-themed dog tags is shown below:



53.     Shields' use of military-related words and insignia is artistically relevant to the purpose of its dog tags, namely, to identify the individuals wearing them and convey their support of the military or patriotism, while also connecting them with and expressing their religion.  Indeed, and at a minimum, the use of the generic and/or descriptive words such as "Army," "Navy, "Marine(s)," and "Air Force" is necessary to accomplish that purpose.

54.     Nothing on Shields' website, advertising and promotional materials, packaging, or the products themselves have ever contained any indication that Shields or its products are affiliated with the DoD and Service Branches.  To the contrary, unless expressly prohibited by an agreement with a Service Branch, Shields' website, advertising and promotional materials,

packaging, and the products themselves have always prominently displayed Shields's SHIELDS OF STRENGTH name and logo.

55.     For almost two decades, Shields had a well-established and friendly mutual relationship with the DoD and Service Branches.  In fact, for over a decade prior to 2011, the DoD and Service Branches acquiesced to—and often affirmatively consented to or encouraged—Shields' sale or distribution of products displaying (i) military words and insignia and (ii) Bible verses without a trademark license.

**E.     Shields' Well-Established Relationship with the DoD**

56.     For almost two decades, Shields had a well-established relationship with the DoD and Service Branches.  In December 2003, the DoD invited Mr. Vaughan to speak at an event held at the Pentagon.  Following the speech, several DoD employees approached Mr. Vaughan and requested that Shields place its products in Army and Air Force Exchange Service ("AAFES") outlets.  At that time, the DoD and Service Branches did not require Shields to obtain a license to sell its products displaying military words or insignia and Scripture verses.  In fact, for over a decade before 2011, the DoD and Service Branches allowed Shields to sell products displaying (i) trademarks of the DoD and Service Branches and (ii) Bible verses without a license.

**F.     The DOD's Trademark Policy and Comparative Products**

57.     The DoD and Service Branches claim rights in and own U.S. trademark registrations for numerous word marks and insignia.[9]

58.     18 U.S.C. § 506 provides that Department of Defense and Military Seals ("Seals") (i.e., the official seals of each of the service branches) are limited to official use by DoD personnel.

---

[9] Plaintiff does not concede that the DoD and Service Branches own enforceable U.S. trademarks or other relevant rights.

SECOND AMENDED COMPLAINT                                                                                    17

However, 18 U.S.C. §506 does *not* restrict the use of other trademarks of the DoD and Service Branches (the "DoD Trademarks").  Instead, the DoD cites the 10 U.S.C. § 2260, 32 C.F.R. § 507.10, and the Lanham Act as the legal bases for enforcing DoD Trademarks.

59.    The DoD Trademarks include, *inter alia¸* terms comprised of ARMY, NAVY, MARINES, or AIR FORCE, as well as designs and other insignia.

60.    Within the DoD, each of the service branches has its own office for licensing its trademarks.  Entities that seek to license DoD Trademarks must apply and negotiate for licenses from each of the offices for the respective service branches.  Under 10 U.S.C. § 2260, the Secretary of Defense may "license trademarks, service marks, certification marks, and collective marks owned or controlled by the Secretary . . . to any qualifying company upon receipt of a request from the company."  Furthermore, "a qualifying company is any United States company that . . . is determined by the Secretary concerned to be qualified in accordance with such criteria as determined appropriate by the Secretary of Defense."

61.    However, internal instructions within the DoD provide unconstitutional limits that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."[10]

62.    The Army Trademark Licensing Program Office, the United States Marine Corps Trademark & Licensing Program Office, the Navy Trademark Licensing Office (Office of Naval Research), and the Air & Space Forces Intellectual Property Management Office now actively license DoD Trademarks to third parties for commercial use.

---

[10] Trademark Licensing Program Requirement and Process, Para. D., Department of Defense Instruction Number 5535. 12.

SECOND AMENDED COMPLAINT                                                          18

63.     The DoD allows its trademarks to be associated with private messages that provide encouragement and inspiration, while denying equivalent messages from Biblical perspectives. For example, the Marine Corps TLO and Defendant O'Haver with the Marine Corps refused to license Shields' products that read, "I can do all things through Christ who strengthens me. Philippians 4:13." The Marine Corps permitted one of its licensed vendors, 2MyHero, to say, "Good things come to those who work their assess off and never give up" on a greeting card.

64.     The DoD allows its trademarks to be associated with some religious viewpoints, while prohibiting Shields' religious products. For example, the Marine Corps, under the direction of Defendant O'Haver, allows Guardian Bells, a religious object described by the accompanying card as "a channel for positive energy" used "to banish evil spirits" and are "good karma" that "prevents bad energy from entering." All of the service branches license religious uses of military trademarks for various Christmas products.   On information and belief, Defendants Jensen, O'Haver, Santiago, and Rowden are responsible for making these decisions.

65.     The DoD allows its trademarks to be associated with "specific interpretations of morality," despite the language in its policy. For example, all of the service branches allow their trademarks to be associated with alcohol consumption, such as alcoholic candies, bottle openers, decanter sets, and beer tap handles. On information and belief, Defendants Jensen, O'Haver, Santiago, and Rowden are responsible for making these decisions.

     **a.**    **Shields' U.S. Army License**

66.     For over a decade before 2011, Shields sold U.S. and foreign military-themed products without a license.  Included in the military-themed products that Shields sold before 2011 are those identified in Exhibit A. During this period, the Army did not enforce any of its alleged trademarks against Shields, nor did it communicate to Shields that a license was required.  Indeed,

the Army encouraged Shields' creation and distribution of Army-themed products.  For example, Mr. Paul Jensen, the Director of the Army Trademark Licensing Program, told Mr. Vaughan that "One of our Licensees, K&S Unique, had some of your [dog tags] there. We talked about you and the [dog tags]. I got to witness a little bit on the job . . . Amazing how God works."

67.     Furthermore, the Army did not apply for a trademark for the word "ARMY" or "U.S. ARMY" until September 2001 despite claiming a date of first use of July 1923.  The Army received its first trademark registration for "ARMY," U.S. Trademark Registration No. 27034279 on September 17, 2002 for "Posters, decals, stickers, brochures and catalogs about sports and sporting activities, printed matter namely, schedules of sporting events, note pads, note cards, postcards, bumper stickers, ink pens and pencils" in Class 16 and "entertainment services, namely, arranging and conducting athletic competitions; Educational services, namely, providing training and instruction in sport and sporting activities" in Class 41.

68.     In 2011, the Army Trademark Licensing Program Office (the "Army TMLPO") first notified Shields that it would need to obtain a license to continue selling Army-themed products. Rather than disagree, and in an attempt to maintain their longstanding relationship, Shields began the process of obtaining a license from the Army to display trademarks registered by the Army on Shields products.  In an April 18, 2011, email exchange, Mr. Vaughan asked the Army TMLPO Director, Mr. Jensen, whether Shields "will be able to use the Army logo or seal on a [dog] tag?" Mr. Jensen responded, "Yes, absolutely.  You would be able to use the Army logo, which I have attached."  Nevertheless, Shields was not able to immediately obtain a license.

69.     On May 7, 2012, Mr. Vaughan emailed the Army asking why the Army might decline to issue a license and whether there is "something written in the Army license guidelines

that excludes this type of item."  Despite Mr. Jensen's previous assurance that Shields would

"absolutely" be able to use the Army logo, he responded:

> If it's not approved, it would most likely be due to the biblical scripture.  There is
> a big concern in the Army right now, as some religious groups have been
> challenging the Army on different issues.

70.     At some point thereafter in 2012, the Army granted a license to Shields to display

Army trademarks on its products.

71.     Shields's license from the Army authorized Shields to use only three specific

Biblical phrases on licensed items:

a)      I will be strong and courageous. I will not be terrified or discouraged.
b)      I can do all things.
c)      Mount up with wings like eagles, run and not get [tired], [walk] and not
become weary.

72.     Although the Army license authorized Shields to use three Biblical phrases, the

Army and Mr. Jensen did not permit Shields to identify the source of those phrases as Bible verses.

This restriction substantially burdened Shields's ability to exercise its sincerely held religious

beliefs.

73.     Under the terms of its license from the Army, Shields was not permitted to display

any other religious words or symbols on its Army-themed products.  This restriction substantially

burdened Shields' ability to exercise its sincerely held religious beliefs.

74.     On October 26, 2020, the Army offered to renew Shields' license.  On December 8,

2020, while in the license renewal negotiation period, Mr. Vaughan requested the following

change to Shields' Army license:

> "The licensed articles may contain the following phrases and citations:
> 1)   'I will be strong and courageous. I will not be terrified, or discouraged; for
>       the Lord my God is with me wherever I go.' Joshua 1:9
> 2)   'I can do all things through Christ who strengthens me.' Philippians 4:13

SECOND AMENDED COMPLAINT                                                                    21

3) 'But those who hope on the Lord will renew their strength. They will soar on wings as eagles; they will run and not grow weary; they will walk and not be faint.' Isaiah 40:31

4) 'He who dwells in the shelter of the Most High will rest in the shadow of the Almighty. I will say of the Lord, "He is my refuge and my fortress, my God, in whom I trust."' Psalm 91:1-2

5) 'Greater love has no one than this: to lay down one's life for one's friends.' John 15:13

6) 'May the Lord watch between you and me while we are apart.' Genesis 31:49

7) 'Yea though I walk through the valley of the shadow of death I will fear no evil, for Thou art with me, Thy rod and Thy staff, they comfort me.' Psalm 23:4

8) 'Then I heard the voice of the Lord saying, "Whom shall I send? And who will go for us?" And I said, "Here am I, send me!"' Isaiah 6:8

75.    In his request to make the aforementioned change to the license agreement, Mr. Vaughan also offered to include on all Shields product packaging and advertising a disclaimer that the Army does not endorse Shields or its licensed products.

