UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:21-cv-00484

———

**Shields of Strength,**
*Plaintiff,*

v.

**U.S. Department of Defense et al.,**
*Defendants.*

———

## OPINION AND ORDER

In this dispute over the military's trademarking of certain words and images, the court has already ruled on one motion to dismiss.[1] Familiarity with that ruling is presumed here.

After that ruling, defendants filed a second motion to dismiss that asserted sovereign immunity from certain claims for equitable relief.[2] After a hearing on that motion, plaintiff Shields of Strength ("Shields") received leave to file a second amended complaint, which both repleaded its prior claims and added new ones.[3] The court dismissed any repleaded claims that it had previously dismissed.[4]

Defendants now move to dismiss the remaining claims of the operative complaint, asserting lack of subject-matter jurisdiction and failure to state viable claims for relief.[5] For the reasons given below, that motion is granted in part and denied in part.

---

[1] Doc. 61.
[2] Doc. 68.
[3] Doc. 110.
[4] Doc. 114.
[5] Doc. 117.

# Table of Contents

I.   Review of claims.................................................................. 3

II.  Motion to dismiss for lack of subject-matter jurisdiction...... 5

    A.   Sovereign immunity ...................................................... 5

        1.   Licensing claims seeking equitable relief.................. 6

        2.   Noninfringement claims seeking equitable relief..... 14

            a.   APA waiver of immunity ................................... 14

            b.   Lanham Act waiver of immunity ....................... 17

            c.   Waiver by conduct ........................................... 19

    B.   Standing for noninfringement claims ........................... 19

        1.   Standing on Count 7 (genericness) ......................... 23

        2.   Standing on Count 12 (fraud) ................................. 23

        3.   Standing on Count 13 (insignia).............................. 25

III. Motion to dismiss for failure to state a claim...................... 26

    A.   Cancellation of marks as a remedy on Counts 7 and 13 . 27

    B.   Count 12's allegation of fraud ...................................... 27

    C.   Count 13's allegation of unregistrable "insignia" ......... 27

        1.   History of the "insignia" exclusion ......................... 29

        2.   Meaning of the "insignia" exclusion........................ 30

        3.   Application of the "insignia" exclusion ................... 34

Conclusion............................................................................. 36

## I. Review of claims

The claims of the current complaint again fall into two categories. The "licensing claims" (Counts 1–3 and 8–11) challenge the military's policy and decisions regarding the grant of a trademark license to Shields. The "noninfringement claims" (Counts 4–7 and 12–13) challenge, on various grounds, the assertion that Shields needs a license in the first place because its merchandise is infringing.[6] The operative complaint differs from the prior version by adding a Count 12 and a Count 13 (relabeled by the court from Count 14 since the complaint's numbering skips 13).

As relief, plaintiff seeks the following:

(1) As to the military's denial or limitation of trademark licenses (Counts 1–3 and 8–11), plaintiff pleads for:

   (a) nominal and compensatory damages for past violation of plaintiff's rights under the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment and under RFRA, the Religious Freedom Restoration Act of 1993 (relief on Counts 1–3 and 8);

   (b) a declaration that the future denial or limitation of a trademark license for plaintiff's merchandise based on Instruction 5535.12 would violate the First Amendment and RFRA, and an injunction against such future conduct (relief on Counts 1–3 and 8–10);

   (c) an order vacating the past denials and limitations of a trademark license for plaintiff's merchandise and

---

[6] Count 4 largely presents the claim that Shields' unlicensed distribution of its merchandise would not create trademark-infringement liability. But it also contains an allegation that defendants "discriminated against Shields and retaliated because of religion." Doc. 110 at 39 ¶ 180. That allegation, which appears to underlie Count 4's damages request, refers to the military's denial or limitation of trademark licenses. Because that allegation in ¶ 180 of Count 4 repeats the allegation in ¶ 174 of Count 3—that defendants "discriminated against Shields and retaliated because of religion"—that aspect of Count 4 is treated as part of Count 3 for simplicity of analysis. The rest of Count 4 concerns, not the military's licensing decisions, but whether a license is needed at all.

vacating the pertinent provision of Instruction 5535.12, as violating the First Amendment and RFRA (relief on Counts 9–10); and

(d) an order vacating the past denials and limitations of a trademark license for plaintiff's merchandise, and vacating the pertinent provision of Instruction 5535.12, as arbitrary and capricious and an abuse of discretion within the meaning of the Administrative Procedure Act (relief on Count 11).

(2) As to whether plaintiff's unlicensed merchandise infringes trademark rights (Counts 4–7 and 12–13), plaintiff seeks:

(a) a declaration that its unlicensed distribution of its merchandise would not create trademark liability because the goods meet the expressive-works test for noninfringement[7] or fall within the defense of an as-applied Free Speech Clause violation (relief on Counts 4 and 6);

(b) a declaration that plaintiff's unlicensed distribution of its merchandise would not be trademark infringement because there is no likelihood of consumer confusion regarding the goods' origin (relief on Count 5);

(c) a declaration that plaintiff's unlicensed distribution of its merchandise would not create trademark liability, under the defense of fair use (relief on Count 5);

(d) a declaration that plaintiff's unlicensed distribution of its merchandise would not create liability for infringing certain trademarks because those marks are unprotectable as generic, and an order cancelling those marks' registration (relief on Count 7);

(e) a declaration that plaintiff's unlicensed distribution of its merchandise would not create liability for infringing certain trademarks because those marks were

---

[7] *Id.* at 38–39 (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)); *see Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023).

fraudulently obtained, and an order cancelling those
marks' registration (relief on Count 12); and

(f) a declaration that plaintiff's unlicensed distribution of its
merchandise would not create liability for infringing
certain trademarks because those marks are unregistra-
ble "insignia of the United States," and an order can-
celling those marks' registration (relief on Count 13).

In its first ruling on those claims, the court dismissed all of the
claims against the defendants sued in their individual capacities
and some of the claims against the defendants sued in their official
capacities.[8] The official-capacity defendants now move to dismiss
the remaining claims on additional grounds.

## II. Motion to dismiss for lack of subject-matter jurisdiction

This court's jurisdiction to hear each of the remaining claims
is challenged based on (a) sovereign immunity and (b) standing.
Each challenge is analyzed below.

### A. Sovereign immunity

Sovereign immunity renders the United States and its depart-
ments and agents in their official capacities immune from suit.[9]
The federal government can waive sovereign immunity, but the
waiver "must be unequivocally expressed in statutory text."[10] Be-
cause sovereign immunity is jurisdictional in nature,[11] a claim
against the government that is not within an unambiguous waiver
of sovereign immunity must be dismissed as outside the court's
subject-matter jurisdiction.[12]

The court has already ruled that sovereign immunity bars the
licensing claims insofar as they seek damages.[13] In the new motion
to dismiss, sovereign immunity is now asserted as to the request

---

[8] Doc. 61.
[9] *Williamson v. USDA*, 815 F.2d 368, 373 (5th Cir. 1987).
[10] *Lane v. Pena*, 518 U.S. 187, 192 (1996).
[11] *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).
[12] *Lane*, 518 U.S. at 192.
[13] Doc. 61 at 11.

for equitable relief on both the licensing claims and the non-infringement claims.

### 1. Licensing claims seeking equitable relief

Plaintiff's licensing claims seek equitable relief: an order vacating the past denials and limitations of a trademark license, a declaration that future denials or limitations of a license on the same grounds would be invalid, and an injunction enforcing that declaratory judgment. As to those claims, plaintiff relies on the APA's waiver of sovereign immunity, which is stated in the second sentence of 5 U.S.C. § 702: "An action in a court of the United States [1] seeking relief other than money damages and [2] stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."