76.    On March 25, 2021, Mr. Michael J. Sullivan, then the Director of the Army Trademark Licensing Program, rejected Mr. Vaughan's request stating

"DoD policy prohibits us from licensing marks for any purpose intended to promote religious beliefs (including non-belief).  *See* Department of Defense Instruction 5535.12, Branding and Trademark Licensing Program Implementation.  Accordingly, we cannot accept the changes you requested to the terms of your agreement as the citations violate DoD policy."

77.    Mr. Sullivan enforced an illegal and unconstitutional policy against Shields.

78.    In September 2021, when Shields' license from the Army expired, Shields waited for the Army's approval to extend the sell-off period provided by its license.

79.    The Army has since been unclear about whether Shields may sell products using the word "army," such as "Army Mom" without a license. Shields and the Army could not agree on the terms on the renewal license.

SECOND AMENDED COMPLAINT                                                    22

      **b.**     **Shields's U.S. Marine Corps License**

80.    For over a decade prior to 2011, the Marine Corps did not require Shields to obtain a license to sell Marine Corps-themed products.  In 2011, the Marine Corps TMLPO representative, Mr. Phillip Greene, first notified Shields it would either need to obtain a license to continue selling Marine Corps-themed products, or alternatively, Shields could sell products so long as it did not promote those products as being licensed by the Marine Corps.  Accordingly, Shields began the process of obtaining a license from the Marine Corps to use Marine Corps trademarks on Shields products.

81.    On July 20, 2011, Mr. Greene sent Mr. Vaughan an email stating "we do not feel comfortable licensing religious materials."

82.    Between 2011 and 2017, Shields sold its products without a license and refrained from stating that the products were licensed by the Marine Corps.

83.    In 2017, AAFES, the distributer for the dog tags, contacted Mr. Vaughan by email stating that it wanted a copy of Shields license to sell Marine Corps dog tags. Mr. Vaughan explained to AAFES that he was told that he did not need a license to sell his dog tags as long as the products did not say they were licensed by the Marine Corps. AAFES asked if Mr. Vaughan could get that guidance confirmed in writing from the Marine Corps license department.

84.    On May 15, 2017, Ms. Jessica O'Haver of the Marine Corps TMLPO said although that was the guidance in 2012, she previously sent Mr. Vaughan the "new" DOD policy issued in 2013 prohibiting DOD licenses "for any purpose intended to promote . . . religious beliefs (including non-belief) . . ." Mr. Vaughan asked for the emails or any communications updating Shields on the new policy because he did not receive it, but Ms. O'Haver never responded to that request.

85.     At this point, Mr. Vaughan decided that since the Marine Corps would not confirm that he could continue selling Shields's dog tags without a license, he needed to obtain a license to continue selling the products. Mr. Vaughan began consistently contacting the Marine Corps by phone and email asking about how he could obtain a license for the Shields dog tags.

86.     On June 26, 2017, Ms. O'Haver stated by email that although Shields *could* display trademarks owned by the Marine Corps on products also displaying Biblical passages, Shields "would need to keep the chapter and verse reference out of the product designs," and the Marine Corps "couldn't allow for Marine Corps branded products with more controversial passages that may offend some (hell, brimstone, lake of fire, eternal damnation, etc.)." Ms. O'Haver did not define what might constitute "controversial."

87.     Finally, on August 16, 2018, after a lengthy and difficult negotiation process, the Marine Corps issued a license to Shields. Shields then began producing Marine Corps-themed items in accordance with the written terms of its license, and Mr. Vaughan's email and verbal agreement with Ms. O'Haver that permitted Shields to use Biblical references in the form of inspirational words as long as it avoided using "controversial" passages or Scripture verses on licensed products.

88.     Unlike the Army license, the Marine Corps license did not limit Shields' ability to display religious references on licensed items. Accordingly, some of Shields' Marine Corps-themed products included the aforementioned religious references,[11] yet Shields at all times complied with the June 26, 2017 request to avoid "controversial" passages. However, cease and desist letters from the Marine Corps TMLPO have significantly lowered the number of licensed items sold by Shields.

---

[11] *See* ¶ 62, supra.

SECOND AMENDED COMPLAINT                                                                    24

89.    In October 2021, the USMC Trademark office provided the following reasons to deny Shields' request to renew its license:

> 1) Shields did not submit a royalty report in 2020 as required by the license and only paid its annual minimum guarantee when invoiced
> 2) That the license costs the USMC Trademark Program more in program costs than it generates in royalty-revenue.

90.    Shields did send the four quarterly royalty reports. The minimum revenue is determined after the USMC receives annual royalty reports.  The Marine Corps can only determine that the Shields program cost more than it generates in revenue after it receives the royalty report. Further, Shields paid the annual minimum guarantee of $600, therefore the USMC does not lose revenue.

91.    On one hand, the USMC substantially burdened Shields' ability to exercise its sincerely held religious beliefs and suppressed Shields' exercise of its freedom of speech by restricting the products Shields could make or sell.  On the other, the USMC cited to Shields low revenue—which was a direct result of USMC's severely limiting the products Shields was allowed to sell—as a reason to deny Shields' license renewal request.

92.    Shields most recent license from the Marine Corps expired on August 26, 2021, and alleging economic reasons, the USMC Trademark Office denied Shields' request to renew its license.

c.    **Shields' U.S. Navy License**

93.    In 2019, Mr. Vaughan applied for a trademark license from the Navy Trademark Licensing Office (the "Navy TMLO").  The Navy TMLO made it clear that they would not grant a license to Shields due to the fact that their products display Scriptural verses.

94.    During the process, Mr. Vaughan spoke with Ms. Santiago from the Navy TMLO regarding Shields' application for a Navy trademark license.  Ms. Santiago informed Mr. Vaughan

that Shields' application had been received, but that DoD policy prohibited the use of Bible verses on products displaying trademarks registered by the Navy.  The representative further suggested that the Navy would approve a license with terms similar to those approved by the Army—for example, the inclusion of Bible verses would be permitted so long as Shields did not identify the source of those verses as the Bible.

95.    The Navy ultimately did not approve a trademark license with Shields.

**d.    Shields' U.S. Air Force License**

96.    Shields attempted to negotiate a license from the Air Force as early as 2014. In 2014, one of Shields' attempts to negotiate a license from the Air Force was denied because the Air Force Branding & Trademark Licensing Program (the "Air Force BTLP") found that the phrase "I will be strong and courageous, I will not be afraid" to be a "religious" phrase, even without identification of the source of the verse as the Bible.

97.    On October 18, 2017, the Air Force granted Shields a license to continue selling some Air Force-themed products.

98.    Shields' Air Force license agreement does not limit Shields' ability to include Bible verses on licensed items.

99.    In 2017, however, Air Force BTLP responded that "we're still unable to license faith-based products.  In accordance with DODI 5535.12, dated 13 September 2013, DoD marks may not be licensed for use in a manner that promotes religious beliefs (including non-belief)."  In 2019, Ms. April Rowden asked Shields to submit "all other merchandise" for approval and reminded Shields that "the language on Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work – including in the product description."

100.   The Air Force's restriction substantially burdened Shields's ability to exercise its sincerely held religious beliefs.

101.   The Air Force license was termed for 36 months from October 1, 2017 to September 30, 2020.

## G.      The DOD and the Military Branches Expand Their Constitutional Violations at the Urging of the Military Religious Freedom Foundation

102.   On July 8, 2019, the Military Religious Freedom Foundation ("MRFF"), a private organization that advocates for a so-called "separation of Church and state" in military affairs, sent the Army TMLPO, Marine Corps TMLPO, and Navy TMLO [12] each a letter threatening "administrative and litigation complaints" to "compel compliance" unless they prohibited Shields from selling Marine Corps-licensed items that include religious references.

### a.      The Army's Response to the MRFF Letter

103.   On August 12, 2019, after seven years without incident or complaint involving Shields, but only one month after receiving the MRFF letter, the Army TMLPO sent an email to Shields.  The subject of the email was "Negative Press."  In the body of the email, Mr. Jensen issued the following directive to Shields:

> "You are not authorized to put biblical verses on your Army products. For example Joshua 1:9. Please remove ALL biblical references from all of your Army products."

104.   The Army TMLPO then included a URL to an article on the "Friendly Atheist" website that discussed a purported "Cease and Desist" letter from the MRFF to the U.S. Navy and the U.S. Marine Corps.  The MRFF letter threatened "administrative and litigation complaints" to

---

[12] Shields does not hold a trademark license with the U.S. Navy and thus does not produce or sell Navy-themed items.

SECOND AMENDED COMPLAINT                                                                27

"compel compliance" unless Shields stopped including religious references on its DoD-licensed products.

**b.      Marine Corps' Response to the MRFF Letter**

105.    On July 11, 2019, just three days after MRFF threatened "administrative and litigation complaints" against the Marine Corps, Mr. Phillip Greene, Marine Corps Trademark Counsel, immediately complied with the MRFF's demands and sent a cease-and-desist notice to Shields on behalf of the Marine Corps.

106.    On information and belief, Mr. Greene sent the letter to Shields at the request of Ms. O'Haver.

107.    The cease-and-desist notice—which was addressed from Mr. Greene— referenced multiple conversations between the Marine Corps TMLPO and Mr. Vaughan in which the Marine Corps TMLPO allegedly issued guidance prohibiting the inclusion of religious expression on Marine Corps-licensed products.

108.    The cease-and-desist notice does not reference his June 26, 2017 email expressly authorizing Shields to use religious expression on Marine Corps-themed items.