Because the equitable-relief licensing claims seek "relief other than money damages," they meet the first requirement to come within the APA's waiver of sovereign immunity. The other requirement in § 702's second sentence is simply that the plaintiff claims that an agency, officer, or employee acted or failed to act in some official capacity. That allegation is also made here.

Until 2014, the circuits uniformly held that § 702's second sentence waives sovereign immunity based on those two criteria alone, without limits imported from other provisions (which could state at most requirements for success on the merits).[14] The Fifth Circuit took that view as early as 1980, four years after the

---

[14] *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) ("we now join all of our sister circuits who have [addressed the issue] in holding that § 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action' as set forth in § 704").

statutory amendments that added § 702's second sentence.[15] That view is also consistent with the Supreme Court's guidance that the use of the word "shall" usually "creates an obligation" (here, an obligation not to dismiss the specified cases on the ground that the United States is a party).[16]

In 2014, however, the Fifth Circuit panel in *Alabama–Coushatta Tribe of Texas v. United States* identified two, additional "requirements for establishing a waiver of sovereign immunity," reasoning that the "suffered legal wrong . . . or is adversely affected or aggrieved" and "agency action" standards from § 702's first sentence are "requirements for establishing a waiver of sovereign immunity."[17] The Fifth Circuit also held that, when a cause of action arises under the APA as opposed to a "statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA," the "final" agency action standard from 5 U.S.C. § 704 is an additional requirement for a waiver of sovereign immunity.[18] For those propositions, the Fifth Circuit cited the Supreme Court's *Lujan* decision even though *Lujan* nowhere mentions sovereign immunity.[19]

Under circuit precedent, those additional requirements are reviewed as to the licensing claims. They too are met.

**a.** First, the term "agency action" includes the "denial" of a "license" in "whole or part."[20] And the licensing claims here

---

[15] *Sheehan v. Army & Air Force Exchange Serv.*, 619 F.2d 1132, 1139 (5th Cir. 1980), *rev'd on other grounds*, 456 U.S. 728 (1982) (joining the Third Circuit's view that § 702's second sentence waives sovereign immunity broadly, without atextual limits such as an implied exclusion of common-law claims).

[16] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

[17] 757 F.3d 484, 489 (5th Cir. 2014).

[18] *Id.*

[19] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 885 (1990). *See generally Bowen v. Massachusetts*, 487 U.S. 879, 896, 899 (1988) (reviewing the amendment that added § 702's second sentence, including an "especially convincing" summary by Judge Bork); *Amin v. Mayorkas*, 24 F.4th 383, 389 n.2 (5th Cir. 2022) (suggesting that the court's view treating the finality requirement as jurisdictional is out of step with Supreme Court rulings).

[20] 5 U.S.C. § 551(13).

challenge the denial or abridgement (i.e., partial denial) of a trademark license. So they seek judicial review of "agency action."

At a hearing on the issue, the government argued that the denial of a trademark license is not "agency action" because the relevant military branch "is acting as the trademark owner" and "not a regulator."[21] The government claimed that the licensing prong of the "agency action" definition applies only to "things like a regulatory license, like, for instance, a driver's license or a license to use certain parts of the broadcast spectrum" and not to "a property owner licensing use of their property."[22]

But the text of the APA does not contain an "acting as a regulator" limitation. Nor does the government cite a case applying such a limit. That distinction also seems easily manipulable. For instance, a license to harvest trees on government land could be called either a "regulatory license" (if one focuses on the ecological purpose) or a "license to use government property" (if one focuses on who owns the land). Finally, that limitation is not supported by what the Supreme Court has recognized as the APA's "central purpose of providing a broad spectrum of judicial review of agency action."[23] For all of those reasons, the government's "acting as a regulator" limitation is rejected.

**b.** Second, plaintiff is "adversely affected or aggrieved" by the denial or abridgement of a trademark license. That much is not disputed. Shields has previously made, and wants to continue to make, dog tags using marks registered by the military. A license provides absolute authority for that use, eliminating the need to avoid the other elements of trademark infringement. The denial or abridgement of a license to use the marks thus adversely affects Shields' business.

**c.** Finally, the licensing claims complain of "final" agency action within the meaning of 5 U.S.C. § 704. The government argues that the "communications described at paragraphs 120, 121, 122,

---

[21] Doc. 82 (July 24, 2023 Hr'g Tr.) at 15.
[22] *Id.* at 18.
[23] *Bowen*, 487 U.S. at 903.

127, 128, 132, 133, 134, and 135 of the complaint all fail" the final-ity requirement.[24] Most of those paragraphs (¶¶ 120, 127, 128, 132, 133, and 134) concern a cease-and-desist order or other di-rection that Shields' goods be removed from commerce (or in one case modified to stay in commerce). But that is the agency action underlying the noninfringement claims. In contrast, the licensing claims simply challenge the military's denial of a license.

As to the other cited paragraphs, one (¶ 122) appears to be background information only. The final two cited paragraphs (¶¶ 121 and 145) do identify the denial or abridgement of a license by one of the military branches. Other paragraphs of the com-plaint, not cited by the government, likewise identify a specific denial or abridgement (i.e., partial denial) of a license.[25]

Each of those alleged denials of a license is a "final" agency action. It was not merely a proposed denial or a tentative denial pending further agency review. Rather, each decision marked the consummation of the agency's decision-making and determined the existence and extent of a license for Shields to use a registered mark in a specific way. Each decision was thus "final" within the meaning of the APA, in that it marked the consummation of the agency's decision-making process and was an action from which legal consequences flow, namely, establishing the "unlicensed" element of an infringement claim.[26]

**d.**   The government also argues that, even if § 702's terms are met, § 701(a)(2) forecloses a waiver of sovereign immunity for re-view of agency action that "is committed to agency discretion by law."[27] That exception is "very narrow."[28] It applies only "if no

---

[24] Doc. 117 at 27.

[25] Doc. 110 at ¶¶ 71–78 (Army), ¶¶ 81, 89–90 (Marine Corps), ¶¶ 93–95 (Navy), ¶¶ 96–101 (Air Force). Those alleged denials or abridgements of a li-cense were all presented for judicial review within the general, six-year statute of limitations for suits against the United States. *See* 28 U.S.C. § 2401(a).

[26] *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

[27] 5 U.S.C. § 701(a)(2); *see Lundeen v. Mineta*, 291 F.3d 300, 304–05 (5th Cir. 2002) (holding that this provision is an exception from the waiver of sov-ereign immunity and is thus jurisdictional in nature).

[28] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971).

judicially manageable standards are available for judging how and when an agency should exercise its discretion."[29]

The First Amendment claims survive that test. Because the Constitution itself provides judicially manageable standards, a claim that agency action violates the Constitution is reviewable unless Congress's intent to bar review is "clear."[30] And nothing establishes such a "clear" bar to review of constitutional claims here. That much is undisputed.

Defendants do dispute whether Shields' other licensing claims for equitable relief—that defendants' licensing policy violates RFRA, violates trademark law, and is arbitrary, capricious, or an abuse of discretion—are barred by § 701(a)(2). Defendants argue that their licensing decisions are committed to agency discretion by law, namely, by 10 U.S.C. § 2260.[31] That statute provides:

> (a) Authority.—Under regulations prescribed by the Secretary of Defense . . . , the Secretary concerned may license trademarks . . . owned or controlled by the Secretary concerned and may retain and expend fees received from such licensing in accordance with this section.[32]

The term "may" in that statute connotes discretion.[33] But "[t]he mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials,

---

[29] *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 410).