109.    The cease-and-desist notice further stated that Shields' "conduct in the coming weeks will have a bearing on whether or not the USMC in fact terminates your company's license, as we are strongly considering doing so."

110.    Shields' license from the Marine Corps is dated August 16, 2018, and it does not contain any restriction or limitation on the use of religious passages or symbols.

111.    Between (i) August 16, 2018, the date on which the Marine Corps granted a trademark license to Shields, and (ii) July 11, 2019, the date on which Mr. Greene chose to comply

SECOND AMENDED COMPLAINT                                                                28

with the MRFF's demands and sent a cease-and-desist notice to Shields, the Marine Corps TMLPO

expressed no concern or issues with Shields' products that displayed religious passages or symbols.

112.   On December 18, 2019, Mr. Greene sent Mr. Vaughan another email stating:

"Frankly, I'm at a loss as to what you're not understanding here.  In July, I went to
great lengths to explain to you that we could not tolerate merchandise that had a)
Marine Corps trademarks and b) a religious theme."

113.   Shields has since sought to restore its trademark license with the Marine Corps, but

to no avail.

114.   The Marine Corps' severe restrictions on Shields' Marine Corps license agreement

and Shields' use of Marine Corps trademarks—in violation of the terms of the license agreement

and Mr. Vaughan's agreements with Ms. O'Haver—substantially burden Shields' ability to

exercise its sincerely held religious beliefs.

### c.       The Air Force's Response to the MRFF Letter

115.   On July 9, 2019—just one day after the MRFF letter of complaint and despite the

absence of any limitation in its license agreement—Ms. April Rowden of the Air Force Intellectual

Property Management Office, Branding, Band Support, & Trademark Licensing, sent Mr.

Vaughan an email asking that he "review all your USAF-branded merchandise and verify they are

using inspiration quotes instead of quoted scripture."

116.   On July 25, 2019, Ms. Rowden sent Mr. Vaughan an email stating "the language on

the Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work

– including in the product description."

117.   Due to the DoD's arbitrary and capricious denial of trademark license applications,

Shields, a business established upon the support for and from members of the military community,

SECOND AMENDED COMPLAINT                                                                    29

was unable to manufacture any products bearing DoD Trademarks, including any military terms or insignia.

118.    Shields' mission, which is rooted in its sincerely held religious beliefs, compel it to share God's Word with others by including religious passages and symbols on its products, including its military-themed dog tags.  Accordingly, Shields cannot remove or obscure the religious expression because to do so would be to violate its mission and sincerely held religious beliefs.

### H.  The Defendants' Cease-and-Desist Notices to Shields

119.    The Defendants have sent multiple cease-and-desist notices to SOS that denies licenses to SOS, sanctions SOS, restricts or otherwise limits SOS' freedom of speech, and interfere SOS' freedom to conduct business.

### a.  Department of the Army

120.    On or about July 17, 2017, Mr. Paul Jensen of the Army sent (via email) a demand to SOS that SOS remove certain products from AAFES.stores.

121.    On April 24, 2018, On or about April 24, 2018, Mr. Paul Jensen of the Army Trademark Licensing Program emailed SOS denying SOS's request to make dog tags that had been requested by specific units with the unit logos or emblems.

122.    On or about August 12, 2019, Mr. Paul Jensen of the Department of the Army sent an email to SOS claiming that SOS was not in compliance with the Army's Trademark license because of the use of religious phrases.

123.    On or about October 21, 2020, Mr. Paul Jensen or the Army Trademark Licensing Program rejected a proposed SOS design that included the "Raider Brigade" emblem on the front

of a dog tag and an excerpt from Psalm 20:7 on the back, even though the dog tag had been requested by the chaplain of the brigade.

124.    On March 25, 2021, the Army rejected SoS's application for a license to use trademarks purported to be owned by the Army, which was communicated by Mr. Michael J. Sullivan (then the Director of the Army Trademark Licensing Program) to SOS.

125.    In August and September 2021, the Army refused to extend the sell-off period provided by SOS' license.

126.    On September 30, 2021, the Army refused to allow SOS to make dog tags requested by Army chaplains.  In specific, Mr. Michael J. Sullivan of the Army Trademark Licensing office refused SOS's request to make and sell dog tags requested by Unit Commanders and Chaplains, including for the Red Bull unit with Joshua 1:9 on the back.

### b.  The USMC

127.    On February 5, 2018, the USMC filed a complaint with Amazon.com, requesting that Amazon remove listings for SOS products bearing marks purportedly owned by the Marine Corps and religious messaging.

128.    On July 11, 2019, Mr. Philip Greene, Trademark Counsel for the U.S. Marine Corps., sent a cease and desist letter to SOS demanding that SOS "immediately cease and desist any and all sales and/or shipments in process of USMC-branded merchandise bearing religious imagery, content and other references."

129.    On or about January 28, 2020, Mr. Philip Greene, Trademark Counsel to the U.S. Marine Corps, again refused SOS's attempts at licensing USMC trademarks in combination with religious symbols.

130.    On or about August 19, 2021, Mr. Matthew McLaughlin of the USMC Trademark Office emailed SOS noting purported reasons the review of the license did not support renewal.

### c.  The Navy

131.    In 2019, the Navy denied SOS's request for license. In specific, Ms. Santiago of the Navy TMLO informed SOS, via telephone conversation, that SOS's application for a license would be denied because the Navy would not permit its use of trademarks in combination with Bible Verses.

### d.  The Air Force

132.    On June 6, 2017, Ms. April Rowden of the Air Force Branding and Trademark Licensing Office stated that "if a product has any military logos on them, it must be licensed."

133.    On or about July 27, 2017, Ms. Rowden provided instruction to (among others) Mr. Mary Farrell of the Army Air Force Exchange Service to remove all SOS products bearing marks purportedly owned by the Air Force and return them to SOS for credit.

134.    On July 25, 2019, Ms. April Rowden of the Air Force emailed SOS, stating that "the language on Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work – including in the product description. We need to modify most of the current AF-branded merchandise on your website to bring it into compliance with DOD guidance."

135.    On or about July 25, 2021, Ms. April Rowden of the USAF Intellectual Property Management Office sent an email to SOS claiming that SOS was not in compliance with its trademark license, and "remind[ing]" SOS that "the language on Air Force-branded merchandise can be inspiration, but please avoid quoting any religious work – including in the product description."

136.    On or about February 22, 2023, Mr. Chadwick Eiring of the Air Force Public Affairs Agency sent a letter to SOS refusing to renew SOS's license, but stating its desire to maintain an "informal Agreement."

## FIRST CAUSE OF ACTION: FIRST AMENDMENT

### Freedom of Speech

137.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

138.    The Free Speech clause of the First Amendment restricts government regulation of private speech.

139.    When the government allows the public to use its property to express private messages, the government must abide by the Free Speech clause and cannot impose unconstitutional restrictions.

140.    The manner in which the DoD licensed trademarks created a limited public forum for private speech.[13]

141.    The DoD opened its trademarks for the public to use on a wide variety of products to send a wide variety of messages, broadly granting trademark licenses to private applicants who meet their criteria.

142.    Historically, the DoD has not used the particular medium at issue, licensing trademarks, to speak to the public.  The DoD did not even monitor the use of military logos until 2011. Even after it began licensing trademarks, the DoD continued to allow a wide variety of private speakers to use DoD Trademarks to send various messages.

143.    Members of the public associate Shields dog tags, such as those bearing phrases such as "Army Mom" and "Marine Sister," to be expression of the person wearing the item. Members of the public do not view merchants' use of such trademarks as endorsed by the U.S. government.

_____

[13] *See Gergich v. Leath*, 861 F.3d 697 (8th Cir. 2017).

SECOND AMENDED COMPLAINT                                                                 33

144.    Viewpoint discrimination is unconstitutional in a limited public forum.

145.    The DoD Instruction Number 5535.12 ("DODI No.5535.12"), Trademark Licensing Program Requirement and Process, provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."[14]

146.    The DoD policy facially and as applied discriminates on the basis of viewpoint in violation of the Free Speech clause.

147.    The DoD policy facially and as applied discriminates on the basis of religious viewpoint in violation of the Free Speech clause.

148.    For example, the DoD allows its trademarks to be associated with private messages of encouragement, but not with equivalent messages from Shields' religious perspective.

149.    The DoD also discriminates between religious viewpoints. The DoD licenses some religious items, but not items with Shields' religious viewpoint.

150.    The restrictions on speech are unconstitutional even where the administration of DoD Trademarks considered a nonpublic forum.

151.    The DoD's restriction on "religious beliefs (including non-belief)" is overbroad, vague, viewpoint discriminatory, and a constitutionally unreasonable restriction on speech.

152.    The DoD's restriction on controversial speech is overbroad, vague, viewpoint discriminatory, and a constitutionally unreasonable restriction on speech.

---

[14] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.

153.    The DoD's restrictions on "ideological movements," "sociopolitical change," and "specific interpretations of morality" are overbroad, vague, viewpoint discriminatory, and a constitutionally unreasonable restriction on speech.

154.    By denying Shields' ability to use DoD Trademarks, the DoD denied Shields access to a limited public forum in violation of the Free Speech Clause of the First Amendment.

155.    All Defendants, including individual officials Jensen, O'Haver, Santiago, and Rowden, discriminated against Shields and retaliated against Shields' speech.

156.    Shields has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages (individual capacity defendants only), and attorneys' fees and costs.

## SECOND CAUSE OF ACTION: FIRST AMENDMENT

### Free Exercise Clause

157.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

158.    The Free Exercise Clause forbids excluding religious organizations from participation in a government program, benefit, or service because of religion.

159.    The DoD excluded Shields' products from the trademark licensing because of religion.

160.    The First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral or non-generally applicable laws or policies unless they are narrowly tailored to a compelling government interest. The Free Exercise Clause also applies strict scrutiny to laws applied in a non-neutral or non-generally applicable way.