[30] *Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998) (citing *Webster v. Doe*, 486 U.S. 592, 603 (1988)).

[31] Doc. 37 at 24–26; Doc. 117 at 25–27.

[32] 10 U.S.C. § 2260(a). Shields' complaint also cites subsection (c) of § 2260, which allows the Secretary to license trademarks "relating to military designations and likenesses of military weapons systems to any qualifying company upon receipt of a request from the company." Doc. 110 at 50 ¶ 220 n.40. But subsection (c) is not applicable because Shields' complaint has no pleading about marks related to weapons systems.

[33] *See Jama v. ICE*, 543 U.S. 335, 346 (2005).

provides absolutely no guidance as to how that discretion is to be exercised." [34]

Counts 9 and 10 claim that defendants' licensing policy violates RFRA and trademark law. Those sources of law provide judicially manageable standards for review of the challenged agency action. So dismissal of Counts 9 and 10 on reviewability grounds is not warranted.

Count 11 is a different matter. It alleges that Instruction 5535.12 is arbitrary, capricious, or an abuse of the Secretary's discretion to regulate the licensing of military trademarks. But Shields has not identified any aspect of the statutory scheme conferring that discretion, or any other relevant materials, that provide the Secretary guidance on how his discretion is to be exercised so long as it complies with the Constitution, RFRA, and trademark law. Shields does point to constitutional limits. But those claims have already been held reviewable. Because the law authorizing Instruction 5535.12 does not supply "standards for the court to apply" in assessing whether that regulation is arbitrary, capricious, or an abuse of discretion (as opposed to whether it violates the Constitution, RFRA, or trademark law), the motion to dismiss Count 11's challenge to Instruction 5535.12 is granted. [35]

Count 11 also challenges the implementation of Instruction 5535.12 by the military trademark offices that reviewed Shields' licensing requests. [36] Instruction 5535.12 provides in pertinent part: "DoD marks may not be licensed for any purpose intended to promote ideological movements, sociopolitical change, religious beliefs (including non-belief), specific interpretations of morality, or legislative/statutory change." [37] Shields argues that,

---

[34] *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam)).

[35] *See Perales*, 903 F.2d at 1047–51; *Ellison*, 153 F.3d at 254.

[36] Doc. 110 at 57–58 ¶¶ 251–54.

[37] U.S. Dep't of Def. Instruction (DoDI) 5535.12, *DoD Branding & Trademark Licensing Program Implementation* at 6, Encl. 2, ¶ 2(d) (Sept. 13, 2013), www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/553512p.pdf.

as applied to its merchandise, that aspect of the regulation is arbitrary, capricious, or an abuse of discretion.

But the pertinent part of Instruction 5535.12 only *prohibits* the military from granting licenses in certain circumstances. It does not *require* the military to grant a license outside those circumstances. So the court would still need some source of law to apply in reviewing whether the Secretary's discretion to deny a trademark license to Shields was exercised arbitrarily or capriciously. As with Count 11's facial challenge to Instruction 5535.12 as arbitrary and capricious, Shields has not identified any judicially administrable standards for reviewing whether the Secretary's as-applied discretion to *deny* a license in a given case was exercised arbitrarily or capriciously. (Again, whether an exercise of that discretion violated the Constitution, RFRA, or trademark law are matters presented in other claims, not Count 11.)

By way of contrast, if a hypothetical plaintiff were to complain that the military *granted* a trademark license (perhaps to a competitor but not to the plaintiff) by applying Instruction 5535.12 arbitrarily or capriciously, then "standards for the court to apply" would exist in analyzing that claim. Instruction 5535.12 itself would provide those standards. As the Fifth Circuit has held: "Even if the substance of an agency's decision [i.e., the issuance of Instruction 5535.12] is beyond review as discretionary, an agency's failure to follow its own regulations may be challenged under the APA."[38]

But Shields is complaining of the opposite—that the military *denied* it a trademark license. That denial is what impairs Shields' business and makes it adversely affected and aggrieved, as to come within § 702's waiver of sovereign immunity. Because the relevant part of Instruction 5535.12 only prohibits the military from

---

[38] *Ellison*, 153 F.3d at 252 (citing *Webster*, 486 U.S. at 601 n.7); *accord Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) ("[J]udicially manageable standards may be found in formal and informal policy statements and regulations.") (internal quotation marks omitted); *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988).

granting licenses in certain circumstances, without requiring licenses outside those circumstances, that regulation does not provide a standard for as-applied judicial review of whether the Secretary's discretion to deny licenses was exercised arbitrarily or capriciously. As the Fifth Circuit held in finding a similar challenge to be jurisdictionally barred under a similar regime—where a regulation stated mere conditions for granting relief without requiring the relief to issue if the conditions were met—the agency's regulation "limits [the agency's] discretion to approve" the relief but "has no effect . . . on [the agency's] discretion to deny" the relief.[39] Likewise here. Since neither Instruction 5535.12 nor 10 U.S.C. § 2260(a) provides a standard to apply in judicial review of whether a license *denial* was arbitrary, capricious, or an abuse of discretion (as opposed to in violation of the Constitution, RFRA, or trademark law), Count 11 is dismissed under § 701(a)(2)'s limit on the waiver of sovereign immunity.

    **e.** Finally, the government argues for dismissal of Counts 9 and 10 on sovereign-immunity grounds as "duplicative."[40] Recall that Counts 1–3 and 8 seek equitable relief because the government's licensing decisions allegedly violate the First Amendment and RFRA. Counts 9 and 10 then allege that the same legal deficiencies justify APA relief on two theories:

- vacatur because the licensing decisions are "not in accordance with law" (Count 9) and

- vacatur because the licensing decisions are "in excess of statutory authority" (Count 10).[41]

Thus, Counts 9 and 10 simply request relief under the APA for legal violations alleged in independent causes of action.

    Perhaps Shields did not need to style those requests for relief as freestanding claims. But that is not a basis for dismissing those requests for relief. The government's cited cases do not address

---

[39] *Flores v. Garland*, 72 F.4th 85, 93 (5th Cir. 2023) (applying INA bar).
[40] Doc. 117 at 28.
[41] Doc. 110 at 52–58.

matters of pleading form but, instead, the matter of a statutorily separate review scheme for a certain immigration decision.[42] In contrast, the APA's waiver of sovereign immunity applies to the remedies specified in § 706 of the APA itself. So the government's request to dismiss Counts 9 and 10 on this basis is denied.

### 2. Noninfringement claims seeking equitable relief

Defendants assert sovereign immunity from the noninfringement claims (Counts 4–7 and 12–13). Damages are not at issue, as those claims seek only equitable relief: a declaration of nonliability for trademark infringement, an injunction enforcing that declaratory judgment if necessary, and an order cancelling the registration of certain marks. But that relief would run against the United States, so a waiver of sovereign immunity to that extent is needed.

Plaintiff contends that those claims are within two statutory waivers (those in the APA and the Lanham Act) and a waiver by conduct. The court agrees as to the APA waiver but not as to the other two asserted waivers.

### a. APA waiver of immunity

The noninfringement claims meet the two, textual requirements in 5 U.S.C. § 702's waiver sentence: they seek "relief other than money damages," and they claim that a federal agency, officer, or employee acted or failed to act in some official capacity.