161.    DODI No.5525.12 is not a neutral and generally applicable government policy.

162.    DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

163.    The exclusion of "religious belief" in DODI No.5525.12 renders it non-neutral and non-generally applicable. As such, it is subject to strict scrutiny.

164.    The DoD policy targets religion for disfavored treatment. As such, it is subject to strict scrutiny.

165.    The DoD policy is applied in a non-neutral or non-generally applicable way. As such, it is subject to strict scrutiny.

166.    The DoD cannot justify its ban on "religious belief" by any narrowly tailored compelling government interest.

167.    Shields is aggrieved by DODI No.5525.12 and the DoD's actions because it cannot follow its religious calling to manufacture, sell, and donate dog tags and other products that contain both the DoD logos and specific references to Bible verses.  As a result, Shields cannot share the love and hope of Jesus Christ with military service members, their families, and the public.

168.    All Defendants, including individual officials Jensen, O'Haver, Santiago, and Rowden, discriminated against Shields and retaliated because of Shields' religious exercise.

169.    Shields has suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION: FIRST AMENDMENT

### Establishment Clause

170.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

171.    The First Amendment's Establishment Clause does not only forbid the government from formally establishing religion, it also prohibits the government from officially favoring or *disfavoring* particular religious viewpoints or expression.[15]  The DoD's directive that Shields remove all Biblical references from its products demonstrates precisely the type of government hostility towards religion that the Establishment Clause forbids.

172.    Additionally, the DoD's internal policy provide that "DoD marks may not be licensed for any purpose intended to promote … religious beliefs …."  These policies fall under the type of government hostility towards religion that the Establishment Clause forbids.[16]

173.    The DoD has reiterated in various occasions that Shields's designs with verses that have Biblical origins are acceptable, if such verses are used *without* Biblical citations or references. Clearly, the DoD and its various branches' reluctance with licensing their Trademarks to Shields did not stem from the language or underlying message of the Scripture; instead, their hostility is based on their blatantly anti-religious positions.   This is, once again, precisely the type of government hostility towards religion that the Establish Clause forbids.

174.    All Defendants, including individual officials Jensen, O'Haver, Santiago, and Rowden, discriminated against Shields and retaliated because of religion.

---

[15] *See Good News Club v. Milford Central Sch*., 533 U.S. 98, 115 (2001).
[16] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.

175.     Shields suffered irreparable harm, including the loss of fundamental constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION: FIRST AMENDMENT

## Expressive Works

176.     Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

177.     Shields thoughtfully and creatively selects and arranges the content on the dog tags so that they convey unique, succinct, compelling, and profound messages to their owners while also depicting creativity and artistry.  The dog tags are two- or three-dimensional artworks.  They are embodiments of Shields' artistic expression and are entitled to First Amendment protection.

178.     Numerous courts have held that the Lanham Act only applies to expressive works if the plaintiff establishes one of the two requirements: either the use of the mark is not artistically relevant to the underlying work, or that it explicitly misleads consumers as to the source or content of the work.  The public policy reason is that protection of expressive works under the First Amendment trumps trademark infringement claims under the Lanham Act.[17]  A work need not be the "expressive equal of Anna Karenina or Citizen Kane" to show artistic relevance to the underlying work and is not rendered non-expressive simply because it was sold commercially.[18] The use by Shields of DoD Trademarks is both artistically relevant to Shields' dog tags and does not explicitly mislead consumers.  Shields's products creatively convey different combinations of a customer's identity as a member of the military, a customer's support of the military, a

---

[17] *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d. Cir. 1989); *VIP Prods. LLC v. Jack Daniel's Properties, Inc.*, 953 F.3d 1170 (9th Cir. 2020) (cert. denied)
[18]  *VIP Prods. LLC v. Jack Daniel's Properties, Inc*., 953 F.3d at 1174.

SECOND AMENDED COMPLAINT                                                                  38

customer's religious beliefs, and/or simply patriotism.  Shields' use of DoD Trademarks in

Shields's products is not gratuitous or irrelevant.  The dog tags have a particular meaning to the

wearer, and serve to memorialize, celebrate, remember, inspire, praise, and respect.  The likelihood

of confusion is nonexistent at least because most of Shields' customers are members of the military

(or their families), and they understand the distinction between Shields' products and other

products bearing DoD Trademarks even better than the general public.  Therefore, Shields'

Freedom of Speech rights outweigh the DoD's trademark rights.[19]

179.    Although Shields benefits economically from its speech, Shields' speech is

principally based on religious convictions and should be categorized as noncommercial.[20]  Thus,

Shields' expressive use of DoD Trademarks is a type of protected speech under the First

Amendment.

180.    All Defendants, including individual officials Jensen, O'Haver, Santiago, and

Rowden, discriminated against Shields and retaliated because of religion.

181.    Shields suffered irreparable harm, including the loss of fundamental constitutional

rights, entitling it to injunctive relief, declaratory relief, legal relief, damages, and attorneys' fees

and costs.

### FIFTH CAUSE OF ACTION: DECLARATORY JUDGMENT OF NO TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, OR UNFAIR COMPETITION (FAIR USE)

182.    Shields incorporates herein by reference each allegation contained in the preceding

paragraphs of this Complaint.

---

[19]  Shields does not concede that DoD has enforceable trademark rights, or that it has infringed
the DoD Trademarks in any manner.
[20] *See Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1309 (N.D. Ga. 2008).

SECOND AMENDED COMPLAINT                                                                                    39

183.     A justiciable and actual controversy exists before this Court with respect to whether Shields's use of DoD Trademarks on Shields' products infringes upon or otherwise violates any rights claimed by Defendants under federal, state, or common law for trademark infringement, false designation of origin, or unfair competition.  Following the cease-and-desist notices from the DoD and Service Branches, Shields is faced with the choice of ceasing all production and sales or distribution of products displaying various word marks that are considered DoD Trademarks ("DoD Word Marks"),[21] or risking liability for damages.  Shields has been using military-related words (e.g., "Army," "Navy," "Marines," "Air Force," etc.) and phrases on its products for over 20 years.  In fact, Shields's use of military-related words and phrases predates the filing and registration dates of many DoD Trademarks at the United States Patent and Trademark Office.

184.     Shields uses DoD Word Marks on its products fairly and in good faith and does not use DoD Word Marks in a manner that is likely to confuse consumers as to the source or affiliation of its products.

185.     Customers purchase Shields' products that bear such military words because they get to voice their support of the military and/or affiliation with the military or military members while simultaneously connecting with their faith.

186.     Shields' use of DoD Word Marks is necessary to communicate customers' support of the military and/or affiliation with the military or military members.

187.     Shields' use of DoD Word Marks constitutes nominative fair use because it is intended to truthfully identify the Service Branches.  In particular, these terms are used to refer to

---

[21] Plaintiffs do not concede that the DoD and Service Branches own enforceable U.S. trademarks or other relevant rights.

SECOND AMENDED COMPLAINT                                                                    40

the Service Branches or their members as organizations or individuals that Shields' customers support or are affiliated with.

188.    Shields' use of DoD Word Marks also constitutes "descriptive" or "classic" fair use because it is intended to describe Shields' customers.  In particular, these terms are used to identify customers' support of or affiliation with the military or military members.  For example, dog tags bearing the terms "Marine Sister" or "Army Mom" are descriptive of the individuals purchasing and/or wearing those tags.  Similarly, a dog tag bearing the word "Marine" is descriptive of the individual as a member of the U.S. Marine Corps.

189.    Shields has never advertised or marketed its products in a manner that suggests affiliation with the DoD and Service Branches, and, to the extent not expressly prohibited by any of the Service Branches, Shields' advertising and promotional materials, packaging, and products themselves have always prominently displayed Shields's SHIELDS OF STRENGTH name and mark to identify the source of the products.

190.    Most of Shields' customers are former or current military members, or family or friends of military members.  Such products are not offered or provided by the DoD and Service Branches, which is why military members, families, and friends obtain them from a third party such as Shields.  Thus, Shields' customers are very much aware of the fact that Shields' products do not emanate from and are not affiliated with the DoD and Service Branches.  As a result, consumer confusion is unlikely.

191.    Indeed, since it first started using DoD Trademarks on its products over 20 years ago, Shields has never been made aware of a single instance of consumer confusion.

192.    Shields' popularity shows that there was no confusion regarding the origin of its products.  Consumers know where to get those products, and it is not from the DoD.

SECOND AMENDED COMPLAINT                                                              41

193.    Instead, it is the DoD or individual military branches that have asked Shields to remove its own branding.  By asking Shields to remove Shields' branding from their own products, the DoD has wrongfully interfered with Shields' ability to identify the source of its products.  In other words, the only opportunities for possible confusion are those directly created by DoD's instructions, not Shields.

194.    Shields' use of military-related words and phrases—licensed or not—therefore does not amount to trademark infringement but is fair use.

195.    Accordingly, Shields seeks a declaration that Shields' use of DoD Trademarks on Shields' products—licensed or not—constitutes fair use and does not infringe Defendants' claimed rights in DoD Trademarks or constitute a false designation of origin or unfair competition.

## SIXTH CAUSE OF ACTION: DECLARATORY JUDGMENT OF NO TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, OR UNFAIR COMPETITION (EXPRESSIVE WORKS)

196.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

197.    A justiciable and actual controversy exists before this Court with respect to whether Shields' use of DoD Trademarks on Shields' products infringes upon or otherwise violates any rights claimed by the Defendants under federal, state, or common law for trademark infringement, false designation of origin, or unfair competition.  Following the cease-and-desist notices from the DoD and Service Branches, Shields is faced with the choice of ceasing all production and sales or distribution of products displaying DoD Trademarks, or risking liability for damages.  Shields has been using military-related words (e.g., "Army," "Navy," "Marines," "Air Force," etc.), phrases, emblems, and insignia on its products for over 20 years.  In fact, Shields' use of military-related

SECOND AMENDED COMPLAINT                                                                42

words, phrases, emblems, and insignia predates the filing and registration dates of many DoD Trademarks at the United States Patent and Trademark Office.