The claims also meet the additional waiver requirements under the Fifth Circuit's *Alabama–Coushatta* decision. First, Shields is a party adversely affected and aggrieved by the military's cease-and-desist orders and requirements of a license, which command Shields to stop selling its relevant goods unless modified to comply with the military's licensing policy.[43] That command is

---

[42] *Hinojosa v. Horn*, 896 F.3d 305, 311 (5th Cir. 2018) (per curiam).
[43] *Consumer Fed'n of Am. v. FTC*, 515 F.2d 367, 369–70 (D.C. Cir. 1975) (holding that a party subject to an agency cease-and-desist order is "adversely affected or aggrieved" within the meaning of § 702).

premised on an assertion of trademark infringement if Shields proceeds without a license.

Second, Shields' noninfringement claims challenge "agency action" within the meaning of the APA for at least two reasons. For one, that term covers a "requirement . . . of a license."[44] An assertion that a person's unlicensed use of a mark would infringe on an agency's trademark rights is, definitionally, a requirement of a license to use the mark.[45]

The complaint alleges that three of the four military branches told Shields that it needs a license to sell merchandise displaying marks registered by those branches:

- The Marine Corps told Shields that it needs a license to sell Marines-themed products[46] and then sent Shields a cease-and-desist letter demanding a halt to unlicensed merchandise sales and sent Amazon a take-down notice for Shields' relevant merchandise.[47]

- The Air Force told Shields that it needs a license to sell products that display a mark registered by that branch.[48]

- The Army directed Shields to remove certain products from stores as unlicensed merchandise and to refrain from selling certain dog tags.[49]

Because those actions assert a requirement of a license for Shields to continue with its desired sales, they are "agency action" under the definition quoted above.

---

[44] 5 U.S.C. § 551(10)(F), (13); *accord id.* § 551(10)(A) (also including a "requirement . . . affecting the freedom of a person," with "person" defined in subsection (2) to include corporations, thus covering an assertion that a corporation must have a license to use a certain mark in commerce).

[45] 15 U.S.C. § 1114(1) (creating infringement liability for use of a registered trademark "without the consent of the registrant").

[46] Doc. 110 at 23 ¶ 80, 24 ¶ 85.

[47] *Id.* at 31 ¶¶ 127–28.

[48] *Id.* at 32 ¶ 132.

[49] *Id.* at 30 ¶ 120; *see id.* at 20 ¶ 68 (earlier requirement of a license to sell goods, consistent with this demand letter); *id.* at 30 ¶ 126.

Moreover, "agency action" also includes an agency "order," which is defined as "the whole or a part" of an agency's final disposition of a matter other than rulemaking, including an order "negative . . . in form."[50] An order to cease and desist from selling unlicensed goods is a negative command disposing of the matter whether, on the agency's view, the recipient may proceed selling its goods as desired. Because the service branches other than the Navy are alleged to have directed Shields to cease selling its unlicensed merchandise bearing military marks, the complaint alleges "agency action" subject to review.

In contrast, the complaint does not allege that the Navy told Shields to cease selling goods with unlicensed marks.[51] The Navy did deny Shields a trademark license. And that licensing decision is challenged here in the licensing claims. But the Navy is not alleged to have asserted that, without a license, Shields' sales would infringe the Navy's trademark rights as opposed to being nonactionable (e.g., as not likely to confuse or as protected by a defense).

The court previously notified Shields of its need to identify such a cease-and-desist order by the Navy to avoid sovereign immunity on the noninfringement claims.[52] And the court gave Shields a chance to amend its complaint, which Shields did.[53] The operative complaint still fails to make a sufficient allegation. So the noninfringement claims against the Navy are dismissed as outside of the APA's waiver of sovereign immunity. (Although the United States Marine Corps is part of the Department of the Navy, which also houses the United States Navy, the two service branches have separate trademark-licensing offices and are thus treated as separate entities for purposes of this litigation.)

---

[50] 5 U.S.C. § 551(6), (13).

[51] Doc. 110 at 32 ¶ 131.

[52] Doc. 106 (Nov. 8, 2023 Hr'g Tr.) at 10 ("I'm not sure I see anything in the plaintiff's chart identifying agency actions or in the plaintiff's exhibits to its preliminary injunction motion that suggests or would show the existence of a cease and desist order by the Navy . . . .").

[53] *Id.* at 10–11 (noting that "maybe you were not intending to include the Navy as one of those service branches that has sent a cease and desist order").

*Alabama–Coushatta*'s last requirement for a waiver of sovereign immunity under § 702 is that, if the cause of action also comes from the APA, the agency action must be "final." That last requirement is not applicable here because the cause of action on the noninfringement claims does not come from APA. It comes from the Lanham Act, with Shields suing for a declaration of no infringement liability under that Act's infringement standards, as limited by statutory and constitutional defenses.

Finally, apart from the APA's waiver of sovereign immunity, the government argues that it has immunity from the noninfringement claims because they fall outside of the six-year statute of limitations stated in 28 U.S.C. § 2401(a).[54] That limitations period is treated as a condition of the United States' waiver of sovereign immunity under the APA.[55] Here, the noninfringement claims complain of agency action within that limitations period as to each of the three remaining service branches.[56] So this condition of the immunity waiver is satisfied.

### b.  Lanham Act waiver of immunity

Shields argues, in the alternative, that a waiver of the government's sovereign immunity from the noninfringement claims is found in the Lanham Act itself. That contention is unpersuasive.

The Lanham Act does expressly waive sovereign immunity to an extent. It provides: "The United States . . . shall not be immune

---

[54] Doc. 117 at 24.

[55] *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021).

[56] This action was filed on December 14, 2021, making the six-year limitations window begin on December 14, 2015. As to the Marine Corps, Shields alleges a 2017 requirement of a license to continue selling Shields' dog tags bearing Marine Corps marks, Doc. 110 at 23–24 ¶¶ 84–85; a cease-and-desist letter sent to Shields in 2019, *id.* at 31 ¶ 128; and a take-down notice sent to Amazon in 2018 for Shields' products, *id.* at 31 ¶ 127. As to the Air Force, Shields alleges a 2017 requirement of a license for Shields' products to use an Air Force logo. *Id.* at 32 ¶ 132. As to the Army, Shields alleges a 2017 demand that Shields remove unlicensed goods from certain stores, *id.* at 30 ¶ 120; *see also id.* at 20 ¶ 68 (allegation of earlier requirement of a license, informing the nature of the 2017 demand letter), and a 2021 direction that Shields could not sell certain unlicensed dog tags, *id.* at 30 ¶ 126. Those alleged agency actions all occurred within the six-year limitations period.

from suit . . . for any violation under this chapter."[57] But that waiver is inapplicable here because Shields is not alleging that the military "violated" the Lanham Act, as if the military was accused of infringing or diluting Shields' own trademarks. The military is accused of overclaiming the scope of its own rights under the Lanham Act. But that is not a Lanham Act "violation."

Second, the Lanham Act independently provides that "[t]he United States . . . shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity."[58] That too does not rise to the level of a clear and unequivocal waiver of sovereign immunity here.

To be sure, the reference to treating the United States in the "same manner" as other litigants could potentially refer to, and then waive, the government's sovereign immunity from suit. In other words, one might view a private party as "subject to" the "provisions" of the Lanham Act in that the party can be sued for a declaratory judgment when it makes concrete infringement accusations creating an Article III case or controversy.[59]

On the other hand, it is also plausible to read "subject to the provisions of this chapter" as referring to the Lanham Act's provisions defining trademark infringement and related torts. On that view, since the Lanham Act itself does not authorize declaratory-judgment actions, the "same manner" provision is not a clear and unambiguous waiver of sovereign immunity from such actions.

On that view, the "same manner" provision simply means that the United States is liable for trademark infringement (or dilution, etc.) in the same manner that private infringers are liable. If the United States is sued for such a "violation," in turn, the Lanham Act's express waiver of sovereign immunity allows that suit.