198.     Shields' military-themed products are expressive works due to their embodiment of Shields' creative expression.  Furthermore, Shields' use of military-related words, phrases, emblems, and insignia does not confuse consumer as to the source or affiliation of its products.

199.     Shields' use of DoD Trademarks on its products is artistically relevant to the purpose of those products: (i) to identify or describe the customer's role in or relationship to the military, (ii) to convey their support for the military or pride in their country, and (iii) to express their religious faith in connection with (i) and (ii).  For example, the display of "U.S. Navy," "U.S. Air Force," "Marine Sister," and "Army Mom" on Shields's dog tags is intended to identify the individual purchasing or wearing them as a member of the Navy, a member of the Army, a sister of a Marine Corps member, or the mother of an Army member, respectively.

200.     Shields uses DoD Trademarks on its products fairly and in good faith and does not use DoD Trademarks in a manner that is likely to mislead consumers as to the source or affiliation of its products.  Shields has never advertised or marketed its products in a manner that suggests affiliation with the DoD and Service Branches, and, to the extent not expressly prohibited by any of the Service Branches, Shields' advertising and promotional materials, packaging, and products themselves have always prominently displayed Shields's SHIELDS OF STRENGTH name and mark to identify the source of the products.

201.     Most of Shields' customers are former or current military members, or family or friends of military members.  They purchase or wear Shields' products displaying DoD Trademarks to identify their affiliation with the military or military members and express their support of the military or patriotism, while simultaneously connecting with their faith.  Such

SECOND AMENDED COMPLAINT                                                                43

products are not offered or provided by the DoD and Service Branches, which is why military members, families, and friends obtain them from a third party such as Shields. Thus, Shields' customers are very much aware of the fact that Shields' products do not emanate from and are not affiliated with the DoD and Service Branches. As a result, consumer confusion is unlikely.

202. Furthermore, Shields' expressive use of DoD Trademarks is artistically relevant to the underlying Shields products, and such use is not explicitly misleading. Shields' customers purchase goods bearing DoD Trademarks to express their support of the military or to self-identify, and they are not misled by Shields' expressive use in any manner. In fact, most of Shields' customers are veterans, otherwise affiliated with the military, or related to military members, and they are aware of the fact that Shields' products are not produced by and do not emanate from the military. In other words, Shields' expressive use of DoD Trademarks does not cause confusion, mistake, or deception as to the origin of the goods. As a result, the Lanham Act does not apply to Shields' expressive use of DoD Trademarks. Such use does not constitute trademark infringement; instead, it falls squarely under First Amendment protection.

203. Shields' products are a form of artistic expression protected by the First Amendment.

204. Accordingly, Shields seeks a declaration that Shields's use of DoD Trademarks on Shields's products—licensed or not—constitutes expressive works and does not infringe Defendants' claimed rights in DoD Trademarks or constitute a false designation of origin or unfair competition.

**SEVENTH CAUSE OF ACTION: DECLARATORY JUDGMENT OF NO TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, OR UNFAIR**

## COMPETITION & CANCELLATION OF TRADEMARK REGISTRATIONS UNDER 15 U.S.C. § 1119 (Genericness)

205.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

206.    Shields seeks to continue its use of the terms "Army," "Air Force," "Navy," and "Marine" / "Marines" (the "DOD Word Marks") in connection with its products.

207.    The United States Department of Army has attempted to regulate all use of the term "ARMY," without regard to the class of goods on which the term is used, claiming trademark rights in the term based on its trademark registrations and common law use.  For example, the United States Army has required through contract that Shields pay licensing fees in order to use the term "ARMY" in its licensing agreement with Shields, and has registered various trademarks comprised of the word "ARMY."[22]

208.    The meaning of the noun "army" is "[a] large organized body of armed personnel trained for war especially on land" or when capitalized, "the complete military organization of a nation for land warfare."[23]  The primary function of the United States Army is to provide an organized body of armed personnel trained for war for the People of the United States (i.e. an Army).  Thus, "ARMY" is a generic term that refers to the primary service offered by the United States Army.  Indeed, the term "ARMY" is not exclusively used in connection with the United States Army, but rather is used to refer to the land-based armed services of other countries.  For example, countries such as Canada and the United Kingdom also have branches of their militaries

---

[22] *See, e.g.* ARMY, Registration No. 3,152,724.

[23] *See* https://www.merriam-webster.com/dictionary/army.  On information and belief, this was and has remained the dictionary definition of the term ARMY since the United States Army first sought to regulate the use of the term.

SECOND AMENDED COMPLAINT                                                    45

referred to as the ARMY.[24]   As such, the term sought to be controlled ("ARMY") is a generic word for the primary service provided by the United States Army.

209.    Similarly, the United States Air Force has attempted to regulate the use of the term "AIR FORCE," without regard to which the class of goods on which the term is used, claiming trademark rights based on its trademark registrations and common law use.  For example, the United States Air Force has required through contract that Shields pay licensing fees in order to use the term "Air Force" in its licensing agreement with Shields.  On information, investigation, and belief, the United States Department of Air Force has not registered the term "AIR FORCE" with the United States Patent and Trademark Office, but has registered other related terms.[25]

210.    The meaning of the noun "air force" is "the military organization of a nation for air warfare."[26]   The primary function of the United States Air Force is to provide a military organization for the People of the United States for air warfare (i.e., an Air Force).  Thus, "AIR FORCE" is a generic term that refers to the primary service of the United States Air Force. Indeed, the term "AIR FORCE" is not exclusively used in connection with the United States Air Force, but rather is also used to refer to the air-based armed services of other countries.  For example, both Canada and the United Kingdom have branches of their militaries refer to as the AIR FORCE.[27]   As such, the term sought to be controlled ("AIR FORCE") is a generic word for the primary service provided by the United States Air Force.

---

[24] *See, e.g.,* https://www.canada.ca/en/army.html (Canadian Army); https://www.army.mod.uk/ (British Army).

[25] *See, e.g.,* U.S. AIR FORCE, U.S. Trademark Application No. 97,154,951.

[26] *See* https://www.merriam-webster.com/dictionary/air%20force.  On information and belief, this was and has remained the meaning of the term AIR FORCE since the United States Department of Air Force has sought to regulate the use of the term.

[27] *See, e.g.,* https://www.canada.ca/en/air-force.html (Royal Canadian Air Force); https://www.raf.mod.uk/ (UK Royal Air Force).

SECOND AMENDED COMPLAINT                                                                              46

211.    The United States Department of Navy has attempted to regulate the use of the term "NAVY," without regard to the class of goods on which the term is used, claiming trademark rights based on its trademark registrations and common law use.  For example, the United States Navy has registered various trademarks comprised of the word "NAVY."[28]

212.    The meaning of the noun "navy" is "a group of ships" or "the complete naval establishment of a nation, including yards, stations, ships, and personnel."[29]  The primary function of the United States Navy is to provide the naval establishment for the People of the United States (i.e., a NAVY).  Thus, "NAVY" is a generic term that refers to the primary service of the United States Navy.  Indeed, the term "NAVY" is not exclusively used in connection with the United States Navy, and is used to refer to the maritime-based armed services of other countries.  For example, both Canada and the United Kingdom have branches of their respective military services referred to as the NAVY.[30]  As such, the term sought to be controlled ("NAVY") is a generic word for the primary service provided by the United States Navy.

213.    The United States Marine Corps has attempted to regulate the use of the terms "MARINE" and/or "MARINES," without regard to the class of goods on which the term is used, claiming trademark rights based on its trademark registrations and common law use.  For example, the United States Marine Corps has required through contract that Shields pay licensing fees in order to use the term "MARINE" and/or "MARINES" in its licensing agreement with Shields, and has registered various trademarks comprised of the word "MARINE" and "MARINES."[31]

---

[28] *See, e.g.*, NAVY, U.S. Trademark Registration No. 6,169,397.

[29] *See* https://www.merriam-webster.com/dictionary/navy.  On information and belief, this was and has remained the definition of the term NAVY since the United States Navy first sought to regulate the use of the term.

[30] *See, e.g.,* https://forces.ca/en/about-us/navy (Royal Canadian Navy); https://www.royalnavy.mod.uk/ (UK Royal Navy).

[31] *See, e.g.*, MARINE, Registration No. 6,280,533; MARINES, Registration No. 4,707,971.

SECOND AMENDED COMPLAINT                                                         47

214.     The meaning of the noun "Marine" is "one of a class of armed service personnel on shipboard or in close association with a naval force."[32]  The primary function of the United States Marine Corps (also commonly referred to as the United States Marines) is to provide the armed services in close association with a naval force.  Thus, the terms "MARINE" and/or "MARINES" are generic terms that refer to the primary service provided by the United States Marines.  Indeed, the term "MARINE" is not exclusively used in connection with the United States Marine, and is used to refer to the maritime-based armed services of other countries.  For example, the United Kingdom has and has long had a branch of the armed service described with the term MARINES.[33]  As such, the term sought to be controlled ("MARINE" or "MARINES") is a generic word for the primary service provided by the United States Marines.