That fit between those two Lanham Act provisions is natural and makes this reading the better one, or at least equally plausible.

---

[57] 15 U.S.C. § 1122(a).
[58] *Id.* § 1114(1).
[59] *E.g.*, *Amazon.com, Inc. v. Nat'l Ass'n of Coll. Stores, Inc.*, 826 F. Supp. 2d 1242, 1249 (W.D. Wash. 2011).

This reading's more confined scope of the Lanham Act's express waiver provision also eliminates any redundancy with the APA's waiver of sovereign immunity, which (as noted above) extends to Lanham Act causes of action presented in a declaratory posture when the government requires a trademark license or issues an order premised on an assertion of trademark infringement.

Because a waiver of sovereign immunity must be clear and unequivocal, the court is not persuaded by Shields' alternative argument that the Lanham Act waives sovereign immunity here.

### c.  Waiver by conduct

Lastly, Shields argues that, because it is the "substantive defendant" in seeking a declaratory judgment (meaning that it would be the named defendant in a hypothetical infringement action seeking damages), the government has waived sovereign immunity through its conduct of creating this Article III case or controversy. That argument fails. The established rule is that the sovereign immunity of the United States cannot be waived by the actions of its officials.[60]

### B.  Standing for noninfringement claims

The two, new noninfringement claims in the complaint allege that: the marks listed in Exhibits B, C, and D should be cancelled because the agencies committed fraud in the prosecution or renewal of those marks' registration (Count 12),[61] and the marks listed in Exhibit E should be cancelled because they are "insignia of the United States" whose registration is statutorily prohibited (Count 13).[62] The complaint seeks a declaration that Shields' use of any of those marks does not give rise to trademark liability.[63]

For comparison, an originally pleaded claim (Count 7) seeks cancellation of five, specific marks as generic and a declaration of

---

[60] *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 513 (1940).
[61] Doc. 110 at 61–68.
[62] *Id*. at 68–70.
[63] *Id*. at 71.

no trademark liability for using those five terms.[64] And the other, originally pleaded noninfringement claims (Counts 4–6) seek a declaration of no trademark liability because Shields' use of certain marks creates no likelihood of confusion, is fair use, or is protected by the First Amendment or the expressive-works test.

The government contends that Counts 12 and 13 do not present a justiciable case or controversy within the meaning of Article III because Shields has not alleged concrete plans to use the hundreds of marks in Exhibits B, C, D, and E on specific goods that the military has asserted would infringe its trademarks if unlicensed.[65]

The court previously ruled that the noninfringement claims in Counts 4–7 present a concrete dispute creating standing.[66] That is still true of those counts in the newly amended complaint. The complaint alleges that the Air Force, Army, and Marine Corps required a license for Shields to continue selling specific products that it had been selling, which the complaint depicts.[67]

For instance, the complaint alleges that the Marine Corps sent a cease-and-desist order directing Shields to stop selling Marines-themed merchandise, an example of which is shown:[68]



Fig. 1 from Second Am. Complaint (Doc. 110)
(obverse: Marine Corps' emblem, "Marine Sister," and American flag;
reverse: Bible verse, Shields' logo, and Marine Corps' emblem)

---

[64] *Id.* at 45–49, 71 (concerning the marks AIR FORCE, ARMY, MARINE, MARINES, and NAVY).
[65] Doc. 117 at 28–30.
[66] Doc. 61 at 10.
[67] Doc. 110 at 2–3 ¶¶ 2–3.
[68] *Id.* at 2 ¶ 2, 31 ¶ 128.

As to the Army, the complaint similarly alleges that the Army told Shields that it needs a license to continue selling Army-themed products while denying a license for Army-themed products that use Bible verses.[69] As an example, the complaint shows an "Army Mom" dog-tag design:[70]



Fig. 2 from Second Am. Complaint (Doc. 110)
(obverse: "Army Mom," cross, and American flag;
reverse: Bible verse and Shields' logo)

The complaint's first exhibit shows more dog-tag designs made by Shields that contain a Bible verse and a military unit's emblem or designation, such as the following:[71]



Second Am. Complaint, Exh. A (Doc. 110-1) at 9
(obverse: "United States of America," "One Nation Under God" and
American flag; reverse: Bible verse, Shields' logo, and
U.S. Army 3rd Infantry Division emblem)

---

[69] *Id.* at 20 ¶ 68, 22 ¶ 76.
[70] *Id.* at 3 ¶ 2.
[71] Doc. 110-1 (Exh. A).

- 21 -

As to the Air Force, the complaint likewise alleges that the Air Force denied a trademark license while ordering that Shields' un-licensed "Air Force-branded merchandise" be removed from commerce.[72] Although the complaint does not depict a specific dog tag using a mark registered by the Air Force, the complaint describes with specificity the real-world existence of those goods: "Shields dog tags designed for members of the Army or Air Force have displayed 'U.S. Army' or 'U.S. Air Force' and Army or Air Force insignia on one side, with a Bible verse on other side."[73]

Shields does also show its creation of dog-tag products using marks registered by the Navy.[74] But, as noted above, Shields does not allege any Navy order or requirement that Shields receive a license to continue selling its Navy-themed products. The court has thus dismissed the noninfringement claims as to the Navy on sovereign-immunity grounds.

Those allegations plausibly allege an immediate intention and ability for Shields to make and sell substantially fixed designs that the Air Force, Army, and Marine Corps reviewed and asserted would infringe their trademark rights. That establishes a "sub-stantial controversy, between parties having adverse legal inter-ests, of sufficient immediacy and reality," as to create a justiciable infringement dispute.[75]

That justiciable dispute extends to each substantially fixed product design that a military branch is alleged to have reviewed and asserted could not be sold without a license. That category includes (1) the fixed designs depicted in the complaint itself and its first exhibit and (2) the complaint's description of

---

[72] Doc. 110 at 32 ¶ 132 (Air Force assertion that "if a product has any mil-itary logos on them, it must be licensed"); *id.* ¶ 133 (Air Force direction to store to remove all Shields products bearing marks registered by the Air Force); *id.* at 26 ¶ 99 (covering all "Air Force-branded merchandise" in license limitation).

[73] *Id.* at 16 ¶ 52.

[74] *Id.*; Doc. 110-1 (Exh. A) at 7–8.

[75] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (noting that subject-matter jurisdiction is not defeated where threat-eliminating behavior, such as Shields' modification of its designs, is coerced by the opponent).

corresponding, substantially fixed designs that simply substitute one branch's name for another or simply substitute one of eight listed Bible verses.

The ultimate question, then, is whether that category of fixed or substantially fixed designs that a military branch ordered removed from commerce, if unlicensed, corresponds to every trademark whose registrability is challenged in Counts 7, 12, or 13. The court reviews each claim in turn.

### 1. Standing on Count 7 (genericness)

After its dismissal as to the Navy, Count 7 challenges only four marks as generic: AIR FORCE (Reg. No. 2,620,979),[76] ARMY (Reg. No. 3,152,724), MARINE (Reg. No. 6,280,533), and MARINES (Reg. No. 4,707,971). The complaint's identification of substantially fixed, sufficiently disputed dog-tag designs extends to each of those four marks. Shields thus has standing to seek a declaratory judgment and cancellation as to those marks.

### 2. Standing on Count 12 (fraud)

Count 12 alleges that the registration of dozens of trademarks was obtained or renewed through fraud. The complaint itself alleges fraud regarding the Marine Corps' registration of three marks: MARINE MOM (Reg. No. 5,425,473), ONE MIND ANY WEAPON (Reg. No. 4,292,460), and A FEW GOOD MEN (Reg. No. 4,532,685).[77] Exhibits B, C, and D to the complaint use spreadsheets to allege fraud regarding numerous other marks, mostly those of the Marine Corps.