215.     By entering into licensing agreements with various businesses including Shields, or by requiring a license in order to use a term, the DOD has asserted that it has the right to regulate the use of the terms "ARMY," "AIR FORCE," "NAVY," and "MARINE" / "MARINES"  when applied to virtually every type of goods and services.  However, the terms "ARMY," "AIR FORCE," "NAVY," and "MARINE" / "MARINES" cannot be trademarks owned by the respective service branches because they are generic words that refer to the primary services offered by the respective service branches.  Thus, such terms are incapable of functioning as trademarks and are not entitled to trademark protection.

---

[32] *See* https://www.merriam-webster.com/dictionary/marines.  On information and belief, this was and has remained the definition of the term MARINE since the United States Marines first sought to regulate use of the term.

[33] *See, e.g.,* https://www.royalnavy.mod.uk/our-organisation/the-fighting-arms/royal-marines (UK Royal Marines); https://www.royalnavy.mod.uk/news-and-latest-activity/news/2022/may/30/220530-sailors-and-royal-marines-primed-for-platinum-jubilee-pageant-at-buckingham-palace

216.    Accordingly, any trademark registrations for the marks "ARMY," "AIR FORCE," "NAVY," "MARINE," and "MARINES" should be cancelled under Section 37 of the Trademark Act, 15 U.S.C. § 1119, on the ground that the marks are generic and are incapable of functioning as trademarks and any common law rights to these terms should be declared null and void.

**EIGHTH CAUSE OF ACTION: RELIGIOUS FREEDOM RESTORATION ACT**

217.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

218.    The Religious Freedom Restoration Act of 1993 (RFRA) states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."[34]  Unless the government satisfies the compelling interest test by "demonstrat[ing] that [the] application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest,"[35] the governmental act will be found to be a substantial burden and rejected.

219.    RFRA imposes strict scrutiny over all actions of the federal government that "substantially burden a person's exercise of religion."[36]  The act broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[37]  In *Burwell v. Hobby Lobby Stores*, the Supreme Court stated that the exercise of religion involves "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reason."[38]  Further, the Court has repeatedly

---

[34] 42 U.S.C.A. 2000bb-1.
[35] 42 U.S.C.A. 2000bb-1(b).
[36] *Id.*
[37] *Id.*; *See* 42 U.S.C.A. 2000bb-2(4).
[38] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (citing *Smith*, 494 U.S. at 877).

SECOND AMENDED COMPLAINT                                                                49

articulated that courts have no business addressing whether sincerely held religious beliefs are reasonable.[39]

220.    Under 10 U.S.C. § 2260, the Secretary of Defense may "license trademarks, service marks, certification marks, and collective marks owned or controlled by the Secretary . . . to any qualifying company upon receipt of a request from the company."[40]  Furthermore, "a qualifying company is any United States company that . . . is determined by the Secretary concerned to be qualified in accordance with such criteria as determined appropriate by the Secretary of Defense."[41]  However, there is no statute that defines or grants the government's ability to monitor and license trademarks as a compelling government interest.

221.    The DoD Instruction Number 5535.12 ("DODI No.5535.12"), Trademark Licensing Program Requirement and Process, provides that "DoD marks may not be licensed for **any purpose** intended to promote ideological movements, sociopolitical change, **religious beliefs (including non-belief)**, specific interpretations of morality, or legislative/statutory change."[42]

222.    As an organization, Shields has a mission "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ."  In expressing the sincerely held belief of Shields and its owners and employees, Shields produces goods bearing both Biblical Scripture and military related words and insignia.  The production of such goods is not only Shields's foundation and livelihood, but also how Shields as an entity, as well as its owners, its employees, and its customers exercise their sincerely held religious beliefs.  DODI No.5535.12, therefore, does much more damage than

_____

[39] *See id.* at 724.
[40] 10 U.S.C. §§ 2260 (a), (c)(1) (2004).
[41] Id. at § 2260 (c)(2)(B).
[42] DoD Directive 5535.12, "DoD Branding and Trademark Licensing Program Implementation," Sept. 13, 2013.

SECOND AMENDED COMPLAINT                                                                    50

substantially burdening Shields, its owners', its employees', and its customers' (including our frontline U.S. military troops') exercise of religion.

223.    The purpose of RFRA is clear and written into the statute itself.  The Act was created to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."[43]  A compelling interest is defined as, "only those interests of the highest order."[44]  "[O]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation."[45]  Additionally, the government must show it took the least restrictive means in furthering its interest.  Least restrictive means has its plain meaning,[46] and as the Supreme Court has continually noted, "[t]he least-restrictive-means standard is exceptionally demanding."[47]  And most importantly, it is the government that bears the *heavy* burden of demonstrating its actions were the least restrictive means.[48]

224.    The DoD failed to meet its burden when it adopted DODI No.5535.12.  The DoD does not have a compelling state interest in preventing Shields from producing its products.  The DoD's restriction prevents Shields and its customers, including frontline U.S. military troops, from promoting their support of the military, therefore it hurts the government's interest instead.  The blanket restriction that prohibits licensing for "any purpose intended to promote . . . religious beliefs (including non-belief)" is undeniably overbroad, thus not narrowly tailored.  The inclusion

---

[43] 42 U.S.C.A. 2000bb(b)(1).
[44] *Yoder*, 406 U.S. at 215.
[45] *Sherbert*, 374 U.S. at 406.
[46] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009).
[47] *Hobby Lobby*, 573 U.S. at 728.
[48] *See id.* at 727 (emphasis added).

of "non-belief" in the list of restrictions does not change the fact that the policy unlawfully limits

one's freedom to exercise their religious belief(s).

225.    All Defendants, including individual officials Jensen, O'Haver, Santiago, and

Rowden, discriminated against Shields and retaliated because of religious exercise.

226.    Shields has suffered irreparable harm, including the loss of fundamental

constitutional rights, entitling it to injunctive relief, declaratory relief, legal relief, damages

(against all Defendants) , and attorneys' fees and costs.

## NINTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT

### Agency Action that Is Not in Accordance with Law

227.    Shields incorporates herein by reference each allegation contained in the preceding

paragraphs of this Complaint.

228.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12

complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained

of herein are "[a]gency action made reviewable by statute and final agency action for which there

is no other adequate remedy in a court." *Id*. § 704.

229.    The APA prohibits "agency actions" that are "not in accordance with law." 5 U.S.C.

§ 706(2)(A). DODI No.5525.12 is not in accordance with law for several reasons.

230.    DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose

intended to promote ideological movements, sociopolitical change, religious beliefs (including

non-belief), specific interpretations of morality, or legislative/statutory change."

231.    DODI No.5525.12 violates the APA because it is not a neutral and generally

applicable government policy, nor is it justified by a narrowly tailored compelling government

interest, which violates the Free Exercise Clause of the First Amendment.

SECOND AMENDED COMPLAINT                                                      52

232.    DODI No.5525.12 violates the APA because it disfavors religion over nonreligion and demonstrates hostility toward religion in violation of the Establishment Clause of the First Amendment.

233.    DODI No.5525.12 further violates the APA because it discriminates against religious viewpoints in violation of the Free Speech Clause of the First Amendment. By excluding the promotion of "religious beliefs" from the trademark licensing program, and, particularly, by prohibiting Shields from including Scripture citations alongside Bible verses, the DoD discriminates on the basis of viewpoint in a limited public forum.

234.    DODI No.5525.12 further violates the APA because it substantially burdens Shields exercise of religion, is not justified by a compelling government interest, and is not the least restrictive means of achieving the government's purported interest, which violates the Religious Freedom Restoration Act. DODI No.5525.12 burdens Shields's exercise of religion because it prevents Shields from including Scriptural citations when it places a Bible verse next to a DoD logo on one of its dog tags. Shields believes it has a religious calling to place Scripture citations next to Bible verses on its dog tags "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ." The DoD lacks a compelling interest in prohibiting the placement of Scripture references next to its logos, nor is the DoD's policy the least restrictive means of promoting religious neutrality because it bans all mention of religious belief.

235.    The decision by Defendants Army TMLPO and Jensen to allow Shields to use Biblical verses alongside the Army logo but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

SECOND AMENDED COMPLAINT                                                    53

236.     The decision by Defendants Marine Corps TMLPO and O'Haver first to prohibit Shields from including "controversial" passages from the Bible alongside Marine Corps logos on Shields dog tags and then second to prohibit Shields from including any Scripture alongside the Marine Corps logos on Shields dog tags was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

237.     The decision by Defendant Navy TMLO to purportedly allow Shields to use Biblical verses alongside the Army logo but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

238.     The decision by Defendants Air Force TMLO and Rowden to allow Shields to use Biblical verses alongside the Air Force logo but disallow citation to the particular Scripture being used was not in accordance with law because it violates the First Amendment, RFRA, and trademark law.

239.     For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under the First Amendment.

240.     For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under the Religious Freedom Restoration Act.

241.     For the reasons discussed above, DODI No.5525.12 is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under trademark law.

242.     Shields has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

SECOND AMENDED COMPLAINT                                                                54

243.     Shields has no adequate remedy at law.

244.     Absent injunctive and declaratory relief against DODI No.5525.12, Shields will have been and continue to be harmed.

245.     The Court should declare DODI No.5525.12 and each of the Defendants' decisions invalid and set them aside.

## TENTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT

### Agency Action that Exceeds Statutory Authority

246.     Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

247.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12 complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained of herein are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

248.     The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). DODI No.5525.12 exceeds statutory authority for several reasons.

249.     DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

250.     DODI No.5525.12 violates the APA because it disfavors religion over nonreligion and demonstrates hostility toward religion in violation of the Establishment Clause of the First Amendment.

251.    DODI No.5525.12 further violates the APA because it discriminates against religious viewpoints in violation of the Free Speech Clause of the First Amendment. By excluding the promotion of "religious beliefs" from the trademark licensing program, and, particularly, by prohibiting Shields from including Scripture citations alongside Bible verses, the DoD discriminates on the basis of viewpoint in a limited public forum.