In response to the government's motion to dismiss Count 12 on standing grounds, Shields does not point to any allegation of a substantially fixed, sufficiently disputed product design that uses any mark allegedly obtained through fraud. Shields' response merely refers to the three designs shown in its complaint along

---

[76] Cited in the complaint by its serial number 97,154,951. Doc. 110 at 46.
[77] Doc. 110 at 61–68.

with the eight, concrete substitutions noted in its complaint, all of which were alleged to have been before the military for review.[78]

But none of the dog-tag designs that Shields points to as concrete, and were accused by the military of creating infringement liability, contain the mark MARINE MOM, ONE MIND ANY WEAPON, or A FEW GOOD MEN. Likewise, Shields does not specifically point to any mark in Exhibits B, C, or D that is used on one of the substantially fixed, sufficiently disputed designs alleged in the complaint. It is Shields' job—not the court's job—to marshal its arguments in response to the government's motion to dismiss. Because "standing is not dispensed in gross"[79] and because Shields has not pointed to any specific entry in the complaint or its Exhibits B, C, or D that correspond to a specific design alleged to be substantially fixed and sufficiently accused as infringing by the military, Shields has forfeited for lack of briefing any argument that a concrete, justiciable dispute exists as to any specific mark whose registrability is questioned in Count 12.

Shields does argue that it "has concrete plans to produce in the future" additional designs, implying that its hypothetical future designs would use A FEW GOOD MEN or some other mark challenged in Count 12.[80] But Article III does not allow probabilistic standing based on "some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be."[81] And even if Shields had a concrete plan to use one of the Count 12 marks tomorrow, a justiciable non-infringement dispute would exist only if Shields showed that the military had reviewed the use of that mark and contended that it infringed trademark rights by sending a cease-and-desist order or requirement of a license for that use. It is not enough under Article III, as Shields argues, that there is "a risk" of the government

[78] Doc. 120 at 29–30.
[79] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).
[80] Doc. 120 at 30.
[81] *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (quotation marks omitted).

- 24 -

asserting infringement should Shields produce and sell possible future designs.[82]

Finally, Shields argues that, once there is a justiciable trademark dispute as to any product's use of a given mark, the cancellation of any other mark registered by the same party to the action is available.[83] Even if that reading of 15 U.S.C. § 1119 were plausible, which the court questions, it must be avoided in favor of the narrower, product-specific reading of § 1119 because of the serious constitutional question raised by a statute purporting to authorize a district court to issue relief beyond that necessary to resolve a justiciable Article III case or controversy.[84]

Shields may be able to obtain cancellation of the Count 12 marks through a petition to the Patent and Trademark Office, whose jurisdiction is not bounded by Article III. But this court's jurisdiction is so bounded. Accordingly, Count 12 is dismissed.

### 3.  Standing on Count 13 (insignia)

Count 13 alleges that a multitude of marks registered by the military branches are unregistrable as "insignia of the United States" within the meaning of 15 U.S.C. § 1052(b). In analyzing Shields' Article III standing to press that claim, the question is whether any challenged mark is used on one of the dog-tag designs alleged to be substantially fixed and disputed as infringing by the military.

Only a few of the challenged marks clear that bar. Specifically, the complaint and its Exhibit E challenge the following marks that are adequately pleaded to have been used on a substantially fixed product design whose allegedly infringing nature underlies a military branch's order to cease sales of the product:

---

[82] Doc. 120 at 30–31.

[83] *Id.* at 29.

[84] *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

- The Semper Fidelis eagle-globe-and-anchor mark of the Marine Corps (Reg. No. 3,989,378),[85] which is used on the fixed dog-tag design shown in Figure 1 of the complaint.[86]

- The diagonal-stripes mark of the U.S. Army 3rd Infantry Division (Reg. No. 3,063,281),[87] which is used on the fixed dog-tag design shown in the complaint[88] and its Exhibit A.[89]

- The crossed-swords mark of the U.S. Army 10th Mountain Division (Reg. No. 3,060,370),[90] which is used on the fixed dog-tag design shown in Exhibit A.[91]

Shields has adequately pleaded its standing to contest those three marks' registrability as "insignia of the United States."

But Shields has not pleaded facts showing its standing to obtain judicial review of the registrability of the other marks listed in Count 13. Here, too, Shields' argument that it wishes to include those marks in future product designs does not suffice to show an existing, concrete controversy arising from an assertion by the military of trademark infringement by substantially fixed designs using the mark.[92] So Count 13 is dismissed for lack of standing except as to the three dog-tag designs listed above.

### III. Motion to dismiss for failure to state a claim

Next, the government moves to dismiss certain claims under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim

---

[85] Doc. 110 at 69 ¶ 309. Additional registration numbers for that emblem are given in Exhibit E to the complaint.

[86] *Id.* at 2 ¶ 2.

[87] *Id.* Exh. E at 9.

[88] *Id.* at 12 ¶ 41.

[89] *Id.* Exh. A at 9.

[90] *Id.* Exh. E at 9.

[91] *Id.* Exh. A at 6.

[92] Shields does identify a specific product design, *id.* Exh. A at 8, using the eagle-with-trident insignia of the Naval Special Warfare Command (Reg. No. 3,689,754), which Shields claims is not eligible for registration. *Id.* Exh. E at 2 (additional registration numbers for the mark are listed on the same page of Exhibit A). But, as noted above, Shields has not alleged any accusation by the Navy that such a design would infringe its trademark rights in the mark.

on which relief can be granted. That motion is denied for the reasons stated below.

### A. Cancellation of marks as a remedy on Counts 7 and 13

The Lanham Act allows cancellation of trademark registration as a remedy in "any action involving a registered mark."[93] The court has now ruled that parts of Counts 7 and 13 present a justiciable action under the Lanham Act. And that action is one "involving a registered mark." So § 1119 allows Shields to request cancellation of the relevant marks as a remedy in this action. Defendants' motion to dismiss is thus denied to that extent.

### B. Count 12's allegation of fraud

Defendants move to dismiss Count 12, arguing that Shields fails to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) when alleging fraud in obtaining or renewing trademark registrations. Because Count 12 is dismissed based on lack of standing, the court need not resolve that argument.

### C. Count 13's allegation of unregistrable "insignia"

Insofar as Shields has standing to raise this claim, Count 13 challenges three marks as "insignia of the United States" whose federal registration as trademarks is prohibited:

Semper Fidelis eagle-globe-and-anchor mark of the Marine Corps (Reg. No. 3,989,378)[94]



---

[93] 15 U.S.C. § 1119.
[94] Doc. 110 at 69 ¶ 309.

Diagonal-stripes mark of the U.S.
Army 3rd Infantry Division
(Reg. No. 3,063,281)[95]



Crossed-swords mark of the U.S.
Army 10th Mountain Division
(Reg. No. 3,060,370)[96]



Specifically, § 2(b) of the Lanham Act prohibits registration of any trademark that "Consists of or comprises the flag or coat of arms or *other insignia of the United States*, or of any State or municipality, or of any foreign nation, or any simulation thereof."[97]

Defendants move to dismiss Count 13 as failing to state a viable claim for relief because the term "other insignia of the United States" should be interpreted to mean only marks of "national significance" (argued to include the Great Seal of the United States, the Presidential Seal, and seals of governmental departments), as opposed to marks that identify particular people or agencies within a department of the executive branch (such as the Marine Corps or a particular division of the Army).[98]

Shields responds that "insignia of the United States" makes no distinction between insignia identifying affiliation with the U.S. Department of Defense and insignia identifying affiliation with specific service branches and units within that department.[99] At the least, Shields argues, the nature and significance of the

---

[95] *Id.* Exh. E at 9.
[96] *Id.*
[97] 15 U.S.C. § 1052(b) (emphasis added).
[98] Doc. 117 at 35.
[99] Doc. 120 at 37.