252.    DODI No.5525.12 further violates the APA because it substantially burdens Shields exercise of religion, is not justified by a compelling government interest, and is not the least restrictive means of achieving the government's purported interest, which violates the Religious Freedom Restoration Act. DODI No.5525.12 burdens Shields's exercise of religion because it prevents Shields from including Scriptural citations when it places a Bible verse next to a DoD logo on one of its dog tags. Shields believes it has a religious calling to place Scripture citations next to Bible verses on its dog tags "[t]o share the love, hope, forgiveness, and power of God's Word with others and to see people victorious in life's battles and in a relationship with Jesus Christ." The DoD lacks a compelling interest in prohibiting the placement of Scripture references next to its logos, nor is the DoD's policy the least restrictive means of promoting religious neutrality because it bans all mention of religious belief.

253.    The decision by Defendants Army TMLPO and Jensen to allow Shields to use Biblical verses alongside the Army logo but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

254.    The decision by Defendants Marine Corps TMLPO and O'Haver first to prohibit Shields from including "controversial" passages from the Bible alongside Marine Corps logos on Shields dog tags and then second to prohibit Shields from including any Scripture alongside the

Marine Corps logos on Shields dog tags was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

255.    The decision by Defendant Navy TMLO to purportedly allow Shields to use Biblical verses alongside the Army logo but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

256.    The decision by Defendants Air Force TMLO and Rowden to allow Shields to use Biblical verses alongside the Air Force logo but disallow citation to the particular Scripture being used was in excess of statutory authority because it violates the First Amendment, RFRA, and trademark law.

257.    For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates Shields's rights under the First Amendment.

258.    For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates Shields's rights under the Religious Freedom Restoration Act.

259.    For the reasons discussed above, DODI No.5525.12 is in excess of statutory authority within the meaning of 5 U.S.C. § 706(2)(C) as it violates Shields's rights under trademark law.

260.    Shields has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

261.    Shields has no adequate remedy at law.

262.     Absent injunctive and declaratory relief against DODI No.5525.12, Shields will have been and continue to be harmed

263.     The Court should declare DODI No.5525.12 and each of the Defendants' decisions invalid and set them aside.

### ELEVENTH CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT

### Agency Action that Is Arbitrary, Capricious, and an Abuse of Discretion

264.     Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

265.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), DODI No.5525.12 complained of herein is a "rule" under the APA, *id*. § 551(4), and Defendants' actions complained of herein are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

266.     The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). DODI No.5525.12 and Defendants' actions implementing DODI No.5525.12 are arbitrary, capricious, and an abuse of discretion for several reasons.

267.     DODI No.5525.12 provides that "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change."

268.     DODI No.5525.12 prohibits the licensure of DoD Trademarks to "promote" "religious beliefs." The DoD lacks any basis in law for excluding the use of its trademarks alongside religious belief. It is arbitrary and capricious and an abuse of discretion for the DoD to conclude that "religious belief" may not be associated with its trademarks when soldiers buried at Arlington National Cemetery and military cemeteries around the world have headstones in the

shape of Christian crosses and the Star of David and include both religious and non-religious phrases on the headstones.

269. It was also arbitrary and capricious and an abuse of discretion for Defendants Army TMLPO and Jensen to allow Shields to use Biblical verses alongside the Army logo but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendants Army TMLPO and Jensen acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on Shields's dog tags.

270. It was also arbitrary and capricious and an abuse of discretion for Defendants Marine Corps TMLPO and O'Haver first to prohibit Shields from including "controversial" passages from the Bible alongside Marine Corps logos on Shields dog tags and then second to prohibit Shields from including any Scripture alongside the Marine Corps logos on Shields dog tags. Defendants Marine Corps TMLPO and O'Haver never defined the terms "controversial" or "religious theme," and those terms are nowhere contained in any of the authorizing statutes or the Constitution. Defendants Marine Corps TMLPO and O'Haver acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on Shields's dog tags.

271. It was also arbitrary and capricious and an abuse of discretion for Defendant Navy TMLO to purportedly allow Shields to use Biblical verses alongside the Army logo, but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendant Navy TMLO acted arbitrarily and capriciously and abused its discretion by not approving a trademark license with Shields.

SECOND AMENDED COMPLAINT                                                    59

272.     It was also arbitrary and capricious and an abuse of discretion for Defendants Air Force TMLO and Rowden to allow Shields to use Biblical verses alongside the Air Force logo, but disallow citation to the particular Scripture being used. Both the expression of Bible verses and the citation to Biblical Scripture could constitute "religious belief" under DODI No.5525.12. Nevertheless, Defendants Air Force TMLO and Rowden acted arbitrarily and capriciously and abused their discretion by parsing the religious belief allowed on Shields's dog tags.

273.     For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under the First Amendment.

274.     For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under the Religious Freedom Restoration Act.

275.     For the reasons discussed above, DODI No.5525.12 is arbitrary and capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) as it violates Shields's rights under trademark law.

276.     Shields has no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

277.     Shields has no adequate remedy at law.

278.     Absent injunctive and declaratory relief against DODI No.5525.12, Shields will have been and continue to be harmed.

## TWELFTH CAUSE OF ACTION: LANHAM ACT

### Fraudulently Obtained Trademark Registrations

279.     Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

280.     The Lanham Act allows for "[a] petition to cancel a registration of a mark […] be filed […] by any person who believes that he is […] damaged […] by the registration of a mark on the principal register […]: (3) at any time if [the registered mark's] registration was obtained fraudulently […]" 15 U.S.C. 1064 (3).

281.     The Lanham Act also provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.  Courts have held that the effect of § 37 of Lanham Act (15 USCS § 1119) is to give to courts concurrent power with Trademark Office to conduct cancellation proceedings; civil courts are bound by same grounds for cancellation of trademark as is Trademark Office. *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261 (S.D.N.Y. 1969).

282.     Thus, the Lanham Act allows the current Court to rectify fraudulent trademark registrations challenged by *any party* at *any time*.

283.     The Defendants have made knowingly inaccurate or knowingly misleading, false and material representation, with the intent to deceive the USPTO when registering some of their trademarks.

284.     Trademark Registration No. 5,425,473 ("the '473 Trademark") is a standard character mark that contains the word elements "Marine Mom."

285.   For the application of the '473 Trademark, which was filed based on use in commerce under U.S.C § 1051(a), Defendant Philip Greene of the USMC declared:

### Declaration

**Basis:**
**If the applicant is filing the application based on use in commerce under 15 U.S.C. § 1051(a):**

- The signatory **believes that the applicant is the owner of the trademark/service mark sought to be registered**;
- The mark is **in use in commerce** on or in connection with the goods/services in the application;
- The specimen(s) shows the mark as used on or in connection with the goods/services in the application; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

[…]

**To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce**, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Philip J. Greene/   Date Signed: 08/25/2017

Declaration submitted on Aug. 25, 2017, for TEAS Plus New Application Serial No. 87583560

("the '560 Application") (now the '473 Trademark) (emphasis added).

SECOND AMENDED COMPLAINT                                                        62

286.    The '560 Application additionally states:

**Use in Commerce:** The applicant is using the mark in commerce on or in connection with the identified goods/services. The applicant attaches, or will later submit, one specimen as a JPG/PDF image file showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, regardless of whether the mark itself is in the standard character format or is a stylized or design mark. The specimen image file may be in color, and the image must be in color if color is being claimed as a feature of the mark.

In International Class 016, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 06/28/2010, and first used in commerce at least as early as 06/28/2010, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) the specimens are screen shots showing use of the mark in commerce.

287.    In support of the declaration above, USMC submitted the following graphic as a specimen to show the '473 Trademark's "use in commerce" to show the USMC's "ownership" of the '473 Trademark :



Graphic 3. Specimen submitted accompanying the '560 Application (now the '473 Trademark) and the declaration therein. This graphic, submitted by the USMC, shows what on information and

belief is an unlicensed product designed by store owner "rexfmay" offered for sale on a www.zazzle.com, a platform commonly used by free-lancing artists for commercializing their designs.

288.     However, on information and belief, the specimen contained in Graphic 3 does not reflect the USMC's use of the trademark in commerce, because the product shown was not sold by the USMC, licensed by USMC to the sellers whose products are shown, or otherwise authorized by the USMC.   On information and belief, the USMC therefore knowingly and intentionally presented another party's (or parties') use of the mark as its own in order to obtain the trademark registration.  In other words, USMC knew that the representation was false at the time Mr. Greene signed the accompanying declaration.

289.     The USMC's false representation was material to the USPTO's examination of the '473 Trademark for registrability.

290.     Upon information and belief, the USMC intended to deceive the USPTO into issuing the registration.

291.     On information and belief, Defendants USMC, Army, and Navy obtained trademark registrations fraudulently in a similar manner.  Exhibit B provides a specific list of registrations that SOS believes were obtained in a similarly fraudulent manner by the Defendants.

292.     Trademark Registration No. 4,292,460 ("the '460 Trademark") is a standard character mark that contains the word elements "One Mind Any Weapon."

293.     In the Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9 submitted for the '460 Trademark, Defendant Philip Greene of the USMC declared:

> Unless the owner has specifically claimed excusable nonuse, **the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.**

SECOND AMENDED COMPLAINT                                                                                          64

The registrant requests that the registration be renewed for the goods/services/collective organization identified above.

To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Philip Greene/    Date: 02/07/2023

Declaration submitted on February 7, 2023 for the '460 Registration (emphasis added).

294.    In support of the declaration, USMC submitted the following specimen:



Graphic 4. Specimen submitted accompanying the '460 Registration and the Sections 8&9 Declaration for the '460 Registration. Graphic 4 shows a mug offered for sale by what SOS believes is an unlicensed third party, Cubecan's Creations Marine Corps Gifts, available on www.zazzle.com, a platform available for freelance artists to sell their own designs.