- 28 -

disputed marks (now limited to three) has a factual dimension on which discovery is proper.[100]

The court agrees with Shields that Count 13 states a viable claim for relief. The phrase "other insignia of the United States" has the same meaning today as it did when Congress first included the phrase in the Trademark Act of 1905. It refers to marks identifying a person or group of people with the authority or power of the United States government.

In 1905, federal trademark rights were quite limited. The government was unable to register any trademarks. The insignia exclusion reinforced that limit by barring anyone from claiming exclusive control over the use of federal and other governmental insignia. (Constraints outside of trademark law applied, of course, such as laws against deception.) Lawful uses of those governmental marks were reserved to the public domain.

In the intervening century, federal trademark law expanded. Federal agencies are now statutory "persons" eligible to register marks. But the "insignia" prohibition was retained. So while federal agencies are eligible to register some trademarks, neither federal agencies nor anyone else can register marks identifying a person or group with the authority or power of federal, state, city, or foreign governments. Shields plausibly alleges that the marks here come within that prohibition.

### 1.  History of the "insignia" exclusion

At the turn of the 20th century, all trademark law was state law, sounding in the common law of property and unfair competition.[101] In 1905, Congress acted to create a federal registry of trademarks to provide prima facie evidence of ownership and other enforcement benefits.[102] A person, firm, corporation, or

---

[100] *Id.*

[101] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 5:2 (5th ed. 2024); *see Trade-mark Cases*, 100 U.S. 82, 93 (1879) (holding that Congress lacks authority to criminalize intrastate trademark infringement).

[102] Act of Feb. 20, 1905, §§ 1, 15–20, 33 Stat. 724, 728–29.

association could place its trademark on the federal registry upon certification of its right to use the mark to identify particular goods, the mode in which the mark was affixed to the goods, and the length of time during which the trademark had been so used.[103]

As that scope of registrability shows, no allowance was made for a governmental body to obtain trademark registration. Nor would the government's use of marks to identify its authority or power fall within the merchant-focused definition of a trademark. As the Supreme Court explained in 1911:

> the term [trademark] has been used from a very early date; and, generally speaking, means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others.[104]

As the Court explained, a trademark's function at the time was to "point out distinctively the origin or ownership of the articles to which it is affixed"—tangible goods—not to "convey[] . . . meaning" that "others may employ with equal truth."[105] On that view of a trademark, "[t]here was no way to register service marks"[106]—including marks identifying those who provide military service.

## 2.  Meaning of the "insignia" exclusion

In short, at the time of the 1905 Trademark Act, it was not legally possible for government departments to register their insignia as trademarks, brand names, or service marks. Just as the government could not register those marks, neither could anyone else. Their lawful use was reserved to the public domain.

Section 5(b) of the 1905 Trademark Act thus prohibited registration of any trademark that "Consists of or comprises the flag

---

[103] *Id.* §§ 1–2, 33 Stat. at 724.

[104] *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.*, 220 U.S. 446, 453 (1911) (alteration in original) (internal quotation marks omitted).

[105] *Id.*

[106] McCarthy, *supra* note 100, at § 5:2.

or coat of arms or other insignia of the United States, or any simulation thereof, or of any State or municipality, or of any foreign nation."[107] By preventing any one person from claiming exclusivity in marks that identify a government affiliation, Congress dictated that lawful identification using those marks is saved for the public at large.

Congress acted to that end in § 5(b) by first using the word "insignia," which refers to a mark or design that identifies a person or group of people with some authority, organization, or position. That understanding of the term goes back millennia, as shown by both its etymology and modern definition. *Insignia* is the Latin plural of *insigne*, meaning "a distinctive mark, a badge of office."[108] In ancient Rome, each military legion would have an officer, the *insigniferos*, responsible for carrying and defending the legion's insignia in battle.[109] And the Roman poet Virgil describes the Trojans attempting to deceive the Greeks by using their insignia.[110] In the Middle Ages, English knights identified themselves with insignia on their helmets.[111] And the Continental Army wore colored ribbons and cockades as forms of military insignia.[112]

Consistent with that tradition, a legal dictionary at the time of the 1905 Trademark Act defined *insignia* as "Ensigns or arms; distinctive marks; badges; indicia; characteristics."[113] The Oxford English Dictionary of 1900 defined *insignia* as "Badges or distinguishing marks of office or honour; emblems of a nation, person,

---

[107] Act of Feb. 20, 1905, § 5(b), 33 Stat. at 725. Other provisions in § 5(b) prohibited registration of trademarks that would reach too far into the public domain in other ways, such as marks that are "merely a geographical name or term" or "are descriptive of the goods with which they are used." *Id.* at 726.

[108] *Insigne,* Harper's Latin Dictionary (1907).

[109] *Insignia Militares*, Diccionario histórico enciclopédico 220–21 (Vicenç Joaquín Bastús i Carrera ed., 1830).

[110] Nicholas Horsfall, *Virgil, Aeneid 2: A Commentary* 21 (2008) (translating *Aeneid* bk. 2, at 389).

[111] Barry Jason Stein, U.S. Army Heraldic Crests: A Complete Illustrated History of Authorized Distinctive Unit Insignia, at 3 (1993).

[112] U.S. Army Institute of Heraldry, Officer Insignia of Rank – Origin, https://tioh.army.mil/Catalog/Heraldry.aspx?HeraldryId=15750&Category Id=9171&grp=2&menu=Uniformed%20Services.

[113] *Insignia*, Black's Law Dictionary (1st ed. 1891).

etc."[114] That dictionary also records use of the term to refer to personal insignia as far back as 1648.[115] And Webster's Dictionary in 1917 defined *insignia* as "Distinguishing marks of authority, office, or honor; badges; emblems."[116] All of those definitions support the conclusion that the public at the time of the statute's enactment understood *insignia* to refer to a mark or symbol identifying a person or group of people with some authority, organization, or position.

The Act then specified what types of insignia were reserved to the public domain: those "of the United States," "of any State or municipality," or "of any foreign nation." The unifying feature of those entities is their governmental nature—their right to exert authority and power on behalf of the public. The concept that associating with such a public authority is a freedom of the public at large, not whatever company does it first, explains the distinction in Congress's treatment of governmental insignia and more insular insignia, like familial marks.

That understanding of "insignia of the United States" as referring to a mark identifying association with federal authority or power is justified, not only by dictionary definitions and statutory context, but also by the canon of ejusdem generis. The linkage between the two statutory examples of a "flag" or "coat of arms" of a specified government and the residual category of any "other insignia" of a specified government is that all three items represent official authority or power—what makes a governmental entity *governmental*.

Defendants argue that the ejusdem generis canon must impute some narrower scope to the linkage of "other insignia" with a flag and a coat of arms. But any narrower linkage would obscure the deliberate breadth of the term "insignia." As the Supreme Court has explained, the canon's limits are exceeded where it is invoked

---

[114] *Insignia*, Oxford English Dictionary (1st ed. 1900).
[115] The cited example from 1648 is "All the *Insignia* of the late Vice-Chancellor and Proctors. *Mercurius Academicus No. 1. 3.*" *Id.*
[116] *Insignia*, Webster's Dictionary (3rd ed. 1917).