295.    Contrary to the declaration, on information and belief, the specimen contained in

Graphic 4 does not reflect USMC's continuous use of the trademark in commerce, because it was

SECOND AMENDED COMPLAINT                                                              65

not USMC's use.  On information and belief, at the time that the USMC submitted its Statement

of Use Declaration, the product was not sold by USMC, licensed by the USMC to the

seller/advertiser, or otherwise authorized by the USMC.  USMC, once again, presented another

party's use of the mark as its own in order to maintain the trademark registration.  On information

and belief, USMC knew that the representation was false at the time Mr. Greene signed the

accompanying declaration.

296.    The Defendants sustained a troublesome pattern to renew trademark registrations

fraudulently.  Exhibit C provides a specific list of registrations that SOS believes were obtained

and/or renewed in a similarly fraudulent manner by the Defendants.

297.    As another example, for Trademark Registration No. 4,532,685 ("the '685

Trademark"), in response to an office action, Defendant Philip Greene of the USMC declared:

> The applicant is using the mark in commerce, or the applicant's related company
> or licensee is using the mark in commerce, on or in connection with the identified
> goods and/or services. 15 U.S.C. Section 1051(a), as amended.
> […]
> Applicant hereby submits one(or more) specimen(s) for Class 021 . The specimen(s)
> submitted consists of the specimens are screenshots showing use of the mark in
> commerce                                                                    .
> **"The substitute (or new, or originally submitted, if appropriate) specimen(s)
> was/were in use in commerce at least as early as the filing date of the
> application"***[for an application based on Section 1(a), Use in Commerce]
> OR* **"The substitute (or new, or originally submitted, if appropriate)
> specimen(s) was/were in use in commerce prior either to the filing of the
> Amendment to Allege Use or expiration of the filing deadline for filing a
> Statement of Use"***[for an application based on Section 1(b) Intent-to-
> Use]. OR* **"The attached specimen is a true copy of the specimen that was
> originally submitted with the application, amendment to allege use, or
> statement of use"** [for an illegible specimen].
> […]
> Signature: /Philip Greene/      Date: 12/23/2013.

Declaration Submitted on December, 23, 2013, for Response to Office Action (emphasis in

original).

298.    In support of the declaration above, the Defendants submitted the following graphic as a specimen to obtain the '685 Registration:



Graphic 5. Specimen submitted accompanying the declaration as response to office action. This graphic, submitted by the USMC, shows on information and belief an unlicensed product designed and sold by an unnamed third party, bearing the USMC's trademark "A Few Good Men" and available on a "made-to-order" popular among freelancing artists, www.cafepress.com.

299.    The specimen contained in Graphic 5 does not reflect the USMC's use of the trademark in commerce, because on information and belief, the product was not sold by USMC, licensed by USMC, or otherwise authorized by USMC.  In sum, USMC presented another party's or (parties') use of the mark as its own, in order to obtain the trademark registration.  USMC knew that the representation was false at the time Mr. Greene signed the accompanying declaration.

300.    USMC's false representation was material to the USPTO's examination of the '685 trademark for registrability.

SECOND AMENDED COMPLAINT                                                     67

301.    Upon information and belief, USMC intended to deceive the USPTO into issuing the registration.

302.    On information and belief, the Defendants obtained trademark registrations fraudulently.  Exhibit C provides a specific list of registrations that SOS believes were obtained and/or renewed in a similarly fraudulent manner by the Defendants.

303.    Accordingly, the Trademark Registrations contained in Exhibits B, C, and D should be cancelled on the ground that Defendants committed fraud during the prosecution and/or renewal of these filings.

## FOURTEENTH CAUSE OF ACTION: LANHAM ACT

### Prohibition of Federal Trademark Registration of Insignia of the United States

304.    Shields incorporates herein by reference each allegation contained in the preceding paragraphs of this Complaint.

305.    The Lanham Act prohibits the registration of any marks that "[c]onsist[] of or comprise[] the flag or coat of arms or other insignia of the United States. . . ." 15 U.S.C. § 1052(b). This prohibition includes and applies to the owners of such insignia, such as the U.S. government or state government. *See In re City of Houston*, 731 F.3d 1326, 1331 (Fed. Cir. 2013) (refusing to add an exception in the language of Section 2(b) for the owners of the state insignia: "we conclude that the context of § 2(b) supports the plain language of the prohibition and Houston's identity as a **governmental entity** does not free it from the reach of § 2(b).") (emphasis added).

306.    The DoD owns several insignia / coats of arms that it has registered in violation of 15 U.S.C. § 1052(b). An example is the insignia / coat of arms for the Joint Chiefs of Staff, illustrated below. This was registered on November 1, 2016, having the Registration Number 5,071,760.



307.    The Department of the Air Force owns several insignia / coats of arms that it has improperly registered. An example is the insignia / coat of arms typically associated with the Air Force, illustrated below. This was registered on September 23, 2009 having the Registration Number, 2,767,190.



308.    The Army owns several insignia / coats of arms that it has improperly registered. An example is the insignia / coat of arms for US Army Corps of Engineers, illustrated below. This was registered on November 30, 1993 having the Registration Number: 1,807,986.



309.    The Marine Corps owns several insignia / coats of arms that it has improperly registered. An example is its Semper Fidelis insignia / coats of arms, illustrated below. This was registered on July 5, 2011 having the Registration Number: 3,989,378.



SECOND AMENDED COMPLAINT                                                                    69

310.     The Navy owns several insignia / coats of arms that it has improperly registered. The insignia / coat of arms for the United States Navy is illustrated below. This was registered on January 30, 2018 having the Registration Number: 5,392,006.



311.     Shields' use of these improperly trademarked insignia / coats of arms of the United States does not amount to trademark infringement because all such insignia / coats of arms are prohibited from being registered per the Lanham Act.

312.     Accordingly, any trademark registrations for the marks consisting of insignia or coats of arms of the United States should be cancelled under the Lanham Act and should be declared null and void.  Exhibit E provides a list of such insignia / coats of arms for which the registrations should be cancelled pursuant to 15 U.S.C. § 1052(b).

**JURY TRIAL DEMANED**

313.     Shields requests a jury trial on all issues that may be tried to a jury.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that this Court enter an order:

a.     Declaring Defendants' policy and actions violate the Free Exercise Clause of the First Amendment;

b.     Declaring Defendants' policy and actions violate the Establishment Clause of the First Amendment;

c.     Declaring Defendants' policy and actions violate the Free Speech Clause of the First Amendment;

SECOND AMENDED COMPLAINT                                                          70

d.     Declaring Defendants' policy and actions violate RFRA;

e.     Declaring Plaintiff's use of DoD Trademarks on its products does not give rise to liability under 15 U.S.C. §§ 1114, 1125, or any other applicable law;

f.     Declaring that the terms "ARMY," "AIR FORCE," "NAVY," "MARINE," and "MARINES" are generic terms that are incapable of serving as source identifiers for the respective service branches;

g.     Declaring that any registered trademarks for the terms "ARMY," "AIR FORCE," "NAVY," "MARINE," and "MARINES" are cancelled and any common law rights in these terms are null and void.

h.     Declaring that all registered trademarks contained in the exhibits hereto and/or registered fraudulently or otherwise in violation of any section of the Lanham Act are cancelled and any common law rights in these terms are null and void.

i.     Permanently enjoining Defendants from enforcing the policy and actions complained of herein;

j.     Vacate and set aside DODI No.5525.12 and the decisions of Defendants to deny Plaintiff a license based on the policy;

k.     Requiring Defendants to withdraw or refrain from enforcing the unconstitutional aspects of 32 C.F.R. § 507.10;

l.     Awarding Plaintiff nominal and compensatory damages under the First Amendment against the individual capacity Defendants;

m.     Awarding the Plaintiff nominal and compensatory damages under RFRA against the government agencies, official capacity Defendants, and the individual capacity Defendants;

n.     Awarding the Plaintiff costs and reasonable attorneys' fees and expenses; and

SECOND AMENDED COMPLAINT                                                                   71

o.      Granting the Plaintiff all such other relief as the Court deems just and proper.

Dated:  December 5, 2023

Respectfully submitted,

By: */s/ Draft*
_____

Jeffrey C. Mateer
Texas Bar No. 13185320
Hiram S. Sasser, III
Texas Bar No. 24039157
David J. Hacker
Texas Bar No. 24103323
Michael D. Berry
Texas Bar No. 24085835
mberry@firstliberty.org
Danielle A. Runyan
Texas Bar No. 24134548
drunyan@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
(972) 941-4444 – Telephone
(972) 423-6162 – Facsimile

Carl E. Bruce
Texas Bar No. 24036278
bruce@fr.com
Leonard E. Davis
Texas Bar No. 05521600
ldavis@fr.com
Nan Lan
Texas Bar No. 24121711
lan@fr.com
Ashu N. Balimba
Texas Bar No. 24099369
balimba@fr.com
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX  75201
(214) 747-5070 – Telephone
(214) 747-2091 – Facsimile

Kenneth Hoover
Texas Bar No. 24092537
hoover@fr.com
FISH & RICHARDSON P.C.
111 Congress Ave., Suite 810
Austin, Texas 78701
(512) 472-5070 – Telephone
(512) 320-8935 – Facsimile

Oliver Richards
orichards@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
(858) 678-4705 – Telephone
(858) 678-5099 - Facsimile

**COUNSEL FOR PLAINTIFF
SHIELDS OF STRENGTH**

SECOND AMENDED COMPLAINT

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 5, 2023 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ Carl E. Bruce*
Carl E. Bruce