"to create ambiguity where the statute's text and structure suggest none."[117]

For instance, in *United States v. Alpers*, the Supreme Court held that the canon was not properly used to limit "other matter of indecent character" in a criminal statute to only visual material simply because none of the statutorily listed examples were purely auditory media.[118] The Court reasoned that the phrase "matter of an indecent character" was chosen to address precisely that general concept and that the ejusdem generis canon "cannot be employed to render general words meaningless."[119] So the statute was properly read as extending to purely auditory media.

Here, the centuries-old understanding of "insignia," together with the statutory context and purpose reviewed above, give little reason to doubt that Congress chose that term to convey its ordinary meaning: a symbol identifying association with some authority, organization, or position—here, one of the listed governments. The government-insignia clause thus reserves, as outside trademark's first-come-first-served exclusivity, the right to use a mark or symbol identifying a person or group of people with the authority or power of a specified government.

Trademark law has changed much in the past century. The Lanham Act of 1946 replaced the Trademark Act of 1905. But Congress maintained the rule against registration of a trademark in the insignia of a specified government.[120] After 1999, the Lanham Act now defines a "person" who can register trademarks to include the United States and any agency thereof.[121] But the question of *who* does not answer the question of *what*. And the government-insignia prohibition remains.

---

[117] *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008).
[118] 338 U.S. 680 (1950).
[119] *Id.* at 682.
[120] 15 U.S.C. § 1052(b).
[121] *Id.* § 1127 (modified as relevant here in Pub. L. No. 106-43, § 4, 113 Stat. 218 (1999)). Federal agencies previously argued that they were eligible to register trademarks as organizations capable of suing and being sued, within the meaning of § 45 of the Lanham Act.

The Lanham Act also now generally allows the registration of service marks and brand marks. Indeed, the primary drafter of the Lanham Act cited that expansion as the reason for dropping a separate prohibition against the registration of marks identifying fraternal societies and other institutions. Earlier trademark law, Edward Rogers explained, "by excluding from registration service marks, and the marks of associations required a similar prohibition of the registration by other people. Now, this draft permits those marks to be registered."[122] But the Lanham Act treats government insignia differently, by continuing the prohibition on their registration as trademarks. And the evolution of other areas of trademark law gives the court no license to undo a prohibition that Congress chose to retain.

### 3. Application of the "insignia" exclusion

Shields challenges, as relevant here, three marks registered by the military branches as insignia of the United States. Factual development as to the nature and significance of those marks may color ultimate application of that standard. But because the marks are emblems of units of the federal military, they are plausibly alleged to be marks identifying groups of people with the authority or power of the United States.

One relevant feature of the marks may be that the military uses force on behalf of the public at large; it does not merely offer services that an individual may voluntarily accept or refuse. One tribunal applying the insignia provision has drawn that distinction. The Trademark Trial and Appeal Board contrasted an emblem of "national authority" with an optional, recreational visit offered by the National Park Service.[123] That distinction supports

---

[122] Trade-Marks: Hearings Before the Comm. on Patents Subcomm. On Trade-Marks, 75th Cong. 78 (1938).

[123] *In re U.S. Dep't of the Interior*, 142 U.S.P.Q. 506, 507 (T.T.A.B. 1964). That distinction may also explain fact patterns like *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233 (S.D.N.Y. Bankr. 2010), which did not concern the "insignia" trademark prohibition but did recognize the City of New York's protectible interest in the trade name "Tavern on the Green" as a restaurant service mark.

Shields' position here. The military's use of force is a traditional public function.[124]

In a later decision, the Trademark Trial and Appeal Board opined that the registrability line is whether a mark represents "the authority of the government or the nation as a whole."[125] But even the Board's earlier decision reasoned that insignia of just one department in the executive branch were unregistrable, thus rejecting the notion that only marks connoting the government as a whole are covered by that exclusion.[126] In any event, there is at least a factual dimension to whether and to what extent marks identifying military affiliation *do* connote the authority of the federal government as a whole.

Moreover, the Board's later, narrower view would mean that the insignia of a State *and its municipalities* (i.e., its subdivisions) would be covered, but only the insignia of the federal government as a whole *and not its subdivisions* would be covered. The discordance generated by that interpretation is also a strike against it.

The Board's later reading apparently failed to move Congress as well. During the pendency of that tribunal's proceedings, Congress enacted a law, now codified at 10 U.S.C. § 8921(a), declaring: "The seal, emblem, and initials of the United States Marine Corps shall be deemed to be insignia of the United States." If the facts developed in this case show that the eagle-globe-and-anchor mark challenged by Shields here is an "emblem . . . of the United States Marine Corps," that alone would make it an unregistrable "insignia of the United States."[127]

---

[124] *Dobyns v E-Systems, Inc.*, 667 F2d 1219, 1225 (5th Cir. 1982) (holding that a private company acting as "peacekeeper" in the Sinai performed a public function traditionally reserved to the government).

[125] *U.S. Navy v. U.S. Mfg. Co.*, 2 U.S.P.Q.2d 1254, 1257 (T.T.A.B. 1987).

[126] *U.S. Dep't of the Interior*, 142 U.S.P.Q. at 507.

[127] *See U.S. Mfg.*, 2 U.S.P.Q.2d at 1254-55. The Marine Corps' disputed mark (Reg. No. 3,989,378) was registered in 2011, after that legislation. That statute then goes on to create trademark-like protections for the Marine Corps' seal, emblem, name, and initials by prohibiting the unlicensed use of those marks in a manner reasonably tending to show Marine Corps endorsement, with injunctive relief available. 10 U.S.C. § 8921(b)–(c).

Each of the three marks whose registrability Shields has standing to contest under § 1052(b) is plausibly alleged to be a mark identifying a person or group with the authority or power of the federal government. Shields thus states a legally viable claim for relief as to those marks. The parties may engage in discovery on the history and understanding of those marks, to present a complete factual record for resolution of this claim on summary judgment or at trial.

### Conclusion

For the reasons given above, defendants' second motion to dismiss plaintiff's claims (Doc. 117) is granted in part and denied in part. With the case now past the pleading stage, plaintiff bears the burden to prove and not just allege all facts necessary to show the court's jurisdiction and plaintiff's entitlement to relief. So discovery is now open as to all claims, which stand as follows:

| Count | Description | Ruling |
|---|---|---|
| 1 | Licensing—Free Speech Clause | Dismissed as to damages only; otherwise live |
| 2 | Licensing—Free Exercise Clause | Dismissed as to damages only; otherwise live |
| 3 | Licensing—Establishment Clause | Dismissed |
| 4 & 6 | Noninfringement—expressive work/ free speech | Dismissed as to the Navy; live as to substantially fixed designs underlying other branches' orders |
| 5 | Noninfringement—no likely confusion/fair use | Dismissed as to the Navy; live as to substantially fixed designs underlying other branches' orders |
| 7 | Noninfringement—generic mark | Dismissed as to the Navy; live as to substantially fixed designs underlying other branches' orders |
| 8 | Licensing—RFRA | Dismissed as to damages and third parties' rights only; otherwise live |

| 9 | Licensing—APA vacatur of actions contrary to law | Live |
| 10 | Licensing—APA vacatur of actions beyond statutory power | Live |
| 11 | Licensing—APA arbitrary-and-capricious claim | Dismissed |
| 12 | Noninfringement—fraudulent procurement | Dismissed |
| 13 | Noninfringement—insignia of the United States | Live as to one Marine Corps and two Army marks on the designs cited above; otherwise dismissed |

*So ordered by the court on May 31, 2024.*

J. CAMPBELL BARKER
United States District Judge